Elizabeth Mikesell, Esq.
NV Bar No. 8034
Peter Aldous, Esq.
NV Bar No. 11346
Legal Aid Center of Southern Nevada
725 E. Charleston Blvd.
Las Vegas, NV 89104
(702) 386-1533
EMikesell@lacsn.org
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **KIM ROBINSON, BRADLEY SKOUGARD, DESIREE SKOUGARD, TAMMY SANTORII, ARTHUR WHITNEY, MICHELLE HINDS, AND BRADLEY HINDS on behalf of themselves, and on behalf of all other similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**D.R. HORTON, INC., and DHI MORTGAGE COMPANY, LTD.**<br><br>**Defendants.** | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Kim Robinson, Bradley Skougard, Desiree Skougard, Tammy Santorii, Arthur Whitney, Michelle Hinds, and Bradley Hinds (together, "Plaintiffs," or "Ms. Robinson," the "Skougard Family," the "Santorii-Whitney Family," and the

"Hinds Family") individually, and on behalf of all others similarly situated (the "Class" or "Class Members"), file this Class Action Complaint against Defendants D.R. Horton, Inc. ("DR Horton"); and DHI Mortgage Company, Ltd. ("DHI Mortgage") (together, "Defendants"), as follows:

## I.  **INTRODUCTION**

1.      Defendant D.R. Horton, one of the country's largest home builders, operates a deceptive bait-and-switch scheme that conceals the true monthly cost of purchasing its homes from unsuspecting homebuyers. This deception makes D.R. Horton's homes appear more affordable than competitors' properties, while enabling homebuyers to qualify for loans on homes that cost more than they understand they can afford. To carry out its scheme, D.R. Horton works with its "preferred" mortgage lender, DHI Mortgage, to entice prospective homebuyers—predominately middle- and working-class Americans—by promising them low, affordable monthly payments. In reality, Defendants create artificially low monthly mortgage payment quotes by deliberately including only a fraction of required property taxes in their payment calculations, while knowingly excluding the remaining taxes. Through this "Monthly Payment Suppression Scheme," D.R. Horton and DHI Mortgage mislead homebuyers into believing their total monthly housing costs will fit within their monthly budget. But Defendants have actual knowledge of the true property tax amounts throughout the entire home sales and financing process, and they know

what homebuyers' monthly payments will actually be; however, they prominently and repeatedly center the suppressed monthly payment in all the paperwork provided to homebuyers. It is not until well after closing that homebuyers learn the truth, when their monthly payments increase by hundreds of dollars. By this time, DHI Mortgage has transferred the loan, and a new mortgage servicer delivers the bad news.

2.    The surprise increase in these homebuyers' monthly payments causes serious hardship. These homebuyers must now scrape together hundreds more dollars every month to stay current, potentially risking foreclosure. And the overall value of their homes is impacted by the true cost of the property taxes. Deepening the injury, many of Defendants' customers are first time homebuyers on tight budgets, including participants in the Federal Housing Administration's (FHA) mortgage program for working- and middle-class Americans and veterans participating in the Veterans' Administration's (VA) mortgage program.

3.    Defendants' unfair and deceptive scheme enables them to market their homes as more affordable than competitors' properties through artificially low monthly payment quotes. Typically, a monthly mortgage payment consists of principal, interest, taxes, and insurance. Because homebuyers make purchase decisions based on this total monthly payment amount, Defendants can manipulate the disclosed tax component to make higher-priced homes appear affordable. For example, if a homebuyer had a $2,500 a month budget to cover all four components

of a monthly mortgage payment, using a lower tax amount allows Defendants to capture a larger share of that homebuyer's budget for repayment towards the loan principal.

4.     Defendants are able to obscure their misleading property tax estimates from borrowers because of their integrated business model, which allows for the knowing cooperation of the home builder and seller, D.R. Horton, and its "preferred" mortgage lender, DHI Mortgage. By working together, Defendants have devised uniform marketing practices, in which their sales agents focus homebuyers on artificially suppressed monthly payments, a tactic that flows through every step of the process, from the initial pitch to closing. Defendants jointly profit from the scheme, through increased home prices and increased fees charged as a percentage of home price. Consumers lose substantially. They overpaid for their homes and now must pay substantially more out of pocket each month than they were promised.

5.     For example, Defendants promised the Skougard Family a monthly payment of $2,198.77. Based on this payment, the Skougard chose a D.R. Horton home with a DHI Mortgage loan because the monthly payment was—according to Defendants—lower than other homes with similar sales prices. But, less than a year after closing, the Skougard Family payment skyrocketed from $2,198.77 to $2,717.88 per month when the new servicer conducted an escrow analysis that

included all of their property taxes as well as the amounts the Skougard Family now had to cover for back taxes due to this scheme.

6.    Similarly, Defendants promised the Santorii-Whitney Family a monthly payment of $2,878.57. Based on this payment, the Santorii-Whitney Family chose a D.R. Horton home with a DHI Mortgage loan because the monthly payment was—according to Defendants—lower than other homes with similar sales prices. But, less than a year after closing, the Santorii-Whitney Family payment skyrocketed from $2,878.57 to $3,968.84 per month when the new servicer conducted an escrow analysis that included all of their property taxes as well as the amounts the Santorii-Whitney Family now had to cover for back taxes due to this scheme.

7.    On behalf of those victimized by Defendants' Monthly Payment Suppression Scheme, Plaintiffs bring this class action lawsuit. Plaintiffs seek redress for Class Members, who are all homebuyers who purchased their D.R. Horton homes with mortgages originated by DHI Mortgage that included suppressed estimated taxes in the monthly payment (referred to herein as "Homebuyers"), and a subclass of Homebuyers with FHA mortgages ("FHA Homebuyers"). Plaintiffs seek relief including but not limited to damages, disgorgement of profits from Defendants for this illegal scheme, and injunctive relief to ensure that Defendants comply with the law and cease preying on unsuspecting buyers seeking their part of the American dream.

## II.    JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d) of the Class Action Fairness Act because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and it is a class action in which the parties are minimally diverse.

9.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action is brought by Plaintiff pursuant, inter alia, to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961.

10.     Minimal diversity exists. The Defendants are incorporated in Texas and Plaintiffs are citizens of Nevada.

11.     This Court has personal jurisdiction over Defendants. Defendants conduct substantial business in this District, maintain registered agents in this state, have sufficient contacts with this District, and otherwise avail themselves of the markets in this District.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), specifically, because the actions giving rise to this lawsuit occurred in Clark County, Nevada.

## III.    PARTIES

13.     Plaintiff Kim Robinson is a natural person living in Las Vegas, Nevada. At all material times hereto, Kim Robinson was a resident of Nevada.

14.    Plaintiff Bradley Skougard is a natural person living in Pahrump, Nevada. At all material times hereto, Bradley Skougard was a resident of Nevada.

15.    Plaintiff Desiree Skougard is a natural person living in Pahrump, Nevada. At all material times hereto, Desiree Skougard was a resident of Nevada.

16.    Plaintiff Arthur Whitney is a natural person living in Las Vegas, Nevada. At all material times hereto, Aurthur Whitney was a resident of Nevada.

17.    Plaintiff Tammy Whitney is a natural person living in Las Vegas, Nevada. Tammy Whitney married Arthur Whitney in 2025 and changed her last name. At the time of the subject real estate transaction, Tammy Whitney was legally named Tammy Santorii. At all material times hereto, Tammy Whitney was a resident of Nevada.

18.    Plaintiff Bradley Hinds is a natural person living in Pahrump, Nevada. At all material times hereto, Bradley Hinds was a resident of Nevada.

19.    Plaintiff Michelle Hinds is a natural person living in Pahrump, Nevada. At all material times hereto, Michelle Hinds was a resident of Nevada.

20.    Defendant D.R. Horton, Inc.:

    a.    D.R. Horton is the largest homebuilding company in the United States as measured by the volume of home sales closed and revenue. D.R. Horton constructs and sells homes through its operating divisions in 125 markets across 36 states, primarily under the names of D.R. Horton,

America's Builder, Emerald Homes, Express Homes and Freedom Homes.

b. D.R. Horton's principal place of business is 1341 Horton Circle, Arlington, Texas 76011. For citizenship purposes, D.R. Horton is a citizen of the State of Texas.

c. At all times material hereto, D.R. Horton operated as a home builder in Nevada, buying, selling, and developing real estate throughout the state including within this district. DR Horton has purposefully availed itself of Nevada law and routinely profited from doing business in Clark County and under the laws of the State of Nevada. Accordingly, DR Horton is subject to specific jurisdiction in this District.

21. Defendant DHI Mortgage Company, Ltd. (hereinafter "DHI Mortgage"):

a. DHI Mortgage is a wholly owned subsidiary of D.R. Horton.

b. DHI Mortgage's principal place of business is 1341 Horton Circle, Arlington Texas 76011. For citizenship purposes, DHI Mortgage is a citizen of the State of Texas.

c. At all times material hereto, DHI Mortgage served as a mortgage loan originator across the country, serving primarily or exclusively as the mortgage lender for DR Horton real estate transactions.

8

d.  DHI Mortgage has originated thousands of loans across the state of Nevada including within this district. DHI Mortgage has purposefully availed itself of Nevada law and routinely profited from doing business in Clark County and under the laws of the State of Nevada. Accordingly, DHI Mortgage is subject to specific jurisdiction in this District.

## IV.   GENERAL FACTUAL ALLEGATIONS
### a.   Defendants Market and Sell Homes and Mortgages to Homebuyers.

#### i.   D.R. Horton Sells Newly Constructed Homes to Homebuyers.

22.    Defendant D.R. Horton is the largest homebuilding company in the United States. D.R. Horton's common stock is included in the S&P 500 Index and listed on the New York Stock Exchange (NYSE) under the ticker symbol "DHI." D.R. Horton's business operations include homebuilding, rental, a majority-owned residential lot development company (Forestar Group Inc.), financial services, and other related activities.

23.    D.R. Horton has established itself as the dominating builder in the starter home market or as D.R. Horton refers to it, the "express" home space.[1] D.R.

---

[1] D.R. Horton, *Home Series*, https://www.drhorton.com/home-series

Horton first rolled out its targeted starter home in 2015 and since then this product has become the company's primary driver of profits.[2]

24.    D.R. Horton typically buys large parcels of land to develop as residential neighborhoods, using its in-house team of agents to sell to prospective buyers.

25.    According to its corporate filings, D.R. Horton's "primary focus [is] on the first time and first time move-up homebuyer, which account for the majority of [its] home closings." D.R. Horton 2024 Form 10-K. For the year ended September 30, 2024, D.R. Horton's homes had an average closing price of $378,000. *Id.*

### ii.  DHI Mortgage Provides Mortgage Financing, Including FHA, VA, and Conventional Mortgage Loans, to Consumers Buying D.R. Horton Homes.

26.    A substantial majority of consumers buying a D.R. Horton home obtain their mortgage loans from DHI Mortgage. For the year ending September 30, 2024, DHI Mortgage provided mortgage financing services for 78% of the 89,690 homes closed by D.R. Horton's homebuilding operations. And nearly all of DHI Mortgage's business involves originating loans for DR Horton properties.

27.    DHI Mortgage originates conventional loans, largely originated pursuant to Fannie Mae and Freddie Mac guidelines; loans insured by the Federal

---

[2]Builder, *Why D.R. Horton's Express Homes are a Success* (Apr. 29, 2015), https://www.builderonline.com/money/profits/why-d-r-hortons-express-homes-are-a-success_o.

Housing Administration (FHA) and subject to FHA guidelines; and loans insured by the Veterans' Administration (VA) and subject to VA guidelines.

28.    The largest portion Defendants' mortgage loans are made through the FHA program. For example, in 2024, 43.08% of DHI Mortgage's 70,690 loan originations were through the FHA program.[3] The second largest portion of the loans are conventional mortgages (38.4% in 2024), and the third largest is VA loans (17.57% in 2024).[4]

b. **Defendants Know that the Total Monthly "PITI" Payment Is a Key Driver in Homebuyers' Home-Buying Decisions, and to Attract Homebuyers, Engage in Their Monthly Payment Suppression Scheme.**

29.    When looking to buy a home, the price of the home is a major consideration. But for most Homebuyers, the total monthly housing payment is particularly material.

30.    For nearly all mortgages, the monthly mortgage payment consists of four components known as "PITI": loan principal (P); interest on the loan (I); property taxes (T), and homeowner's insurance (I). The principal and interest payments get applied to the loan itself, and the property taxes and insurance

---

[3] See, Origination Data, *DHI Mortgage Company Ltd. Rates, Fees & Info*, https://originationdata.com/institution/5493001SXWZ4OFP8Z903#:~:text=Showing%201%20to%204%20of,15%20Year%2C%20with%20501%20originations (last visited Nov. 10, 2025).
[4] *Id.*

payments are deposited into an escrow account. Accordingly, they are referred to as the escrow payment.[5]

31.     In making homebuying decisions, Homebuyers focus on the monthly payment as a whole to determine if they can afford a home, not the amounts of the individual PITI components. For example, two $300,000 homes in different tax jurisdictions could result in vastly different monthly payments because the property tax component alone can vary dramatically. Similarly, a Homebuyer with a $2,500 monthly budget can afford a more expensive home in a low-tax jurisdiction than in a high-tax area, since the lower property taxes keep the total monthly payment within their budget constraints.[6]

32.     Understanding this dynamic, Defendants seek to maximize the price they receive for their homes while ensuring they appear to offer monthly payments within Homebuyers' budgets.

33.     Because Defendants market to first time Homebuyers and others with more limited means, Defendants understand that monthly payment affordability is these Homebuyers' primary concern. Defendants' marketing strategy emphasizes low monthly payments and affordability to attract Homebuyers. In reality,

---

[5] Escrow payments can also include homeowners' association fees, mortgage insurance, and other amounts.
[6] https://itep.org/housing-affordability-and-property-taxes-how-to-actually-move-the-needle/;
https://www.riskwire.com/how-property-taxes-shape-home-values-and-affordability/

Defendants systematically work together to obscure the true cost of the home from Homebuyers by including only a fraction of the required property taxes in the Homebuyers' monthly PITI payment.

34.    Defendants execute this scheme through a deliberate bait-and-switch, designed to avoid detection until after purchase. Specifically, in calculating the estimated escrow amount in the initial payment disclosures, DHI Mortgage creates two separate escrow estimates. First, Defendants share a "Suppressed Estimate" with Homebuyers that uses the low property tax assessment for the unimproved land before D.R. Horton built the home. Defendants know that this Suppressed Estimate is not correct for the property after the home is built, but rather, dramatically, and falsely depressed. Second, Defendants create an internal "True Estimate" that reflects the substantially higher property taxes that will actually apply to the completed, improved property. While the "True Estimate" is contained in some misleading documents, Defendants do not use it to calculate the Homebuyer's monthly payment. Instead, Defendants quote the Homebuyer an artificially suppressed monthly payment based on the Suppressed Estimate that is hundreds of dollars lower than what they will ultimately be required to pay each month.

35.    Not only do Defendants use the incorrect Suppressed Estimate when DHI Mortgage makes the initial quotes to the Homebuyers, Defendants continue using that Suppressed Estimate in all paperwork through closing. And DHI

Mortgage uses that Suppressed Estimate when setting up the initial escrow account, contrary to both the intent and requirements of federal law.

36. Defendants know that the Suppressed Estimate reflects an amount that is consistent with then-current local actual property tax records for the unimproved land. They also know that the taxing authority will reassess the property later (often months later), and at that point, the Homebuyer will be responsible for a monthly property tax payment equivalent or very close to the True Estimate. At some point after the reassessment, the taxes become due at the new substantially higher amount, which the new servicer pays out of the escrow account. But because the escrow account was not calculated based on the True Estimate, when the new taxes are paid there is a substantial shortfall in the account. Thereafter, the servicer will conduct a new escrow analysis, requiring the Homebuyer to pay not just the higher amount, but also the shortfall, and a new substantially higher cushion. For the Homebuyer, this looks like a sudden, dramatic increase in their regular monthly payment.

37. Through their Monthly Payment Suppression Scheme, Defendants systemically cut the amount escrowed for property taxes by up to 80% annually. For example, DHI Mortgage might include in the escrow payment taxes of $1,500 per year instead of a good faith and legally required estimate of $7,500 per year that it reasonably anticipates will be charged, based on other homes in the DR Horton development and the area generally, as well as its experience in the industry. The

14

end result is that the monthly payment estimate is off by up to $500 per month or $6,000 per year—plus any extra cushion the servicer can collect to ensure the escrow account is not underfunded and any amount necessary to cover any shortfall.

38.    The Monthly Payment Suppression Scheme benefits both Defendants by allowing them to close more sales and loans and generate more revenue. Meanwhile, Homebuyers suffer when their payments skyrocket well after they've committed to the home, and they are forced to scrape together enough money to keep their family's home or risk foreclosure.

39.    The mortgage lending and servicing industry is well-aware of the problems that occur, including increased risk of foreclosure, when there has been an escrow shortage. This is why, when lenders set up an escrow account, they are required to escrow the full amount of the taxes using a true, good faith estimate and the standard industry practice is to include a "cushion" in monthly escrow payments to guard against any surprises.

**c.    <u>DR Horton and DHI Mortgage Work Together to Carry Out Their Monthly Payment Suppression Scheme.</u>**

40.    Defendants have been successful in carrying out their Monthly Payment Suppression Scheme because of their partnership.

41.    Defendants advertise an appealing and easy "one-stop shop" for home buyers. Defendants market primarily to first-time homebuyers with moderate

incomes. Together, Defendants make affordability, and specifically, the monthly payment, a key part of their marketing strategy. And Defendants lean on Homebuyers' inexperience in purchasing homes by designing a one-stop shopping process that funnels Homebuyers through to closing in a way that causes them to never feel the need to seek out any sort of independent experienced lenders and agents who could detect the Scheme.

42.    DHI Mortgage's Facebook page promises: "From finding the right D.R. Horton home, to financing with DHI Mortgage and closing with DHI Title, we're with you every step of the way."[7]

### i. Defendants Employ an Integrated Marketing Strategy to Attract Prospective Homebuyers by Touting Affordability.

43.    DHI Mortgage and DR Horton work together to market their homes and loans to Homebuyers. They have a coordinated advertising strategy designed to promote both services, regardless of which Defendant is doing the advertising. In addition to nationwide advertising, throughout the class period, Defendants created social media pages and accounts for various geographic areas in which they have homes for sale, and, together, they created ads that appeal to prospective Homebuyers by promoting their lending services and their ability to meet borrowers' budgets.

---

[7] November 6, 2025, Post, https://www.facebook.com/DHIMortgage.

44.    For example, D.R. Horton posted the following advertisement on a Facebook page created for the Las Vegas area, with a link to DHI Mortgage's website:



45.    In other advertisements, Defendants, and in particular, DHI Mortgage, appeal to those just entering the home buying process for the first time, by providing simple explanations and tips about home buying, reflecting an understanding that

prospective Homebuyers may have concerns about affordability. For example, DHI Mortgage ran promotions on Facebook in January 2025, providing advice to homebuyers in the form of a multi-step process, including "Step #2 – Know what you can afford" and "Step #3: Create a solid budget."

46.    In addition to online advertising on Facebook, Instagram, and other social media sites, as well as through the MLS listing service and real estate sites such as Zillow, D.R. Horton conducts local advertising to alert consumers of its new residential developments and the range of homes for sale. These ads included flyers, signage, and placement in local media.

47.    Often when D.R. Horton runs advertisements, it includes a link or QR code to direct consumers to its website, where prospective Homebuyers can see more information about the homes for sale in their communities. When prospective Homebuyers visit those pages, they find not only information about the homes, but also advertising for DHI Mortgage, including being directed to a page that touts benefits for Homebuyers, which DHI Mortgage and DR Horton jointly publish. There, consumers will see that DHI Mortgage and DR Horton are working together as well as the possible estimated monthly payment associated with the home, as shown below:

1

2

3

4

5

6

7

8

9

10

11



12   48.   From their Texas headquarters, and throughout the class period,

13   Defendants have communicated with one another and with their various

14   representatives in Texas and around the country to design advertisements similar to

15   those described in the preceding paragraphs and to disseminate them over interstate

16   wires to Homebuyers around the country. Each Defendant disseminated the ads with

17   the shared goal of attracting Homebuyers to purchase D.R. Horton homes with funds

18   borrowed from DHI Mortgage and did so while knowing that they would be

19   engaging in the Monthly Payment Suppression Scheme.

20

49.    Once prospective Homebuyers are interested in a D.R. Horton property, they can contact D.R. Horton through online forms or by phone and wait for D.R. Horton to contact them after completing a form along the lines of the above. From its Texas headquarters, D.R. Horton oversees a large sales staff based around the country, where it has new residential developments with homes for sale. D.R. Horton trains its sales staff to assist Homebuyers with their questions and help them make appointments to view homes. In so doing, D.R. Horton ensures that even those who have not yet obtained a real estate agent are immediately put on a path to private appointments to view homes and obtain financing from DHI Mortgage.

50.    During the initial interactions with prospective Homebuyers, D.R. Horton directs its sales personnel to focus on affordability and one-stop shopping, touting that D.R. Horton can assist them every step of the way. Upon information and belief, D.R. Horton and DHI Mortgage agreed that D.R. Horton's sales personnel should emphasize how their "preferred" partner, DHI Mortgage, offers deals for Homebuyers through its lending program. When performing intakes, D.R. Horton sales representatives ask how much Homebuyers are paying per month for housing.

51.    Once D.R. Horton learns the prospective Homebuyer's target monthly payment, D.R. Horton schedules appointments to show homes, schematics, or model

homes in their portfolio for which it knows DHI Mortgage will be able to design a lending package that appears to fit with the Homebuyer's monthly budget.

> ### ii. Once Prospective Homebuyers Are Interested in a Property, Defendants Prepare Misleading Estimates that Suppress the True Monthly Cost.

52.     When a prospective Homebuyer expresses an interest in moving forward and looking at homes or learning more about DHI Mortgage's options, D.R. Horton works with DHI Mortgage to design information for the Homebuyer to show how the home will fit into their budget, systemically employing the Monthly Payment Suppression Scheme to make the house seem more affordable than it is.

53.     While many buyers rely on lenders they find through personal referrals or their own real estate agent, Defendants know and intend for their business model to result in Homebuyers contracting with DHI Mortgage without looking for an independent lender. To further this scheme, D.R. Horton and DHI Mortgage work together to present false monthly payment projections, which appear to reflect a good deal, making it so these Homebuyers have little reason to shop around.

54.     In connection with open houses, showings, and appointments, D.R. Horton often presents prospective Homebuyers with more information on financing through DHI Mortgage, and assures them that with DHI Mortgage, the total monthly payment on the house will fit into their budget.

55.    If, for example, the starter express series home in a development sells for $400,000 with a DHI Mortgage estimated monthly payment of $2,600, but the prospective Homebuyer tells D.R. Horton that they can afford $3,000 per month, D.R. Horton will then take the Homebuyer to view an elevated model that would max out the prospective Homebuyer's budget, even if Defendants will need to employ the Monthly Payment Suppression Scheme to do so.

56.    To prepare these false monthly PITI payment projections, DHI Mortgage, with agreement from D.R. Horton, uses the Suppressed Estimate when calculating the monthly payment, even though it has the substantially higher True Estimate in hand. In so doing, Defendants create a monthly payment estimate that appears to fit in the prospective Homebuyer's budget, while allowing D.R. Horton to capture more of the prospective Homebuyer's budgeted monthly payment in the form of principal, and by extension, charge a higher amount for the home. Defendants transmit these false PITI payment projections to one another and to prospective Homebuyers using interstate wires.

57.    Following Defendants' training and directives, D.R. Horton sales agents around the country communicate these artificially low monthly payments and other home buying information to prospective Homebuyers, sometimes in person and sometimes over the phone or via email.

58.     When the prospective Homebuyer decides to move forward, D.R. Horton's sales agents refer them to DHI Mortgage.

### iii. Defendants' Integrated Business Model Allows Them to Obscure Their Unfair and Deceptive Practices During the Initial Loan Application Process and Through Closing.

59.     After the Homebuyer expresses interest in a home and begins working with DHI Mortgage for a loan, D.R. Horton offers a series of incentives, such as $10,000 towards closing costs, new appliances, blinds, and even a rate buy-down to entice the buyer to use DHI Mortgage.

60.     DHI Mortgage and D.R. Horton work together, and in most instances, with D.R. Horton's subsidiary title company, to complete the uniform disclosures and other closing documents. Because each of these companies are aware of and participate in the Monthly Payment Suppression Scheme, the artificially low monthly payment is repeatedly confirmed to the Homebuyer throughout the multi-step loan application and closing process.

61.     **Step 1: Application and Approval.** The Homebuyer, together with DHI Mortgage and upon the recommendation of the D.R. Horton sales representative, completes a loan application, providing detailed financial information. DHI Mortgage exchanges these application documents between its Texas headquarters and local affiliates using interstate wires, typically through DocuSign in California or other third-party e-signature vendors. Shortly thereafter,

1    DHI Mortgage runs credit checks over interstate wires and reviews the application.

2    If lending standards are met, DHI Mortgage pre-approves the Homebuyer for the

3    loan. From its Texas headquarters, DHI Mortgage uses the interstate wires to

4    transmit the approval to D.R. Horton and to the Homebuyer.

5    62.    **Step 2: Initial Loan Estimate.** DHI Mortgage then prepares and

6    provides the Homebuyer with a "Loan Estimate." Importantly, the Loan Estimate

7    prominently displays the artificially low monthly payment, created using the

8    Suppressed Estimate, which matches the Homebuyer's budget and conforms to the

9    payment discussed with the D.R. Horton sales agent. DHI Mortgage obtained this

10   information from D.R. Horton to prepare the initial Loan Estimate. The Loan

11   Estimate is prepared on a standardized form and is an official document from the

12   lender purporting to reflect a good faith, true, total estimated cost of the loan and

13   home purchase.

14   63.    Defendants intend for the prospective Homebuyer to rely on the

15   "Estimated Total Monthly Payment" amount, which they use the Suppressed

16   Estimate to calculate. The Loan Estimate document does not disclose the True

17   Estimate that Defendants know will be the actual property taxes but instead discloses

18   the Suppressed Estimate. While it states that the "Estimated Taxes, Insurance &

19   Assessments" "can increase" over time, Homebuyers understand this statement to

20   refer to normal longer-term increases. In reality, Defendants know at the time the

Loan Estimate is provided to the Homebuyer that property taxes are significantly higher than what is disclosed, as indicated by their statement that only "some" property taxes are included in escrow. This vague statement does not disclose to the Homebuyer that the estimated payment is artificially low. The statement is confusing and is not otherwise discussed or explained by Defendants. Further, while the Loan Estimate states in small print "[y]ou must pay for other property costs separately," Defendants do **not** disclose what these costs may be nor do they disclose that DHI Mortgage will not escrow sufficient funds to cover actual estimated property taxes, which Defendants know will be thousands of dollars higher. While Homebuyers might be aware that certain amounts (i.e., homeowners associations dues) would not be included in their escrow account, they have no reason to expect that they would only pay some property taxes as part of their monthly payment and would have to pay a part of the same tax bill to the taxing authority directly.

64.    The Homebuyer signs the Loan Estimate and transmits it back to DHI Mortgage over the interstate wires using the third-party e-signature platform.

65.    **Step 3: Other Initial Loan Paperwork.** After the Homebuyer completes Step 2, Defendants provide dozens of additional documents to the Homebuyer to review and sign to move forward with the loan and home purchase. These documents include various consumer protective disclosures required by law and documents related to the purchase agreement. These documents are exchanged

between DHI Mortgage in Texas and its local affiliates and Homebuyers electronically over interstate wires, often using DocuSign in California or other third-party e-signature vendors.

66.     These documents largely comprise consumer protective disclosures and authorizations, many of which are mandated by law, such as notices of business affiliation, disclosures under the Equal Credit Opportunity Act, and authorizations to release information. Other documents require the Homebuyer to acknowledge their obligations, such as to truthfully and accurately complete loan application and related documents. None of these documents materially alter the terms of the loan or home purchase.

67.     At times, hidden in this massive collection of documents to review and sign, DHI Mortgage includes another document purporting to warn Homebuyers that the tax amount included in the loan is inaccurate ("Tax Notice"). This cryptic document is prepared by DHI Mortgage in Texas, with D.R. Horton's knowledge and agreement, and shared over interstate wires with local DHI Mortgage affiliates to transmit to Homebuyers over interstate wires via third-party e-signature platforms, including DocuSign in California. The information contained in the Tax Notice is confusing and misleading in several ways.

68.     First, the Tax Notice is misleading to Homebuyers because DHI Mortgage provides this notice after the Homebuyer has been told the total estimated

monthly payment and agreed to proceed with the loan. The purpose of supplemental notices after the Initial Loan Estimate is to provide additional details about the terms to which the Homebuyer based their decision to move forward with the loan and home purchase, not to correct falsities in the Initial Loan Estimate. Thus, Homebuyers would have no reason to believe that later fine print disclosures would contain information that would render the initial estimate materially false.

69.    Second, by providing the Tax Notice to Homebuyers in conjunction with sixteen or more other forms for Homebuyers to review and sign, it is insufficient to put Homebuyers on notice of any deception. Indeed, other than the Tax Notice, every other document Homebuyers sign as part of Step 3 is not one that materially alters the terms of the loan and home purchase. DHI Mortgage intentionally includes this information into the large stack of the other two categories of documents so that Homebuyers understand it as routine paperwork and not something carrying a material surprise.

70.    Third, as discussed above, including in paragraphs 34, 36, 63, and 72, Defendants know how to calculate and obtain the True Estimate and could conduct property tax estimates using the True Estimate at the time the Loan Estimate is provided. There is no legitimate reason to elect to use the Suppressed Estimate. Moreover, the notice does not provide the actual estimate of the true monthly

payment, based on the True Estimate, in order to actually inform the Homebuyer of the impact of Defendants' conduct.

71.    Fourth, Defendants are legally obligated by RESPA to conduct an accurate escrow analysis and, for FHA Homebuyers, by FHA regulations and guidance to create an escrow account that escrows all property taxes. These laws and regulations do not provide Defendants the right to obtain a waiver of these obligations, nor does the Tax Notice constitute a knowing and effective waiver, particularly given how misleading it is.

72.    **Step 4: Preparation of the FHA Approval Paperwork (FHA Loans Only).** After DHI Mortgage internally pre-approves an FHA loan, it sets forth preparing the necessary FHA paperwork. This includes, for each FHA Homebuyer, the HUD form entitled "Conditional Commitment Direct Endorsement Statement of Appraised Value." There, DHI Mortgage lists information including the estimated value of the property and monthly expense estimate, for which it uses the True Estimate of the property taxes. DHI Mortgage does not use these accurate figures in the calculating payment in the Loan Estimate and other disclosures that are simultaneously provided to the Homebuyer. These forms do not include a total estimated monthly cost, so when they are provided to the Homebuyer, the Homebuyer does not see any information that would alert them to a material change to their out-of-pocket costs or monthly PITI payment.

73.    **Step 5: Additional Estimates and Pre-Closing Disclosures.** In between loan approval and closing, DHI Mortgage often provides Homebuyers with additional disclosures. These disclosures include revised Loan Estimates, which follow the same form as discussed in paragraphs 62-63. They might contain minor variations as closing costs and other details become finalized. When providing these updated Loan Estimates, DHI Mortgage knows the True Estimate of property taxes. But in each of these disclosures of the Homebuyer's monthly payment, DHI Mortgage continues to use the Suppressed Estimate.

74.    Closer to the loan closing, DHI Mortgage also provides the Homebuyer with a formal Closing Disclosure document, which is on a federal form and appears similar to the Loan Estimate. The Closing Disclosure utilizes the Suppressed Estimate to calculate the total monthly payments, despite DHI Mortgage's knowledge of the true property tax amount. The estimated monthly payment appears on the first page in large font and is consistent with or below the monthly payment the Homebuyer initially requested and with the estimates in the Loan Estimate documents. As an example, page 1 of the Closing Disclosure says:

| Projected Payments | | |
|---|---|---|
| Payment Calculation | | Years 1-30 |
| Principal & Interest | | $2,521.87 |
| Mortgage Insurance | + | 210.43 |
| Estimated Escrow *Amount can increase over time* | + | 146.27 |
| Estimated Total Monthly Payment | | $2,878.57 |

| Estimated Taxes, Insurance & Assessments *Amount can increase over time* *See page 4 for details* | $580.63 Monthly | This estimate includes | In escrow? |
|---|---|---|---|
| | | ☒ Property Taxes | SOME |
| | | ☒ Homeowner's Insurance | YES |
| | | ☒ Other: Homeowners Assoc Dues | NO |
| | | *See Escrow Account on page 4 for details. You must pay for other property costs separately.* | |

75.    Obscured on page 4 of the Closing Disclosure, DHI Mortgage lists escrowed and non-escrowed amounts, but nowhere in this document is it clear that the Homebuyer has to pay these amounts and do so separately. And at no time does either Defendant explain that the "Estimated Total Monthly Payment" is inaccurate because of this extra amount that would have to be paid.  As an example, page 4 of the Closing Statement says:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**Escrow Account**
**For now,** your loan
☒ will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | $3,923.70 | Estimated total amount over year 1 for your escrowed property costs: *See attached page for additional information* |
| Non-Escrowed Property Costs over Year 1 | $4,777.96 | Estimated total amount over year 1 for your non-escrowed property costs: *Property Taxes, HOA Dues*  You may have other property costs. |
| Initial Escrow Payment | $58.00 | A cushion for the escrow account you pay at closing. See Section G on page 2. |
| Monthly Escrow Payment | $356.70 | The amount included in your total monthly payment. |

☐ will not have an escrow account because ☐ you declined it ☐ your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| No Escrow | | |
|---|---|---|
| Estimated Property Costs over Year 1 | | Estimated total amount over year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | | |

15

16

17

18

19

20

76.    This document states that there *will* be an escrow account and does not explain what "Non-Escrowed Property Costs" means, nor does it advise a Homebuyer how or where they might pay these costs, even if they understood what this language meant. This document does not explain that the amount listed as "Estimated Total Monthly Payment" was inaccurate and will be significantly higher when correctly calculated.

77.    Upon information and belief, no other mortgage lender in the United States engages in the practice of partially escrowing property taxes by deliberately including only small a portion of a Homebuyer's property taxes in their monthly payment.

78.    The additional Loan Estimates and Closing Disclosures are exchanged between DHI Mortgage in Texas and its local affiliates and Homebuyers electronically over interstate wires, often using DocuSign in California or other third-party e-signature vendors.

79.    **Step 6: Closing.** Several weeks after approving the loan, DHI Mortgage arranges a real estate closing to finalize the deal. Around this time, using interstate wires, DHI Mortgage creates the loan obligating the Homebuyer. DHI Mortgage also creates an escrow account using the Suppressed Estimate for the upcoming year. And Defendants and D.R. Horton's subsidiary title company prepare the paperwork.

80.    On closing day, the Homebuyer arrives at an office to sign all the prepared documents. Defendants know that Homebuyers arrive at closing expecting that all documents conform to their prior expectations, built from their prior representations regarding the monthly payment for the property. They also know that virtually no borrower walks away from a closing, particularly as doing so will cause

them to lose any earnest money or other non-refundable fees paid, as well as jeopardize other terms of the loan and potentially the home itself.

81.    Numerous documents presented at closing conform with the Homebuyer's expectations. The Homebuyer is provided with a Closing Disclosure, utilizing the Suppressed Estimate to create a monthly payment amount that conforms with prior estimates. In addition, at the closing, numerous other standard documents are provided to the Homebuyer to sign, including a document verifying they received the house keys, the mortgage and deed, the promissory note, various riders and addenda, and other disclosures.

82.    At times, DHI Mortgage will hide a document in the stack of documents for the Homebuyer to review or sign right before or at closing that might suggest a Homebuyer must set aside additional amounts. For example, DHI Mortgage might include a "First Payment Letter." The top half of the First Payment Letter displays a breakdown of the total monthly payment and a total amount that is consistent with the amount appearing on the Loan Estimates and Closing Disclosures, uses the Suppressed Estimate for taxes, and states when the first payment is due. Beneath that, DHI Mortgage includes vague language about how the estimated taxes owed on the home exceed the estimate taxes that it has included in the breakdown and recommends that the Homebuyer make additional payments to their escrow account

without explaining how to do so and without being billed for these amounts. It also states that the Lender will not accept partial payments.

83.     Defendants know that any last minute "disclosures" will not cause Homebuyers to walk away from closing. Homebuyers do not expect that closing will be a bait-and-switch, where the terms of the transaction materially differ from what they have been conditioned to expect—indeed, these disclosures are required by federal law (RESPA and the Truth in Lending Act) precisely to ensure that there are no surprises at closing.

84.     Further, Homebuyers have every reason to focus and rely on the monthly payment that Defendants have thus far disclosed orally, in the Loan Estimates, and in the Closing Disclosures—which Defendants know. Homebuyers are invested in the dream of home ownership. Some may have given notice to their landlords and not have a place to live. They may have paid non-refundable earnest money or other costs to Defendants, or have incurred other non-refundable costs, like moving expenses. They have spent considerable time and energy getting to this moment when they are about to be handed the keys to their home. Regardless of the reason, Defendants know that any such last minute "disclosure" regarding property taxes will not cause anyone to walk away, even if that person would have rejected the deal on the home had Defendants used the True Estimate in the earlier Loan Estimates.

85.    At this point, the Homebuyer completes the paperwork, D.R. Horton transfers the deed to the Homebuyer, and DHI Mortgage places a deed of trust or mortgage on the property preserving DHI Mortgage's interest in the property.

### iv.  Homebuyers Discover the Scheme Months Later When Their Payments Skyrocket.

86.    After the closing, at Defendants' direction, D.R. Horton's subsidiary title company ensures that the funds from DHI Mortgage and the Homebuyer's down payment is transferred to the proper parties, including paying D.R. Horton the purchase price of the home with the DHI Mortgage loan proceeds and paying DHI Mortgage for the costs and fees associated with originating the loan.

87.    Shortly after the closing, DHI Mortgage transfers/sells the mortgage loan to a new holder and servicer. DHI Mortgage no longer owns the loan, its liquidity is restored, and it can proceed to make more mortgage loans and repeat its scheme.

88.    Meanwhile the new servicer begins collecting the Homebuyer's monthly payment. Eventually, the new servicer will have to conduct a new escrow analysis on the loan. Often this happens when property taxes come due, which could be many months after closing. When the servicer sees that the amount in escrow is insufficient to cover the amount due, the servicer will notify the Homebuyer. Under the new analysis, the Homebuyer's monthly payments often skyrocket. The Homebuyer must not only pay more in property taxes going forward, but servicers

collect more than what is required to have the required cushion in the escrow account, which is often substantial. In addition, the Homebuyer is required to repay the shortage or deficiency caused by the underpayment of the escrow amount. This new payment—even leaving out the need to cure the deficiency or shortage—far exceeds the payment that the Homebuyer sought and that Defendants promised. Often, the higher payment is more than the Homebuyer can actually afford.

89.    Thus, only after closing and transfer of the loan, when the new servicer conducts an appropriate escrow analysis, do Homebuyers learn that the monthly payment they were promised was a lie, and instead, they owe hundreds more a month because Defendants had only included a small portion of their actual monthly tax obligation in their monthly payment. These additional amounts put many Homebuyers at risk of default and foreclosure. In addition, when the correct property tax measurement is considered, the home value may have declined or not have appreciated in a way that keeps pace with the market.

> **v. Defendants' Conduct Is Inconsistent with Borrower Expectations, Industry Practice, and Defendants' Legal Obligations.**

90.    As part of the loan application and closing process, originating lenders like DHI Mortgage calculate the regular monthly payment for Loan Estimates, Closing Disclosures, and other documents. The lender calculates the monthly

principal (P) and interest (I) payment using the interest rate, term, and loan amount. The lender is further required to calculate the monthly payment for taxes (T) and insurance (I) that will be paid out of an escrow account. The Real Estate Settlement and Procedures Act (RESPA) sets forth the generally applicable guidelines for establishment and operation of escrow accounts to provide minimum protections for homeowners. Pursuant to RESPA, when establishing an escrow account or estimating related payments, a lender first determines a true, accurate, and reliable amount of the taxes, insurance, and other escrowed sums and the timing of when these amounts must be paid. The lender then conducts a trial analysis for the coming year to determine how much must be paid monthly by the consumer into the escrow account, plus any amount that must be paid at closing as an escrow deposit, to ensure the taxes and other escrowed sums will be paid timely and that the account not only never falls into a negative but also maintains a permissible cushion at all times. All monthly payments for taxes and insurance that are included in the total monthly payment are placed into an escrow account, from which the ultimate loan servicer disburses funds to pay the property taxes other escrowed costs when those payments come due—which may be months after the Homebuyer closes on the home. If all the calculations are done correctly, there should be sufficient funds in escrow to pay the property taxes.

91.    If the initial estimate is low, there can be dire consequences for the Homebuyer. When an accurate escrow analysis is eventually completed, the Homebuyer's payment will sky-rocket, causing substantial payment shock—their new monthly payment will not only include the higher monthly payment for the actual taxes, but also the required cushion as a percentage of that higher payment and amounts to cover the shortfall for the past months they have owned the home and paid too little into escrow.

92.    In addition, FHA loans set forth specific requirements to meet the goals of the program. Congress created the FHA program in 1934 to make homeownership accessible to working-class Americans by providing government-backed financing, enabling them to build intergenerational wealth. FHA loans are insured by the government and issued by a bank or other private lender. FHA loans require a lower minimum down payment than many conventional loans, and applicants may have lower credit scores than some mortgage lenders usually require. FHA loans are designed to help low- to moderate-income families attain homeownership, and they are particularly popular with first-time homebuyers. FHA loans are intended to make homeownership more accessible, reduce the risk of foreclosure, make payments more affordable, and reduce the exposure to changing interest rates. Many lenders to first-time buyers choose to offer FHA mortgages because they are insured against

loss and lower-income and lower-wealth individuals qualify for FHA loans but may not qualify for traditional loans.

93.     To protect homeowners from default as well as its own interest in the property, the FHA requires that originating lenders such as DHI Mortgage escrow the "estimated amount of all property taxes," as well as insurance and other required payments, and to ensure that these are paid through the regular monthly mortgage payment. 24 C.F.R. § 203.23; *see also* 24 C.F.R. § 203.257 (requiring DHI Mortgage to adhere FHA regulations "with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage."). FHA regulations also require that mortgage lenders, servicers, and holders properly estimate and timely collect these amounts, in accordance with the Real Estate Settlement and Procedures Act (RESPA). 24 C.F.R. § 203.550. The FHA reinforces the express language in the regulation through clear guidance in its FHA Mortgage Handbook. Specifically, FHA Handbook 4000.1 states: "The escrow account must be sufficient to meet the following obligations when they become due: . . . real estate taxes . . . ." FHA Handbook 4000.1 at 375, available at https://www.hud.gov/sites/dfiles/OCHCO/documents/40001-hsgh-update16-5.pdf. The Handbook further explains that "[t]he Mortgagee must use accurate estimates of monthly tax escrows when calculating the total Mortgage Payment. In New

Construction cases and Manufactured Homes converting to real estate, property tax estimates must be based on the land and improvements." *Id* at 361-62.

94.    Similarly, VA loans were established to provide homeownership opportunities to veterans. VA regulations and guidelines explicitly require lenders to comply with RESPA and all other generally applicable laws when establishing escrow accounts. VA Handbook 26-7, Chapter 9-23. VA loan regulations further require that lenders utilize accurate property tax estimates when originating loans— including explicitly requiring that lenders use the higher property tax figure when they expect an assessment to increase. *See, e.g.*, 38 CFR 36.4340.

95.    DHI Mortgage creates escrow accounts for all Homebuyers—whether they obtain conventional, FHA, or VA loans. However, as described above, DHI Mortgage does not set up Homebuyer escrow accounts using reliable, complete, and accurate estimates of property taxes (the True Estimate) as required. Instead, DHI Mortgage conducts the escrow analyses using the Suppressed Tax Estimate. In doing so, DHI Mortgage violates its legal requirements under RESPA as to all Homebuyers. As to FHA Homebuyers, it violates additional legal requirements under FHA regulations and requirements.

96.    Defendants' conduct is, unsurprisingly, inconsistent with industry practice. No other homebuilder or lender engages in the schedule described above, including only purporting to escrow "some" of a borrower's total property taxes and

utilizing a suppressed estimate of property taxes for its escrow analyses when it has actual knowledge of the true property taxes for the property.

97.    By artificially depressing the total monthly mortgage payment by manipulating the estimated property taxes, Defendants unlawfully trap homeowners into homes that are more expensive than they can afford, at great loss to homebuyers—and great gain to Defendants.

98.    Ultimately, the result of Defendants' Monthly Payment Suppression Scheme is that Plaintiffs and the Homebuyer class do not get what they were promised. They are forced to pay far more per month for the same house after specific misrepresentations were made about the monthly costs of the home purchase and corresponding loans. D.R. Horton has given itself an unfair advantage in the marketplace at the expense of Plaintiffs and the class by presenting its homes as more affordable on a monthly basis than they truly are. In turn, Defendants generate record sales, record profits, and consistently charge greater and greater sums for their properties than they would have commanded on the open market.

## V.    **PLAINTIFFS' ALLEGATIONS**

### a.  **The Skougard Family Facts**

99.    The Skougard Family are residents of Pahrump, Nevada.

100.    The Skougard Family first began looking for homes on Zillow in the summer of 2023. Soon after they started looking, Ms. Skougard drove past a

billboard advertising D.R. Horton's new build homes in Pahrump, Nevada, a suburb located 45-minutes outside of Las Vegas.

101.    Ms. Skougard visited Pahrump to view a D.R. Horton home in-person in July of 2023 where she met a D.R. Horton sales representative named Darin Chong.

102.    Mr. Chong asked Ms. Skougard what the Skougard Family could afford to pay per month. Ms. Skougard informed Mr. Chong that the Skougard Family could afford a payment of $2,100 per month. Mr. Chong showed Ms. Skougard a home that was $349,000 and advised that this was the home that would be within the Skougard Family budget.

103.    The next day, Mrs. Skougard returned to look at the same home with her husband, Mr. Skougard. Mr. Chong explained the incentives that were available if the Skougard Family agreed to use DHI Mortgage as their lender and to use other D.R. Horton affiliated services, including $5,000 towards the closing.

104.    Mr. Chong then connected the Skougard family with DHI Mortgage, through DHI Mortgage loan officer Howard Cooper. As a part of the initial call, Mr. Coooper asked the Skougard Family basic information about their income, family size, and what they were looking for in a home. Mr. Cooper also asked the Whitney Family what monthly payment they could afford and specifically asked them how

much they paid per month for rent. The Skougard Family informed Ms. Cooper that they could afford a home with a monthly payment of $2,100 per month.

105.    On or about July 8, 2023, the Skougard Family executed a purchase agreement for a property located at 73 E Wildcat Ave, Pahrump, Nevada 89060, for $348,830.

106.    Because of the price of the home and the Skougard Family income level, DHI Mortgage recommended that the Skougard Family utilize an FHA Mortgage.

107.    The same day, Defendants and the Skougard Family began to undertake Steps 1, 2, and 3, as described in paragraphs 61 to 71, whereby each of the documents described therein was provided by DHI Horton and its local Nevada representatives to the Skougard Family to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

108.    In Step 1, the Skougard Family filled out a loan application that identified the key financial information about the Skougard Family.

109.    As part of Step 2, DHI Mortgage prepared and provided the Whitney Family with a Loan Estimate that estimated a "Total Monthly Payment" would be approximately $2,198.77 per month, consistent with their budget. In so doing, and

unbeknownst to the Skougard Family, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

110.    The Loan Estimate states in small print "You must pay for other property costs separately." It does ***not*** disclose what these costs may be nor does it disclose that DHI Mortgage would not be escrowing enough property taxes to cover the actual estimated property taxes on the home, which Defendants knew would be thousands of dollars more. At the time it prepared the Loan Estimate, DHI Mortgage knew that the Skougard Family would be assessed much higher property taxes than what was in the Suppressed Estimate, and either knew the True Estimate or knew how to obtain the True Estimate.

111.    After approval, DHI Mortgage initiated Step 4 and completed the HUD form described in paragraph 72. There it listed the True Estimate of monthly taxes, which were several hundred dollars more per month. It did not revise its Loan Estimate.

112.    Between loan approval and closing, Defendants undertook Step 5, including providing the Skougard Family with a Closing Disclosure. All preclosing Loan Estimates and Closing Disclosures estimated the Skougard Family's "Estimated Total Monthly Payment" would be approximately $2,198.77, again utilizing the Suppressed Estimate. DHI Horton used DocuSign in California to

transmit the documents to the Skougard Family, who signed these documents and returned them shortly thereafter via interstate wires.

113.   As the Loan Estimates and Closing Disclosure also conformed to the Skougard Family's expectations about their total monthly payment amount, the Skougard Family understood that even with some minor variations, their monthly payments would fit comfortably in their budget.

114.   On September 21, 2023, the day of the closing, the Skougard Family received a final Closing Disclosure from DHI Mortgage over the interstate wires that again disclosed an "Estimated Total Monthly Payment" identical to the ones received prior, in the amount of $2,198.77. At no time was the Skougard Family informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

115.   On September 21, 2023, the Skougard attended the closing, and completed the documents described in Step 6, paragraphs 79 to 85.

116.   At no point during the initial sales pitch from Mr. Chong nor the financing discussions with Mr. Cooper did any D.R. Horton or DHI Mortgage representative mention that Skougard Family would owe substantial additional property taxes beyond those property taxes included in his monthly PITI payment nor that their payment would be more than $500 more per month than the amount that was listed as his "Estimated Total Monthly Payment."

117.   Within sixty days of closing, DHI Mortgage transferred ownership and servicing of the Skougard Family loan to a different company. DHI Mortgage received proceeds from that sale via the interstate wires.

118.   From November 1, 2023, through March 1, 2025, the Skougard Family paid approximately $2,198.77 per month as stated on each bill that they received from the servicer.

119.   On or about April 1, 2025, seventeen months after closing, the Skougard Family received an Escrow Account Disclosure Statement from the loan's servicer that informed the Skougard Family that their escrow account had a negative balance of $2,879.18 and that the mortgage payment was increasing on July 1, 2025, to $2,717.88, a 20% increase.

120.   The shortage and increase were the result of a county tax bill that increased the monthly escrow payment from a total of $254.87 to $773.98.

121.   DHI mortgage and D.R. Horton used the suppressed estimate of $1,219.08 per year for property taxes in the Loan Estimates and Closing Disclosure to reach an estimated payment of $2,198.77.

122.   Defendants intended to mislead the Skougard Family. The Loan Estimates and Closing Disclosures provided to the Skougard Family were prepared using forms created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure home buyers have

accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that a budget-sensitive Homebuyer like the Skougard Family would focus on the monthly payment amount, and by repeating that the suppressed monthly amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth. Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

123.    The Skougard Family has struggle financially to keep their home, falling behind on monthly payments several times. To accommodate the commute to Las Vegas, Nevada, the Skougard Family purchased a new vehicle. The Skougard Family did not account for a 20% increase in their mortgage when deciding to purchase a vehicle. As a result, the Skougard Family has had to choose between a car payment and the monthly mortgage payment.

124.    The Skougard Family was injured by Defendants' Monthly Payment Suppression Scheme. They agreed to purchase a home with a Monthly Payment equal to $2,198.77, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants taken timely and proper steps to provide the Skougard Family with a monthly payment estimate utilizing the True Estimate of property taxes in

accordance with the duties and obligations of a FHA mortgage lender and set up the account to escrow all taxes, the Skougard Family would not have moved forward with the purchase, or at a minimum, would have paid less for the house.

125.   As a result, the Skougard Family has suffered damages including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for his home, diminished home value, lost opportunity to purchase alternative homes within his budget, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees.

### b.  **The Hinds Family**

126.   The Hinds Family are residents of Pahrump, Nevada. Mr. Hinds is a member of the United States Military.

127.   The Hinds Family began looking for homes in Pahrump on Zillow in 2023. Shortly after they started looking, the Hinds Family came across advertisements for active-duty military and veterans to get incentives towards a D.R. Horton new build home.

128.   In September 2023, the Hinds Family visited a D.R. Horton property located at 59 E Pioneer Range Ave Pahrump, Nevada 89060. There the Hinds Family met a D.R. Horton sales representative who asked them what they could afford to pay per month. The Hinds Family responded that they could afford $2,100 per

month. The sales representative encouraged the Hinds Family to use DHI Mortgage and other D.R. Horton affiliated services for their purchase and introduced them to a DHI Mortgage loan officer.

129.   As a part of the initial call with the DHI Mortgage loan officer, the Hinds Family was asked for basic information about their income, family size, and what they were looking for in a home. In addition, the loan officer asked the Hinds Family what monthly payment they could afford. The Hinds Family informed the loan officer that they could afford a home with a monthly payment of $2,100.

130.   On or about September 26, 2023, the Hinds Family agreed to purchase the D.R. Horton home for $355,310.

131.   Based on Mr. Hind's military service, income information, and the home price, DHI Mortgage recommended that the Hind Family utilize a VA loan to purchase the home.

132.   Also on or about September 26, 2023, Defendants and the Hinds Family undertook Steps 1, 2, and 3, as described in paragraphs 61 to 71, whereby each of the documents described therein was provided by DHI Mortgage and its local Nevada representatives to the Hinds Family to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

133.    In Step 1, the Hinds Family filled out a loan application that identified the key financial information about the Hinds Family.

134.    As part of Step 2, DHI Mortgage prepared and provided the Hinds Family with a Loan Estimate that estimated a "Total Monthly Payment" would be approximately $2,100 per month, consistent with their budget. In so doing, and unbeknownst to the Hinds Family, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

135.    Between loan approval and closing, Defendants undertook Step 5, including providing the Hinds Family with a Closing Disclosure. Each Loan Estimate and Closing Disclosure estimated the Hinds Family's "Estimated Total Monthly Payment" would be approximately $2,076.24, again utilizing the Suppressed Estimate. DHI Mortgage used DocuSign in California to transmit the documents to the Hinds Family, who signed these documents and returned them that day via interstate wires.

136.    As the Loan Estimates and Closing Disclosure also conformed to the Hinds Family's expectations about their total monthly payment amount, the Hinds Family understood that even with some minor variations, their monthly payments would fit comfortably in their budget.

137.    On October 26, 2023, the day of the closing, the Hinds Family received a final Closing Disclosure from DHI Mortgage over the interstate wires that again

disclosed an "Estimated Total Monthly Payment" identical to the ones received prior, in the amount of $2,076.24. At no time was the Hind Family informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

138.    On October 26, 2023, the Hinds Family attended the closing, and completed the documents described in Step 6, paragraphs 79-85.

139.    At no point during the initial sales pitch from the D.R. Horton sales agent nor the financing discussions with the DHI Mortgage loan officer did any D.R. Horton or DHI Mortgage representative mention that the Hinds Family would owe substantial additional property taxes beyond those property taxes included in his monthly PITI payment nor that their payment would be more than $500 more per month than the amount that was listed as their "Estimated Total Monthly Payment."

140.    Within sixty days of closing, DHI Mortgage transferred ownership and servicing of the Hinds Family loan. DHI Mortgage received proceeds from that sale via the interstate wires.

141.    From November 2023 through September 2024, the Hinds Family paid approximately $2,076.24 per month as stated on each bill that they received from the new servicer.

142.    Shortly before October 2024, eleven months after closing, the Hinds Family received an Escrow Account Disclosure Statement from the new servicer

that informed the Hinds Family that their escrow account was significantly in the negative and that the mortgage payment was increasing on October 1, 2024, to $2,485.78, a more than $400 per month and nearly 20% increase.

143.   The shortage and increase were the result of a county tax bill that increased the escrow payment.

144.   DHI Mortgage and D.R. Horton used the Suppressed Estimate of $255.96 per year for property taxes in the Loan Estimates and Closing Disclosure to reach an estimated payment of $2,076.24.

145.   Defendants intended to mislead the Hinds Family. The Loan Estimates and Closing Disclosures provided to the Hinds Family were prepared using forms created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure homebuyers have accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that a budget-sensitive Homebuyer like the Hinds Family would focus on the monthly payment amount, and by repeating that the suppressed monthly amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth. Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

146.   The Hinds Family has struggle financially to keep their home, falling behind on monthly payments several times. The Hinds Family had a home in Utah that they hoped to retire to and live in. When their payment rose to $2,485.78, the Hinds Family made the difficult decision to sell the Utah Home so that they could afford their Nevada home.

147.   The Hinds Family was injured by Defendants' Monthly Payment Suppression Scheme. They agreed to purchase a home with a Monthly Payment equal to $2,076.24, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants taken timely and proper steps to provide the Hinds Family with a monthly payment estimate utilizing the True Estimate of property taxes in accordance with the duties and obligations of a VA mortgage lender and set up the account to escrow all taxes, the Hinds Family would not have moved forward with the purchase, or at a minimum, would have paid less for the house.

148.   As a result, the Hinds Family has suffered damages including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budget, increased out of

1  pocket monthly expenses in the form of a higher PITI, and other consequences, such

2  as an increased risk of foreclosure and late fees.

3       **c.  <u>Ms. Robinson's Facts</u>**

4       149.   Ms. Robinson is a resident of Las Vegas, Nevada.

5       150.   Ms. Robinson began looking for a home in May of 2023 on Zillow.

6  Shortly after she started looking for a home, Ms. Robinson found D.R. Horton's

7  new build homes.

8       151.   In May 2023, Ms. Robinson went to visit a property located as 10908

9  Rollingford Ave., Las Vegas, Nevada. There Ms. Robinson met a D.R. Horton sales

10 representative who asked her what she could afford to pay per month. Ms. Robinson

11 responded that she could afford $1,750 per month. The sales representative

12 encouraged Ms. Robinson to use DHI Mortgage and other D.R. Horton affiliated

13 services for her purchase and introduced her to a DHI Mortgage loan officer.

14      152.   As a part of the initial call with the DHI loan officer, Ms. Robinson was

15 asked for basic information about her income, family size, and what she was looking

16 for in a home. In addition, the loan officer asked Ms. Robinson what monthly

17 payment she could afford. Ms. Robinson informed the loan officer that she could

18 afford a home with a monthly payment of $1,750.

19      153.   On or about May 12, 2023, Ms. Robinson agreed to purchase the D.R.

20 Horton home for $378,990.

54

154.    Based on Ms. Robinson's income information, down payment, and the home price, DHI Mortgage recommended that Ms. Robinson utilize a conventional mortgage.

155.    Also, on or about May 12, 2023, Defendants and Ms. Robinson undertook Steps 1, 2, and 3, as described in paragraphs 61 to 71, whereby each of the documents described therein was provided by DHI Horton and its local Nevada representatives to the Ms. Robinson to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

156.    In Step 1, the Ms. Robinson filled out a loan application that identified the key financial information.

157.    As part of Step 2, DHI Mortgage prepared and provided Ms. Robinson with a Loan Estimate that estimated a "Total Monthly Payment" would be approximately $1,780.60 per month, consistent with her budget. In so doing, and unbeknownst to Ms. Robinson, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

158.    Between loan approval and closing, Defendants undertook Step 5, including providing a Closing Disclosure. Each Loan Estimate and Closing Disclosure estimated the Ms. Robinson's "Estimated Total Monthly Payment" would be approximately $1,780.60, again utilizing the Suppressed Estimate. DHI

Mortgage used DocuSign in California to transmit the documents to the Ms. Robinson, who signed these documents and returned them that day via interstate wires.

159.   As the Loan Estimates and Closing Disclosure also conformed to the Ms. Robinson's expectations about her total monthly payment amount, Ms. Robinson understood that even with some minor variations, her monthly payments would fit comfortably in her budget.

160.   On June 12, 2023, the day of the closing, Ms. Robinson received a final Closing Disclosure from DHI Mortgage over the interstate wires that again disclosed an "Estimated Total Monthly Payment" identical to the ones received prior, in the amount of $1,780.60. At no time was Ms. Robinson informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

161.   On June 12, 2023, Ms. Robinson attended the closing, and completed the documents described in Step 6, paragraphs 79 to 85.

162.   At no point during the initial sales pitch from the D.R. Horton sales agent nor the financing discussions with the DHI Mortgage loan officer did any D.R. Horton or DHI Mortgage representative mention that Ms. Robinson would owe substantial additional property taxes beyond those property taxes included in his

monthly PITI payment nor that her payment would be more than $400 more per month than the amount that was listed as her "Estimated Total Monthly Payment."

163. Within sixty days of closing, DHI Mortgage sold the ownership and servicing rights to Ms. Robinson's loan. DHI Mortgage received proceeds from that sale via the interstate wires.

164. From July 1, 2023, through June 1, 2024, Ms. Robinson paid approximately $1,780.60 per month as stated on each bill that she received from the new servicer.

165. On or about June 1, 2024, twelve months after closing, Ms. Robinson received an Escrow Account Disclosure Statement from her loan servicer that informed her that her escrow account was several thousand dollars in the negative and that the mortgage payment was increasing on July 1, 2024, to roughly $2,158.31, a 18% increase.

166. The shortage and increase were the result of a county tax bill that increased the escrow payment.

167. DHI mortgage and D.R. Horton used the suppressed estimate of $917.88 per year for property taxes in the Loan Estimates and Closing Disclosure to reach an estimated payment of $1,780.60.

168. Defendants intended to misled Ms. Robinson. The Loan Estimates and Closing Disclosures provided to the Ms. Robinson were prepared using forms

created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure home buyers have accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that a budget-sensitive Homebuyer like Ms. Robinson would focus on the monthly payment amount, and by repeating that the suppressed monthly amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth. Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

169.    Ms. Robinson has struggle financially to keep her home. Notably, Ms. Robinson received a job offer that would involve a slight pay cut but was a dream job for her. Because of the 18% increase in her monthly payment, Ms. Robinson was forced to turn that job down.

170.    Ms. Robinson was injured by Defendants' Monthly Payment Suppression Scheme. She agreed to purchase a home with a monthly payment equal to $1,780.60, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants taken timely and proper steps to provide Ms. Robinson with a monthly payment estimate utilizing the True Estimate of property taxes in accordance with

its duties and obligations as a mortgage lender, Ms. Robinson would not have moved forward with the purchase, or at a minimum, would have paid less for the house.

171.    As a result, Ms. Robinson has suffered damages including but not limited to purchasing a home that she would not have purchased but for the fraudulent scheme, paying an inflated price for her home, diminished home value, lost opportunity to purchase alternative homes within her budget, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees.

### d.  The Santorii-Whitney Family Facts

172.    The Santorii-Whitney Family resides in Las Vegas, Nevada.

173.    The Santorii-Whitney Family first began looking for a home in North Las Vegas, Nevada, on Zillow in October 2024. Soon after they started looking the they found DR Horton's new build homes.

174.    In December 2024, when the Santorii-Whitney Family wanted to view a DR Horton property, they were told that they needed to fill out a loan application with DHI Mortgage. They were introduced to Nicole Grandos, a loan officer with DHI Mortgage.

175.    As a part of the initial call, Ms. Grandos asked the Santorii-Whitney Family basic information about their income, family size, and what they were looking for in a home. Ms. Grandos asked the Santorii-Whitney Family what

monthly payment they could afford and specifically asked them how much they paid per month for rent. The Santorii-Whitney Family informed Ms. Grandos that they could afford a home with a monthly payment of $2,800.

176.    On or about December 8, 2024, the Santorii-Whitney Family viewed a home located at 4574 Aqua Landing Ave, North Las Vegas, Nevada 89115. During the showing, the Santorii-Whitney Family met DR Horton's agent, Eddie Aiello.

177.    During the showing Mr. Aiello continued to push the Santorii-Whitney Family to use DHI Mortgage as their lender and to use DHI Title and all other DR Horton affiliated services including by offering seller credits towards the closing. Among other things, Mr. Aiello said that DR Horton could be the Santorii-Whitney Family's one stop shop for the entire home buying process.

178.    Because of the price of the home and the Santorii-Whitney Family income level, DHI Mortgage recommended that the Whitney Family utilize an FHA Mortgage.

179.    After viewing the home, the Santorii-Whitney Family was presented with an approval for a purchase price of $478,990 and a loan estimate that stated that their payment would be $2,878.57.

180.    The Whitney Family agreed to buy the home built by D.R. Horton, with DHI Mortgage to provide the financing and DHI Title and DHI Title of Nevada to provide the title work. To the Santorii-Whitney Family, the differences in these

entities were not apparent and appeared that all the people and paperwork were from D.R. Horton.

181.   On December 11, 2024, the Santorii-Whitney Family executed a purchase agreement to purchase the property for $478,990.

182.   The same day, Defendants and the Santorii-Whitney Family undertook Steps 1, 2, and 3, as described in paragraphs 61-71, whereby each of the documents described therein was provided by DHI Horton and its local Nevada representatives to the Santorii-Whitney Family to sign over the interstate wires, using DocuSign in California to exchange the Loan Estimate, loan application, interest rate lock form, and other initial loan paperwork.

183.   In Step 1, the Santorii-Whitney Family filled out a loan application that identified their key financial information.

184.   As part of Step 2, DHI Mortgage prepared and provided the Santorii-Whitney Family with a Loan Estimate that estimated a "Total Monthly Payment" would be approximately $2,878.57 per month, consistent with their budget. In so doing, and unbeknownst to the Santorii-Whitney Family, DHI Mortgage used the Suppressed Estimate instead of the True Estimate.

185.   The Loan Estimate states in small print "You must pay for other property costs separately." It does ***not*** disclose what these costs may be nor do they disclose that DHI Mortgage would not be escrowing enough property taxes to cover

the actual estimated property taxes on the home, which Defendants knew would be thousands of dollars more. At the time it prepared the Loan Estimate, DHI Mortgage knew that the Santorii-Whitney Family would be assessed much higher property taxes than what was in the Suppressed Estimate, and either knew the True Estimate or knew how to obtain the True Estimate.

186.   After approval, DHI Mortgage initiated Step 4 and completed the HUD form described in paragraph 72. There it listed the True Estimate of monthly taxes, which were several hundred dollars higher than the Suppressed Estimate that it used in calculating the "Total Estimated Payment." It did not revise its Loan Estimate.

187.   Between loan approval and closing, Defendants undertook Step 5, including providing the Santorii-Whitney Family with a Closing Disclosure. Each Loan Estimate and Closing Disclosure estimated the Santorii-Whitney Family's "Estimated Total Monthly Payment" would be approximately $2,878.57, again utilizing the Suppressed Estimate. DHI Mortgage used DocuSign in California to transmit the documents to the Whitney Family, who signed these documents and returned them that day via interstate wires.

188.   As the Loan Estimates and Closing Disclosure also conformed to the Santorii-Whitney Family's expectations about their total monthly payment amount, the Santorii-Whitney Family understood that even with some minor variations, their monthly payments would fit comfortably in their budget.

189.   On January 8, 2025, the day of the closing, the Santorii-Whitney Family received a final Closing Disclosure from DHI Mortgage over the interstate wires that again disclosed an "Estimated Total Monthly Payment" identical to the ones received prior, in the amount of $2,878.57. At no time was the Santorii-Whitney Family informed that this monthly payment was inaccurate or would be higher due to Defendants' failure to escrow the majority of the estimated property taxes.

190.   On January 8, 2025, the Santorii-Whitney Family attended the closing, and completed the documents described in Step 6, paragraphs 79 to 85.

191.   At no point during the initial sales pitch from Mr. Aiello nor the financing discussions with Ms. Granados did any D.R. Horton or DHI Mortgage representative mention that the Santorii-Whitney Family would owe substantial additional property taxes beyond those property taxes included in their monthly PITI payment nor that their payment would be more than $1,000 more per month than the amount that was listed as their "Estimated Total Monthly Payment."

192.   Within sixty days of closing, DHI Mortgage transferred ownership and servicing of the Santorii-Whitney Family loan. DHI Mortgage received proceeds from that sale via the interstate wires.

193.   From February 1, 2025, through October 1, 2025, the Santorii-Whitney Family paid $2,878.57 per month as stated on each bill that they received from the new servicer.

194.    On September 23, 2025, nine months after closing, the Santorii-Whitney Family received an Escrow Account Disclosure Statement from their loan servicer that informed them that their escrow account had a negative balance of $3,096.36 and that the mortgage payment was increasing on November 1, 2025 to $3,968.84, a 27.5% increase.

195.    The shortage and increase were the result of a county tax bill that increased the monthly escrow payment from a total of $356.70 to $1,446.97.

196.    DHI Mortgage and D.R. Horton used the Suppressed Estimate of $1,059.24 per year for property taxes in the Loan Estimates and Closing Disclosure to reach an estimated payment of $2,878.57.

197.    Defendants intended to mislead the Santorii-Whitney Family. The Loan Estimates and Closing Disclosures provided to the Santorii-Whitney Family were prepared using forms created by the federal government and transmitted at various points in advance of closing in accordance with federal law to ensure homebuyers have accurate and truthful information about the mortgage loan. D.R. Horton and DHI Mortgage knew that a budget-sensitive Homebuyer like the Santorii-Whitney Family would focus on the monthly payment amount, and by repeating that the suppressed monthly amount many times, in contravention of both law and mortgage lending best practices, Defendants did not use those forms to disclose the truth.

Instead, Defendants created other paperwork that reinforced the intentional nature of the Monthly Payment Suppression Scheme.

198.   The Santorii-Whitney Family is struggling financially to keep their home, and has already pulled money out of their 401K in order to make up the deficit in their monthly budget.

199.   The Santorii-Whitney Family was injured by Defendants' Monthly Payment Suppression Scheme. The Santorii-Whitney Family agreed to purchase a home with a monthly payment equal to $2,878.57, with minor and reasonable fluctuations as the home value and local tax rates changed. But at all times, Defendants knew the cost of the home would be substantially more, independent of changes to the home value and local taxes. Had Defendants had taken timely and proper steps to provide the Santorii-Whitney Family with a monthly payment estimate utilizing the True Estimate of property taxes in accordance with the duties and obligations of a FHA mortgage lender and set up the account to escrow all taxes, the Santorii-Whitney Family would not have moved forward with the purchase, or at a minimum, would have paid less for the house.

200.   As a result, the Santorii-Whitney Family has suffered damages including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for his home, diminished home value, lost opportunity to purchase alternative homes within their budget,

increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees.

## CLASS ACTION ALLEGATIONS

201.   Plaintiffs bring this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Class (the "Class") is defined as follows:

> **All individuals in the United States who, during the Class Period, (1) purchased a D.R. Horton home; (2) with a loan originated by DHI Mortgage in which DHI Mortgage established an escrow account that included property taxes; and (3) where a document created in the loan origination process set forth a figure for property taxes that was higher than the amount of taxes included in the analysis to calculate the Estimated Total Monthly Payment as reflected on the final Closing Disclosure, within the applicable statute of limitations.**

202.   Plaintiffs bring this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed "FHA Sub-class" is defined as follows:

> **All members of the Class defined above who entered an FHA-insured loan.**

203.   Plaintiffs bring this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed "Nevada Sub-class" is defined as follows:

**All members of the Class defined above who purchased a home located within the State of Nevada.**

204.   Expressly excluded from the Class are:

a. Any Judge or Magistrate Judge presiding over this action and members of their immediate families;

b. Defendants and any entities in which Defendants have a controlling interest, or which has a controlling interest in Defendants and its legal representatives, assigns and successors; and

c. All persons who properly execute and file a timely request for exclusion from the Class.

205.   Plaintiffs reserve the right to amend the Class definition at the Class Certification stage of the litigation if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

### Fed. R. Civ. P. 23(a) Criteria

206.   <u>Numerosity</u>. The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the number of closings that Defendants conduct annually, the nation-wide class is believed to be

in the high tens of thousands, possibly greater than 100,000. Due to the number of closings Defendants conduct annually in Nevada, the number of Nevada Sub-class members is expected to be in the thousands. Thus, the Class is so numerous that joinder of all members is impracticable.

207. <u>Commonality</u>. Common questions of law and fact affect the rights of each Class Member, and common relief by way of damages is sought for Plaintiffs and Class Members. Common questions of law and fact that affect Plaintiffs and the Class include, but are not limited to:

    a.  Whether Defendants formed a RICO enterprise and conspiracy;

    b.  Whether Defendants' alleged use of the mail and interstate wires to (i) disseminate advertisements over social media and the internet generally targeting Homebuyers; (ii) transmit and exchange information and documents relating to the homebuying process, such as estimates, quotes, Homebuyer information, loan documents, and other forms, between one another, and with Homebuyers, often utilizing third-party e-signature platforms; (iii) transmit and exchange funds associated with the homebuying process and subsequent sale and transfer of the loans between one another and any third parties who later acquire the loans, in furtherance of the their Monthly Payment Suppression Scheme and systematic bait-and-switch scheme to deceive Homebuyers about the

1    true cost of homeownership constitutes a pattern of wire fraud under

2    RICO;

c.    Whether Defendants' Monthly Payment Suppression Scheme misled

4    the Class into purchasing their homes;

d.    Whether Defendants Monthly Payment Suppression Scheme is unfair

6    and/or deceptive in violation of Nevada's Deceptive Trade Practices

7    Act ("DTPA"), Nev. Rev. Stat. §§ 598.0903, *et seq.*

e.    Whether Defendants' Monthly Payment Suppression Scheme

9    constitutes a per se negligence;

f.    Whether Defendants' conduct was negligent;

g.    Whether Defendants were unjustly enriched by the Monthly Payment

12    Suppression Scheme;

h.    Whether Defendants' conduct damaged Plaintiffs and Class Members,

14    including, but not limited to, by causing them to pay an inflated price

15    for their home, experience diminished home value, lose opportunities

16    to purchase alternative homes within their budgets, suffer increased out

17    of pocket monthly expenses in the form of a higher PITI, and face other

18    consequences, such as an increased risk of foreclosure and late fees,

19    and otherwise depriving them of the benefit of the bargain;

i.  Whether Plaintiffs and Class Members are entitled to treble damages, equitable relief, civil penalties, punitive damages, injunctive and/or declaratory relief.

208.   In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

209.   Typicality. The claims and defenses of Plaintiffs are typical of the claims and defenses of the Classes because Plaintiffs were subjected to the same uniform sales practices, documents, and conduct as that of the Class. Plaintiffs are members of the Class and the Nevada Sub-class. Plaintiffs the Skougard Family and the Santorii-Whitney Family are members of the FHA Sub-class.

210.   Adequacy of Representation. Plaintiffs will fairly and adequately assert and protect the interests of the Class. First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims across the United States, and who will adequately represent the interests of the Class. Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent. Further, Plaintiffs understand their obligations to the Class, are committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Class.

1

## **Rule 23(b)(3) Criteria**

2    211.   The common questions of law and fact set forth herein predominate

3  over any questions affecting only individual Class Members. A class action provides

4  a fair and efficient method for the adjudication of this controversy for these reasons

5  and is superior to the alternative methods involved in individual litigation.

6    212.   Although the Class is numerous enough to meet the numerosity

7  requirement, the proposed Class does not create manageability problems because the

8  claims turn on common legal determinations. Either Defendants violated RICO,

9  were unjustly enriched, violated DTPA, and/or were negligent, or they did not.

10  Either the home values were inflated or they were not. There are no unusual legal or

11  factual issues that would create manageability problems as the issues turn on a single

12  interpretation of Defendants' uniform conduct regarding their home sales and

13  origination of home-secured loans in relation to Plaintiffs and others in similar

14  circumstances.

15    213.   Prosecution of separate actions by individual members of the Class

16  would create a risk of inconsistent and varying adjudications against Defendants

17  when confronted with incompatible standards of conduct.

18    214.   Despite the sizeable sum of money unlawfully collected and retained

19  by the Defendants, the claims of the individual Class Members are, nevertheless,

20  small in relation to the expenses of individual litigation, making a class action the

only procedural method of redress in which Class Members can, as a practical matter, and recover their damages. Further, the issues raised in this litigation are complex such that an individual's recovery is small in relation to the amount of effort, cost, and expertise necessary to obtain said recovery.

215.    Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using their business records.

## CAUSES OF ACTION

## COUNT I

**Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity (RICO 18 U.S.C. § 1962 (c) ("RICO")**

**(On Behalf of Plaintiffs and the Classes against All Defendants)**

216.    Plaintiffs repeat and reallege paragraphs 1 through 215 as if set forth fully herein.

217.    Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).

**The Enterprise**

218.    The Enterprise within the meaning of 18 U.S.C. § 1961(4) consists of an association-in-fact of, at a minimum, D.R. Horton and its "preferred lender," DHI Mortgage (the "Enterprise").

219.    Each Defendant is an entity within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property."

220.    Each Defendant is legally distinct from the other, in that each is separately incorporated, and each operates different businesses. D.R. Horton's business is to build and sell homes, and it does so with or without financing from DHI Mortgage. DHI Mortgage operates as a separate lending institution with its own mortgage origination business. DHI Mortgage's business is to make home-secured loans, and it does so for homes sold by D.R. Horton as well as other individual and corporate home-sellers and refinancing existing loans on owner-occupied homes.

221.    Each Defendant has distinct regulatory and legal obligations, licensing requirements, and insurance considerations. In executing the Monthly Payment Suppression Scheme, each Defendant performs different roles in the Enterprise, relying on a web of contractual and business relationships designed to execute the Monthly Payment Suppression Scheme.

222.    **Connection to Interstate Commerce:** The Enterprise is engaged activities that affect interstate and foreign commerce. Defendants each participate in and operate the Enterprise from their respective headquarters in Texas and through their agents and representatives around the country. They conduct home sales and mortgage originations across multiple states and, as discussed below, rely on the interstate wires to further their goals.

223.    **Relationship:** Each member of the Enterprise has a relationship to each other. D.R. Horton is the parent corporation of DHI Mortgage. They have agreed with one another to execute the Monthly Payment Suppression Scheme.

224.    **Common Purpose:** Each member of the Enterprise associated together for the common purpose of selling as many homes as quickly as possible for the maximum profit, including selling homes to Homebuyers at higher prices than these buyers would otherwise be willing to pay. Each member of the Enterprise has an interest in furthering the common purpose. D.R. Horton obtains more money for the sale of each home, and DHI Mortgage can command a higher price for the loan that it sells after origination. And because of the Monthly Payment Suppression Scheme, Defendants each increased their total number of closings by making the deal look better than it actually is, enticing Homebuyers to buy homes they would not otherwise buy. Each Defendant benefited financially from its scheme to defraud the

Class, receiving monies which they would not have received but for the existence of the scheme.

225.  **Longevity:** Beginning before the Class Period and continuing to this day, Defendants have engaged in the Monthly Payment Suppression Scheme as to thousands of Homebuyers. The names, locations, and dates of each Homebuyer's injuries are in the exclusive control of Defendants. Defendants, through the Enterprise, continue to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO Enterprise has functioned as a continuing unit.

## Each Defendant Conducts and/or Participates in the Affairs of the Enterprise

226.  Defendants each had the specific intent to participate in the overall RICO Enterprise and the scheme to defraud Plaintiff and the Class, and each participated and controlled in the enterprise as follows:

227.  Defendant D.R. Horton directs, controls, and participates in the activities of the Enterprise in a variety of ways as set forth herein, including:

a.  building the home, and listing the home for sale,

b.  running advertisements nationwide and locally, using the interstate wires, that promote both D.R. Horton and DHI Mortgage, including its mortgage lending business,

c.  employing and training the sales representatives that:

  i. communicate with potential buyers including Plaintiffs and Class Members,

  ii. promote to Class Members its relationship with DHI Mortgage, the benefit of one-stop shopping when purchasing a home, and both Defendants' ability to work within a budget,

  iii. solicit the monthly payment or PITI that the buyer can afford,

  iv. show homes to Class Members that it knows it will price at an amount that exceeds their budget, and

  v. offer the buyers incentives to use DHI Mortgage for their financing;

d. Determining the inflated price on the home, with the knowledge that DHI Mortgage will structure an estimated monthly payment with suppressed amount of property taxes, to make the home appear more affordable to the Class Member;

e. Facilitating the Class Member's relationship with DHI Mortgage, all while knowing that DHI Mortgage will structure an estimated monthly payment with suppressed amount of property taxes, enabling it to charge a higher amount for the home, by:

  i. directing the Class Member to a specific DHI mortgage sales professional for financing, and

ii. communicating with DHI Mortgage regarding the Class Member's budget and pricing on its homes;

f. Coordinating with DHI Mortgage on the determining the Suppressed and True Estimates for property taxes on the homes;

g. Undertaking efforts to finalize the paperwork associated with the sale and closing; and

h. Receiving the proceeds of the sale of the home at an inflated price via interstate wires.

228. Defendant DHI Mortgage directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following:

a. Authorizing D.R. Horton to run advertisements on its behalf and promote the benefit of one stop shopping to Class Members;

b. Communicating with Class Members about DHI Mortgage's lending options,

c. Communicating with D.R. Horton regarding the price at which the home should be sold, the Class Members' budgets, and the Suppressed and True Estimates of associated property taxes to design a lending package that uses a higher home price to capture an outsized share of

the Class Member's monthly payment in the form of principal and interest,

d. Obtaining and review loan applications, including the expected monthly payment of the buyer,

e. Completing the escrow calculation in coordination with D.R. Horton,

f. Drafting, completing, transmitting each of the documents identified in paragraphs 61 to 85, including the Loan Estimates and Closing Disclosures, and collecting signatures from Class Members, utilizing suppressed monthly payment amounts,

g. Undertaking efforts to finalize the paperwork associated with the sale and closing; and

h. Receiving profits from the closing of Plaintiffs' and the Class Members' loan through inflated fees and through the sales of servicing rights for the loans through interstate wires.

## **Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

229.    Defendants each conducted the Enterprise's affairs through "a pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1) and (5). During the ten (10) years preceding the filing of this action and to the present, Defendant did cooperate jointly and severally in the commission of three (3) or more of the

predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint. This pattern consists of numerous related acts of wire fraud (18 U.S.C. § 1343) committed in furtherance of the Monthly Payment Suppression Scheme.

230.   The acts set out below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs and the Class for the benefit of Defendant. Each Racketeering Act involved the same or similar methods of commission and participants and affected the Class similarly. Without the repeated predicate acts, the ability to conduct their fraud using the interstate telecommunications wires, the Enterprise's goal of carrying out the Monthly Payment Suppression Scheme would not have succeeded. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their business to fraudulently induce Plaintiffs and the Class to purchase D.R. Horton homes with DHI Mortgage originated loans at a cost that they would not have agreed to but for the scheme.

231.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff and the Class out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

232.   In engaging in the Monthly Payment Suppression Scheme, it was reasonably foreseeable that interstate wire communications would be used.

233.   Each Defendant could not have furthered their fraud without the ability to use the telecommunications wires to share documents, information, and money with the other Defendant, co-conspirators, Homebuyers, and others.

234.   The acts of wire fraud include, but are not limited to, each of the transmissions designed to induce Plaintiffs and the Class to enter the home sales and financing transactions with Defendants which do not conform with industry practices, borrower expectations, and/or legal requirements. As the Class, the acts of wire fraud follow the same format set forth in paragraphs 40 to 85, and the precise dates, locations, and identities of each of Class Members associated with each act are known to Defendants and are in their exclusive control. The Plaintiffs all experience acts of wire fraud following the same format as the Class, and where readily known to Plaintiffs, the precise details of the various acts of wire fraud are set forth in paragraphs 99 to 125 (the Skougard Family), paragraphs 126 to 148 (the Hinds Family), paragraphs 149 to 171 (Ms. Robinson), and paragraphs 172 to 200 (the Santorii-Whitney Family).

235.   In addition, the acts of wire fraud include Defendants' receipt of funds from the sale of loans procured via the Monthly Payment Suppression Scheme. With respect to D.R. Horton, that includes funds received from DHI Mortgage shortly

after each Plaintiffs closing, and shortly after the closings of Class Members, the dates of which are in the exclusive control of Defendants. With respect to DHI Mortgage, this includes funds received and retained from the loan proceeds shortly after shortly after each Plaintiffs closing, and shortly after the closings of Class Members, the dates of which are in the exclusive control of Defendants; as well as funds received from the sale and transfer of each loan's servicing and/or ownership, including funds received from new servicers and/or holders shortly after each Plaintiffs closing, and funds received from servicers and/or holders shortly after the closings of Class Members, the identities and dates of which are in the exclusive control of Defendants.

### The Monthly Payment Suppression Scheme Proximately Caused Injuries to Plaintiffs and the Class

236.   Defendants' RICO scheme, including its ongoing pattern of racketeering activity, was reasonably calculated to deceive Plaintiffs and Class Members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the true monthly payments for the home purchases and related loans. The scheme has injured and continues to injure Plaintiffs and the Class.

237.   Plaintiffs and Class Members would not have purchased the homes or entered the loans on the terms presented but for the illegal racketeering scheme operated by Defendants.

238.   Defendants' wrongful conduct has caused injury to Plaintiffs and the Class, remains part of their ongoing business practices, and remains a continuing threat to Plaintiff, the Class and the general public.

239.   Plaintiffs and the Classes suffered economic harm by reason of the said violation of 18 U.S.C. § 1962(c), including but not limited to purchasing a home that they would not have purchased but for the fraudulent scheme, paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher PITI, and other consequences, such as an increased risk of foreclosure and late fees, and otherwise depriving them of the benefit of the bargain. The amounts of these damages will be proven at trial.

240.   By reason of the damages directly sustained by Plaintiffs and the Class from the injuries to their business and/or property, they are entitled to treble damages, equitable relief, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. §§ 598.0903 through 598.0999; Nev. Rev. Stat. § 41.600
*(On Behalf of Plaintiffs and the Nevada Sub-class)*

241.   Plaintiffs re-allege paragraphs 1 through 215 as though fully set forth herein.

242.   Plaintiffs bring this claim against Defendants under Nevada's Deceptive Trade Practices Act ("DTPA"), Nev. Rev. Stat. §§ 598.0903 *et seq*. *See, e.g.*, *Betsinger v. D.R. Horton, Inc.,* 126 Nev. 162, 166, 232 P.3d 433, 436 n.4 (2010) (DTPA regulates Defendants' deceptive sale and financing of real property).

243.   Defendants engaged in deceptive trade practices in violation of DTPA through the conduct described above, which led to consumers entering transactions they otherwise would not have if Defendants had not suppressed the true monthly housing cost, including through misleading oral representations, Loan Estimates, and Closing Disclosures. Plaintiffs would not have purchased the homes had they known that the monthly cost would be more expensive than advertised at closing, or at a minimum, would have paid less.

244.   Defendants' use of misleading Loan Estimates and Closing Disclosures to obscure the full and true price of its homes and the full monthly cost of the mortgage is likely to deceive consumers into purchasing the homes with DHI mortgages because the estimated monthly cost is material to the average, ordinary, and reasonable consumer. Defendants knew consumers would rely on the estimated payment. By using a partially escrowed property tax calculation in its monthly payment estimate, Defendants has demonstrated that this lower monthly payment is material to consumers. As a result of their deceptive acts and practices, Defendants have sold and financed thousands of homes. If Defendants had performed the escrow

calculation truthfully and in a non-misleading fashion, Plaintiffs, and the Nevada Sub-class Members, would not have purchased the homes or would not have paid as much.

245.   Defendants' actions in failing to escrow the full property taxes, as described herein, constitute deceptive trade practices as defined by DTPA. Defendant's actions are unfair and/or deceptive because Defendant conduct led customers into believing their monthly payment or PITI would be significantly lower than it was.

246.   This scheme is deceptive as defined by DTPA because Defendant has an unfair advantage over Plaintiffs and the Nevada Subclass as well, as they were not fully informed of the details of the transaction at the time they compared the monthly payment or PITI of an existing home with the D.R. Horton home.

247.   Defendants' conduct violated the DTPA, including but not limited to by:

    a. Knowingly making false representations about goods and services, in violation of Nev. Rev. Stat. § 598.0915(6);

    b. Making false or misleading statements of fact concerning the price of goods or services, in violation of in violation of Nev. Rev. Stat. § 598.0915(13);

c.  Knowingly making other false representations in a transaction, in violation of Nev. Rev. Stat. § 598.0915(15);

d.  Engaging in "bait and switch" tactics in violation of Nev. Rev. Stat. § 598.0917;

e.  Knowingly violating federal statutes and regulations, namely RESPA, 12 U.S.C. § 2609(c)(1)(A), 12 C.F.R. § 1024.17; TILA, 12 C.F.R. § 1026.38(c); and, as to the FHA subclass, FHA regulations, 24 C.F.R. § 203.23, FHA Handbook 4000.1 at 361-62, 375, each in violation of Nev. Rev. Stat. § 598.0923(1)(c); and

f.  Knowingly using an unconscionable act or practice in the transaction, by taking advantage of unequal knowledge, ability, and experience of consumers and/or obtaining a gross disparity between the value received and the consideration paid, in violation of Nev. Rev. Stat. § 598.0923(1)(e), (2)(b).

248.  Solely as to the misrepresentation-based claims above, Plaintiffs and the Nevada Subclass members reasonably relied on Defendant's material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased the homes from Defendants, or would not have paid as much for said homes, had they known the truth about Defendant's policies and practices.

249.   Plaintiff and Class Members are victims of consumer fraud within the meaning of Nev. Rev. Stat. § 41.600 and are thus entitled to actual damages, equitable relief, and reasonable attorneys' fees and costs.

250.   As a direct and proximate result of Defendant's misconduct and violations of the DTPA, Plaintiffs and the Nevada Subclass were injured and suffered actual damages, including but not limited to paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a result of Defendants' scheme.

251.   Plaintiffs and the Nevada Subclass members seek actual damages, equitable relief, an injunction to halt Defendant's unlawful practices, and reasonable attorneys' fees and costs from Defendants. Nev. Rev. Stat. § 41.600.

## COUNT III

### Negligence

*(On behalf of Plaintiffs and the Class)*

252.   Plaintiffs re-allege paragraphs 1 through 215 as though fully set forth herein.

253.   Defendants owed a duty of care to Plaintiffs and Class members in Defendants' marketing and sales of homes; and in Defendants' marketing, sales, and origination of home loans.

254. Defendants breached this duty by failing to accurately calculate the PITI payment, by failing include all taxes in the escrow analysis; and by thereby failing to disclose an accurate payment to borrowers.

255. Plaintiffs and the Class were damaged by this breach, including but not limited to paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a proximate result of Defendants' breach.

256. Plaintiffs' and the Class's damages were proximately caused by Defendants' conduct, as described above.

257. Plaintiffs are thus entitled to actual damages and all other appropriate relief.

## COUNT IV

### Negligence Per Se
### *(On behalf of Plaintiffs and the Class)*

258. Plaintiffs re-allege paragraphs 1 through 215 as though fully set forth herein.

259. RESPA requires that, at the time of origination, the borrower must be provided "a statement clearly itemizing the estimated taxes . . . that are reasonably anticipated to be paid from the escrow account during the first 12 months after the

establishment of the account . . . ." 12 U.S.C. § 2609(c)(1)(A); *see also* 12 C.F.R. § 1024.17.

260.   The Truth in Lending Act ("TILA") requires that the Closing Disclosure must accurately disclose projected payments, including accurately estimated escrow payments. 12 C.F.R. § 1026.38(c).

261.   Neither RESPA nor TILA permit the inclusion of a portion, but not all, of the estimated property taxes in the escrow account.

262.   These provisions are intended to ensure that borrowers are made meaningfully aware of all the monthly payment associated with the loan to assist them in making informed decisions about whether to enter the transaction. The provision thus proscribes the unfair or deceptive acts of suppressing the true cost of the home purchase and loan from borrowers and/or misrepresenting the true costs of the transaction, causing payment shock for Homebuyers.

263.   As described above, including in paragraphs 34–37 and 95-98, Defendants violated the letter and intent of these provisions by only including a small portion of the property taxes in the escrow account and thus artificially suppressing the monthly payments, thereby inducing borrowers into the transactions.

264.   Further, as to the FHA Subclass, FHA Mortgagees (i.e., the original lender, and later the Holders and Servicers of the loans) are required to escrow "all" property taxes, as well as insurance and other required payments, and to ensure that

these are escrowed appropriately pursuant to RESPA. 24 C.F.R. § 203.23. *See also* FHA Handbook 4000.1 at 361-62, 375.

265.   The FHA regulations and guidelines are intended to ensure that FHA Homebuyers are made aware of the monthly payment associated with the loan, that the loan is affordable, and that borrowers have the ability to repay the loan. The provision thus proscribes the unfair or deceptive acts of suppressing the true cost of the home purchase and loan from borrowers and/or misrepresenting the true costs of the transaction, causing payment shock for Homebuyers.

266.   As described above, including in paragraphs 34–37 and 95-98, Defendants violated the letter and intent of the FHA regulations and guidelines by only failing to escrow all property taxes, and instead only including a small portion of the property taxes in the escrow account and thus artificially suppressing the monthly payment, thereby inducing borrowers into the transactions.

267.   The injuries sustained by Plaintiffs, the Class, and the FHA Subclass— including payment shock and difficulty making their mortgage payments after the escrow payments skyrocketed when based on accurate estimates—are the type of injury RESPA, TILA, and (as to the FHA Subclass) the FHA regulations and guidelines were meant to protect against.

268.   Plaintiffs and the Class are among the parties RESPA and TILA are intended to protect.

269.   Plaintiffs and the FHA Subclass are among the parties that the FHA regulations and guidelines are intended to protect.

270.   Defendants breached their duties to Plaintiffs and the Class and FHA Subclass by failing to comply with RESPA, TILA, and the FHA regulations and guidelines.

271.   Plaintiffs and the Class and FHA Subclass were damaged by this breach, including but not limited to paying an inflated price for their home, diminished home value, lost opportunity to purchase alternative homes within their budgets, increased out of pocket monthly expenses in the form of a higher monthly payment, to be proven at trial, as a proximate result of Defendants' breach.

272.   Plaintiffs' and the Class's damages were proximately caused by Defendants' conduct, as described above.

273.   Plaintiffs are thus entitled to actual damages and all other appropriate relief.

## COUNT V

### Unjust Enrichment

### *(On behalf of Plaintiffs and the Class)*

274.   Plaintiffs re-allege paragraphs 1 through 215 as though fully set forth herein.

275.   Defendants unlawfully conducted their Monthly Payment Suppression

Scheme with the express intent of profiting from closing more home sales and loans and inflating the profits realized from these sales and loan originations.

276.  Plaintiffs and the Class thus conferred a benefit on Defendants by paying Defendants for the homes and the loans.

277.  Defendants had knowledge of the benefits conferred on them.

278.  Defendants voluntarily accepted and retained these benefits.

279.  The circumstances, as alleged herein, including that Defendants suppressed the true monthly payment from Plaintiffs and the Class and led Plaintiffs to believe that the monthly payments would be substantially lower, leading ultimately to payment shock for Plaintiffs and the Class, make it inequitable for Defendants to retain the benefits of their scheme.

280.  Plaintiffs thus request that the Court order that Defendants disgorge all amounts by which they were unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Class, and against Defendants for:

  a.  an order certifying this case to proceed as a class action, designating Plaintiffs as the Class representative, and designating the undersigned attorneys as Class Counsel;

b.  actual damages and interest;

c.  treble damages and interest;

d.  a declaration that Defendants' conduct is unlawful as set forth herein;

e.  injunctive relief requiring Defendants to cease all such unlawful
    conduct;

f.  equitable relief including but not limited to disgorgement of
    Defendants' profits;

g.  attorney's fees and costs; and

h.  such further relief as this Court may deem appropriate.

### Jury Demand

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:        December 3, 2025

Respectfully submitted,

<u>/s/Elizabeth Mikesell, Esq.</u>
**LEGAL AID CENTER**
**OF SOUTHERN NEVADA**
Elizabeth Mikesell, Esq.
NV Bar No. 8034
Peter Aldous, Esq.
NV Bar No. 11346
Legal Aid Center of Southern Nevada
725 E. Charleston Blvd.
Las Vegas, NV 89104
(702) 386-1533
EMikesell@lacsn.org

**VARNELL & WARWICK, P.A.**
Jeffrey L. Newsome, II: FBN 1018667*
Brian W. Warwick; FBN: 0605573*
Janet R. Varnell; FBN: 0071072*
Christopher J. Brochu: 1013897*
Pamela Levinson, 538345*
400 N. Ashley Dr., Ste. 1900
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
*bwarwick@vandwlaw.com*
*jvarnell@vandwlaw.com*
*jnewsome@ vandwlaw.com*
*cbrochu@vandwlaw.com*
*plevinson@vandwlaw.com*
*ckoerner@vandwlaw.com*

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio*
Roke Iko*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299
*ksimplicio@clarksonlawfirm.com*
*riko@clarksonlawfirm.com*

**NATIONAL CONSUMER LAW CENTER**
Jennifer Wagner (WVSB # 10639)*
Shennan Kavanagh (MA BBO # 655174)*
7 Winthrop Square, 4th Floor
Boston, MA 02144
Telephone: (617) 542-8010
Fax: (617) 542-8028
*jwagner@nclc.org*
*skavanagh@nclc.org*

***Attorneys for Plaintiffs and the Proposed
Class***

*pro hac vice applications forthcoming*