Mitchel H. Kider
*pro hac vice* pending
Timothy P. Ofak
*pro hac vice* pending
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc. and
DHI Mortgage Company, Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| KIM ROBINSON, BRADLEY SKOUGARD, DESIREE SKOUGARD, TAMMY SANTORII, ARTHUR WHITNEY, MICHELLE HINDS, and BRADLEY HINDS on behalf of themselves, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>        vs.<br><br>D.R. HORTON, INC. and DHI MORTGAGE COMPANY, LTD.,<br><br>    Defendants. | Case No: 2:25-cv-02394-RFB-MDC<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>**(ORAL ARGUMENT REQUESTED)** |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants—D.R. Horton, Inc. ("D.R. Horton") and DHI Mortgage Company, Ltd. ("DHIM")—move to dismiss Plaintiffs' Complaint (Dkt. 1) in its entirety for failure to state a claim upon which relief can be granted.

This Motion is based on the papers filed in this action, the following memorandum of points and authorities (including attached exhibits, which are relied upon and incorporated by reference in the Complaint), and any argument made during a hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

<u>INTRODUCTION</u>

Plaintiffs purchased newly constructed homes from D.R. Horton with mortgage loans from DHIM.  As is typical with newly constructed homes, the properties purchased by Plaintiffs were still assessed by the local taxing authorities as "unimproved" properties—with lower property tax rates—at the time Plaintiffs' loans closed.  Local taxing authorities have varying timetables for re-assessing property values for taxing purposes, and Plaintiffs were expressly informed that their homes would be reassessed at some point after closing as "improved" properties with higher property taxes and correspondingly higher monthly payments.

Despite having received all federally mandated disclosures and estimates, and additional notices regarding their future property taxes, Plaintiffs allege that DHIM provided fraudulent information related to their estimated property taxes.  They purport to bring claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), predicated on alleged wire fraud arising out of DHIM's sending allegedly fraudulent disclosures required under the federal Truth-in-Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA").  They also bring claims under a Nevada consumer protection statute and Nevada common law, all of which are also premised on DHIM's allegedly providing fraudulent information in the disclosures required under TILA and RESPA.  None of Plaintiffs' claims can survive dismissal.

At the heart of their Complaint is the assertion that DHIM suppressed total monthly payments on two standardized federal mortgage disclosure forms—the Loan Estimate ("LE") and Closing Disclosure ("CD").  Plaintiffs, however, misstate the information DHIM disclosed on their own LEs, which included estimated property taxes based on estimated improved property values, putting them on notice of those future payment amounts at the start of the loan origination process.  The estimated property taxes based on improved property values—which Plaintiffs claim are the "True Estimates"—were disclosed in the documents on which Plaintiffs rely in their Complaint.

Plaintiffs' claims also fail because DHIM properly calculated estimated escrow payments required at closing based on the actual property tax values in effect at the time, given that the expected future reassessment by local tax authorities had not yet occurred.  DHIM provided the

escrow and property tax estimates in the CDs in accordance with how TILA and its implementing regulations require those amounts to be calculated.

Equally telling is the lack of any factual allegation, aside from conclusory statements, concerning any purported fraud by D.R. Horton, the company that built Plaintiffs' homes. Plaintiffs assert no factual allegation of any kind plausibly linking D.R. Horton to the escrow and property tax estimates or the disclosure forms in question. D.R. Horton's lack of any role in preparing the supposedly fraudulent mortgage disclosures undercuts Plaintiffs' efforts to manufacture the existence of a RICO enterprise predicated on these disclosures. An ordinary corporate relationship between a homebuilder and its wholly owned subsidiary mortgage lender cannot constitute a RICO enterprise.

The lack of any plausibly alleged fraud is fatal to all of Plaintiffs' claims. Because Plaintiffs have not, and cannot, state a RICO claim against DHIM—much less D.R. Horton—these claims must be dismissed. In the same vein, Plaintiffs' state law claims based on the same deficient allegations must also be dismissed.

<u>BACKGROUND</u>

D.R. Horton is a homebuilder that builds and sells newly constructed homes. Dkt. 1 at ¶¶ 22-24. DHIM is a mortgage lender and wholly owned subsidiary of D.R. Horton that provides financing for buyers and originates mortgages, including mortgages insured by the Federal Housing Administration ("FHA") and mortgages guaranteed by the Department of Veterans Affairs. *Id.* at ¶¶ 21, 27. The mortgage industry is heavily regulated, and lenders like DHIM must adhere to regulations governing disclosures. *Id.* at ¶ 27.

Here, Plaintiffs' claims are based on LEs (which are provided when a borrower applies for a loan) and CDs (which are provided before the loan's closing) prepared by DHIM, both of which list an "Estimated Total Monthly Payment" for the mortgage. *Id.* at ¶¶ 62-63, 74-75. These disclosures are "standardized" "federal form[s]" that were "created by the federal government." *Id.* at ¶¶ 62, 74. The Consumer Financial Protection Bureau ("CFPB") promulgated these forms after a multi-year notice-and-comment rulemaking process, and they are subject to extensive and exacting regulations governing the calculation and disclosure of various mortgage-related costs

3

and payment amounts (including estimated escrow and estimated property taxes). *See* 12 C.F.R. §§ 1026.37, .38. On the front page of both the LE and the CD, escrow payment amounts (which include estimated monthly property taxes that will be due at the time of closing) are reflected in a box showing "Estimated Escrow," which is caveated with the statement "[a]mount can increase over time." Exs. B, C, H, I, N, O, T, U, each at 1. Another box on the first page titled "Estimated Taxes, Insurance & Assessments" also provides information on property taxes and, for a second time on the same page, caveats that "[a]mount can increase over time." *Id.*

The applicable regulations governing the LE and CD require that property taxes be calculated and presented in a different way for each of the two different forms. The property taxes shown on the LE are calculated based on the estimated future (improved) property values—the very amounts that plaintiffs claim were "suppressed." *See* Exs. B at 1-2; H at 1-2; N at 1-2; T at 1-2. This form gives borrowers a more general estimate of what they will pay over the course of the loan (as opposed to what they will pay at and just after closing). *See* 78 Fed. Reg. 79730, 79730, 79909 (Dec. 31, 2013). As shown on Plaintiffs' LEs (Exs. B at 1-2; H at 1-2; N at 1-2; T at 1-2)[1]:

| LOAN ESTIMATES | Monthly Property Taxes (based on estimated future reassessed property value) | Estimated Monthly Escrow | Estimated Total Monthly Payment |
|---|---|---|---|
| Kim Robinson | $362.37 | $379 | $2,066 |
| Bradley & Desiree Skougard | $346.80 | $382 | $2,479 |
| Tammy Santorii & Arthur Whitney | $468.63 | $527 | $3,259 |
| Bradley & Michelle Hinds | $353.24 | $393 | $2,410 |

Plaintiffs misrepresent these figures in their Complaint. *See* Dkt. 1 at ¶¶ 109, 134, 157, 184.

The property taxes shown on the CD are calculated based on the current (unimproved) property values in effect at the time of closing, and the monthly payment amount and property tax escrow amounts shown are designed to reflect exact amounts that the borrower will need to pre-pay at closing and amounts that will be due in the months immediately following the loan's closing. *See* 78 Fed. Reg. 79730, 79730, 79999 (Dec. 31, 2013). As shown on Plaintiffs' CDs (Exs. C at 1-2;

---

[1] Robinson received an initial LE and a revised LE, each listing the same estimated improved property taxes ($362.37/month) and escrow amounts ($379/month). Exs. B at 1-2; Y at 1-2.

I at 1-2; O at 1-2; U at 1-2):

| CLOSING DISCLOSURES | Monthly Property Taxes (based on actual currently assessed property value) | Estimated Monthly Escrow | Estimated Total Monthly Payment |
|---|---|---|---|
| Kim Robinson | $76.49 | $93.24 | $1,780.60 |
| Bradley & Desiree Skougard | $14.42 | $101.59 | $2,198.77 |
| Tammy Santorii & Arthur Whitney | $88.27 | $146.27 | $2,878.57 |
| Bradley & Michelle Hinds | $21.33 | $58.83 | $2,076.24 |

Plaintiffs also received Uniform Residential Loan Applications ("URLAs"), which broke down their expected monthly mortgage payments, including property tax amounts based on estimates of the improved property values after the local taxing authorities' reassessments. *See* Exs. A at 10; G at 10; M at 10; S at 10. Again, Plaintiffs' URLAs show the estimated future property taxes that were supposedly concealed (*id.*):

| Named Plaintiff URLAs | Monthly Property Taxes (based on estimated improved property value) | Total Monthly Payment |
|---|---|---|
| Kim Robinson | $362.37 | $2,237.48 |
| Bradley & Desiree Skougard | $346.80 | $2,572.15 |
| Tammy Santorii & Arthur Whitney | $468.63 | $3,312.93 |
| Bradley & Michelle Hinds | $353.23 | $2,449.14 |

Additionally, Plaintiffs received two "Important Property Tax Notices"—one at the time of application and one before closing. *See* Exs. D, E, J, K, P, Q, V, W, each at 1. These notices explained that their estimated property tax escrow amounts may be based on the current "unimproved" property taxes that will be due at the time of their next property tax payment but that, eventually, "the Escrow Account will be reanalyzed using the new, higher taxes (improved)" and that "[s]uch analysis will likely result in a substantial increase in your monthly escrow account payment." *Id.* Plaintiffs signed these notices, acknowledging the use of "unimproved or partially improved taxes due to establish the Escrow/Impound Account" and "that when the Account is re-analyzed the amount of the monthly escrow account payments may increase substantially." *Id.* Lenders are "encouraged, but not required," to provide borrowers with these notices, and DHIM's voluntary notices were significantly more detailed than the sample language proffered by the CFPB. *See* 12 C.F.R. § 1024.17(a); 63 Fed. Reg. 3214, 3236 (Jan. 21, 1998).

Finally, Plaintiffs each received before closing a "First Payment Letter" (Exs. F at 1; L at 1; R at 1; X at 1) with a breakdown of the monthly payment, including estimated taxes, explaining:

> The Estimated Taxes shown above are based on the unimproved assessed value of your home. When your home is assessed based on its full value, the tax is estimated to be \$[amount] per month. To avoid a shortage in your escrow account, it is recommended that you put an additional \$[amount] per month in your escrow account.[2]

Contrary to Plaintiffs' contention, the disclosures that they received throughout the loan process are replete with information concerning their estimated property taxes based on estimated improved property values. In turn, the Court, when ruling on a motion to dismiss, need not accept as true allegations purporting to characterize the contents of these documents and can instead consider the documents themselves, which the Complaint references. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("[Court] need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint."); *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1162-63 (9th Cir. 2019) (holding that a document attached to a motion to dismiss can be considered if "the document forms the basis of the plaintiff's claim" (quotations omitted)); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (holding that court can consider documents attached to a motion to dismiss if the complaint references them).

## LEGAL STANDARD

A complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quotations omitted). A claim that "sound[s] in fraud" or that is "grounded in fraud" must satisfy Rule 9(b)'s heightened pleading standard. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).

---

[2] The amounts, after reassessment, shown in the named Plaintiffs' First Payment Letters are:

- Robinson: property tax estimated at \$362.37/month and \$285.88/month extra recommended to be placed into escrow.
- Skougard: property tax estimated at \$346.80/month and \$332.28/month extra recommended to be placed into escrow.
- Santorii-Whitney: property tax estimated at \$468.63/month and \$380.36/month extra recommended to be placed into escrow.
- Hinds: property tax estimated at \$353.23/month and \$331.90/month extra recommended to be placed into escrow. Exs. F at 1; L at 1; R at 1; X at 1.

<u>ARGUMENT</u>

Plaintiffs' central claim is that Defendants breached their legal duties by failing to disclose the estimated property taxes based on estimated improved property values that Plaintiffs might owe at some point in the future and by not requiring Plaintiffs to pay extra amounts into escrow in advance to cover future increased property taxes. This claim is patently false and plagued by numerous misrepresentations and pleading deficiencies. As an initial matter, there is no specific factual allegation, aside from conclusory assertions, of any impropriety as to D.R. Horton.

As to DHIM, the applicable mortgage disclosure laws instruct DHIM to base estimated escrow payments at closing on the currently assessed property value. Additionally, DHIM provided Plaintiffs with the estimated "improved" property taxes—the figures that Plaintiffs claim were withheld—in the very disclosures that Plaintiffs purport to rely on in their Complaint. DHIM also voluntarily provided Plaintiffs with additional disclosures (the Important Property Tax Notices and First Payment Letters) to alert them to the anticipated future property tax increases and to consider paying more into escrow to prepare for the future increases.

That Plaintiffs seemingly ignored these many disclosures does not render DHIM's conduct fraudulent or misleading—quite the opposite. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) ("Plaintiffs' omissions theory fails to state a claim because … Defendants clearly disclosed material information to [Plaintiffs].").  DHIM's compliance with both the letter and intent of applicable mortgage laws undercuts the entire basis of Plaintiffs' Complaint.

### I.    Plaintiffs Fail to Plausibly Allege Wire Fraud Predicate Acts

Plaintiffs claim that Defendants conducted a "pattern ... of numerous related acts of wire fraud" by engaging in a "scheme" allegedly "designed to induce Plaintiffs and the Class to enter the home sales and financing transactions with Defendants which do not conform with industry practices, borrower expectations, and/or legal requirements." Dkt. 1 at ¶¶ 229, 234. A wire fraud claim must be based on affirmative material misrepresentation or breach of an independent duty to disclose. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015); *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010).

DHIM's tax and escrow estimates in the LEs and CDs, however, were consistent with legal

requirements as to how those forms must be completed, so it fulfilled the relevant disclosure duties. And the Complaint does not identify any affirmative material misrepresentation made by either Defendant. Because Plaintiffs fail to plead with particularity either basis for wire fraud predicate acts as Rule 9(b) requires, the RICO claims must be dismissed.

**A. Plaintiffs' Wire Fraud Allegations Do Not Satisfy Rule 9(b)**

Given that these claims allege fraud, Plaintiffs must satisfy Rule 9(b) by identifying "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation" and "the role of each defendant in each [alleged] scheme." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). The Complaint, however, sets forth only "conclusory allegations of fraud ... punctuated by a handful of neutral facts." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

1. Allegations Against D.R. Horton Do Not Satisfy Rule 9(b)

As to D.R. Horton, the Complaint does not include any factual allegation, aside from conclusory assertions, of wrongdoing sufficient to satisfy Rule 8(a), let alone Rule 9(b). Under Rule 9(b), "a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds*. Here, however, Plaintiffs simply describe the standard process for purchasing a home and obtaining a mortgage.

Plaintiffs' allegations referring to D.R. Horton are general in nature and unrelated to the alleged predicate acts. For example, the allegation that, pursuant to Defendants' agreement, "D.R. Horton's sales personnel should emphasize how their 'preferred' partner, DHI Mortgage, offers deals for Homebuyers through its lending program," Dkt. 1 at ¶ 50, does not contain "specific content of the false representations" to homebuyers, *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (quotations omitted). Claims that D.R. Horton employed and trained sales representatives to promote a relationship with DHIM, Dkt. 1 at ¶¶ 49-51, are not "accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (quotations omitted). This lack of detail as to D.R. Horton's alleged fraudulent conduct is insufficient to satisfy Rule 9(b). *See United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984,

998 (9th Cir. 2011) (holding that fraud allegations failed to state a claim when complaint "provide[d] no additional detail as to the nature of the Individual Defendants' involvement in the fraudulent acts" and "attribute[d] wholesale all of the allegations against [corporate defendant] to the Individual Defendants," because "Rule 9(b) undoubtedly requires more").

Instead, Plaintiffs lump D.R. Horton and DHIM together and frequently refer to "Defendants" generally, rather than D.R. Horton specifically.  *See, e.g.*, Dkt. 1 at ¶¶ 61-85 (describing supposed structure of Defendants' alleged "scheme").  By conflating Defendants' actions in the Complaint, Plaintiffs ignore Rule 9(b)'s core purpose of informing each Defendant separately of the allegations surrounding that Defendant's participation in the alleged fraud.  *See, e.g.*, *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) ("[W]ith different actors playing different parts, it is not enough [under Rule 9(b)] to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'"); *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (holding that fraud allegations failed to state a claim when the complaint was rife "with general allegations that the 'defendants' engaged in fraudulent conduct but attribute[d] specific misconduct only to" some defendants).  Here, D.R. Horton was not involved in preparing the allegedly deficient LEs and CDs.  Plaintiffs have alleged no fraudulent act with particularity as to D.R. Horton, so the claims against it must be dismissed.

 2.  <u>Allegations Against DHIM Do Not Satisfy Rule 9(b)</u>

Plaintiffs also cannot allege with particularity that DHIM made any false or misleading statement.  Rule 9(b) requires a plaintiff to "set forth what is false or misleading about a statement, and why it is false."  *Decker*, 2 F.3d at 1548.  And where, as here, companies enter into "transactions that are facially legitimate, ... operate legitimate businesses for years thereafter, and otherwise act as routine participants in American commerce, a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme."  *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997-98 (9th Cir. 2014).  The Complaint does not carry this heavy burden and "set forth an explanation as to why the [LEs and CDs] complained of [were] false or misleading."  *Decker*, 2 F.3d at 1548. Plaintiffs conclusorily allege that DHIM violated the applicable statutes and regulations while

including only a handful of errant citations of specific provisions and ignoring the rationale underlying the disclosure framework that Congress and federal agencies carefully crafted.

**B. DHIM Prepared Its Disclosures as Required by TILA and RESPA[3]**

DHIM complied with the relevant statutory and regulatory disclosure requirements, so Plaintiffs' wire fraud claims cannot be premised on breach of a disclosure duty. The TILA regulations govern the LE and CD forms.[4] DHIM is not free to include whatever information it wants on the LE or CD. Nor do the forms become fraudulent or misleading because Plaintiffs contend that they could have designed more helpful disclosures.

1. Loan Estimate

The LE is designed to provide disclosures to borrowers early on in the loan application process to help them understand the key features and costs (including amounts the borrower will need to pay at closing) of their mortgage transactions. *See* 78 Fed. Reg. 79730, 79730 (Dec. 31, 2013). As part of these costs, the LE provides a projected monthly payment, which includes payments to be made from the escrow account. *See* 12 C.F.R. § 1026.37(c). In a separate section, the LE includes an estimate of property taxes, insurance, and assessments, which can include amounts that are not covered in the estimated escrow payment amount. *See id.* § 1026.37(c)(4)(iv).

DHIM could have shown the unimproved property tax amounts then in effect on the LEs and satisfied its legal obligation. But it took the extra step of including the estimated improved property tax amounts that might apply after reassessment in the estimated monthly payments to provide additional information to Plaintiffs. *See* Exs. B at 1-2; H at 1-2; N at 1-2; T at 1-2. Plaintiffs received both what they were legally entitled to and what they now claim DHIM withheld. The information DHIM provided in these disclosures is more than sufficient to contradict general and conclusory allegations that the LEs were somehow fraudulent. *See Manzarek*, 519 F.3d at 1031.

---

[3] Plaintiffs do not bring claims under TILA itself. *See* 15 U.S.C. § 1640. Likewise, the relevant provision in RESPA governing escrow calculations does not provide a private right of action. *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006).

[4] The TILA regulations are also known as Regulation Z (12 C.F.R. Part 1026).

2.  <u>Closing Disclosure</u>

The purpose of the CD is to provide a borrower with information concerning the final costs of the loan transaction at closing. *See* 78 Fed. Reg. 79730, 79730 (Dec. 31, 2013). The CDs that Plaintiffs reviewed and signed do exactly that. The regulations governing CDs incorporate RESPA regulations and state that:

> If the servicer **knows** the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts. If the charge is **unknown** to the servicer, the servicer may base the estimate on **the preceding year's charge** ....

12 C.F.R. § 1024.17(c)(7) (emphases added) (incorporated by reference at *id.* § 1026.38(c)(1)(i)). The charge for an escrow item shall be used if "known," but if "unknown," it may be based on "the preceding year's charge." *Id.* For escrowed property taxes, the "known" amount would be the then-current unimproved property tax, and not some future amount that has not yet been assessed by the local taxing authority. This information concerning monthly property tax amounts is listed in a section of the CD titled "Initial Escrow Payment at Closing."

The regulation also provides that, for "unassessed new construction," the lender "**may** base" the property tax escrow calculation "on the assessment of comparable residential property in the market area." *Id.* § 1024.17(c)(7) (emphases added). Plaintiffs do not allege that DHIM assessed comparable residential properties in the market area. Nor did DHIM violate any legal requirement or breach any disclosure duty by not conducting this type of assessment because it is only something that lenders "may" do, not must do.

Moreover, the CDs for all Plaintiffs make clear that the monthly payment amounts do not include all estimated property taxes that might be due during the first year of the loan. On the first page, the CDs show that the "Estimated Taxes, Insurance & Assessments" are much higher than the "Estimated Escrow" included in the monthly payment amount and that only "SOME" of the total estimated property taxes are included in the estimated escrow amount used for the monthly payment calculation. Exs. C at 1; I at 1; O at 1; U at 1. Page four of the CDs provides additional detail on the "Non-Escrowed Property Costs over Year 1," which include estimated "Property Taxes" that are Plaintiffs' responsibility to pay. Exs. C at 4; I at 4; O at 4; U at 4. DHIM appropriately used the then-current property taxes to calculate the funds that the RESPA

regulations require to be deposited into escrow at closing and disclosed on the CD the estimated improved property taxes not deposited into escrow that might be due later.

Basing escrow estimates on "then-current" property taxes that were set by local taxing authorities effectuates RESPA's congressional purpose, which is to protect homebuyers "from unnecessarily high settlement charges" by reducing "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes." 12 U.S.C. § 2601. Accordingly, RESPA prohibits lenders from collecting excessive funds for escrow. *See id.* § 2609(a)(1) ("A lender ... may not require the borrower ... to deposit in any escrow account ... an aggregate sum (for such purpose) in excess of a sum that will be sufficient to pay such taxes ...."). DHIM is not required to force Plaintiffs to deposit more funds into escrow to cover property taxes based on future property valuations that had not yet been assessed by local tax authorities. DHIM, however, provided the Important Property Tax Notices and First Payment Letters to encourage borrowers to voluntarily pay additional amounts into escrow in anticipation of the future increase.

Moreover, the CFPB's official interpretation of the TILA regulations states that property tax "[e]stimates of mortgage-related obligations should be based upon information that is known to the creditor at the time the creditor underwrites the mortgage obligation" and that "the creditor ***need not project potential changes, such as by estimating possible increases in taxes***." Official Interpretation of 12 C.F.R. § 1026.43(c)(2)(v) at ¶ 5 (emphases added). Even when the lender expects that property taxes will be reassessed at a higher amount within the next year:

> The creditor complies ... by determining the annual property tax amount owed in the prior [taxing period] .... The creditor complies ***even if the consumer will likely owe more in the next year than the amount owed the prior [taxing period] because the jurisdiction normally increases the property tax rate annually***, provided that the creditor does not have knowledge of an increase in the property tax rate ***at the time of underwriting***.

*Id.* at ¶ (4)(i) (emphases added). Plaintiffs do not allege that DHIM had knowledge that the local taxing authorities reassessed their properties at higher values before closing. To the contrary, Plaintiffs allege that DHIM's estimated escrow payments at closing were based on the "then-current local actual property tax records." Dkt. 1 at ¶ 36. These estimates complied with the relevant regulations and were not misleading. *See Clarke v. Fid. Bank*, No. 1:14-cv-3287, 2015

U.S. Dist. LEXIS 184104, at *9-10 (N.D. Ga. June 4, 2015), *adopted in relevant part by* 2015 U.S. Dist. LEXIS 184086 (N.D. Ga. June 30, 2015) (rejecting alleged TILA violation when lender based estimated property taxes on prior taxes).

### 3. FHA Requirements

Plaintiffs claim that FHA regulations require that escrow payments include "the estimated amount of all property taxes." Dkt. 1 at ¶ 93 (internal quotation marks omitted) (citing 24 C.F.R. § 203.23). But these regulations do not offer any specificity regarding how that amount is to be calculated and say nothing about using current taxes versus future estimated taxes. Plaintiffs also ignore that the FHA regulations explicitly require lenders to follow RESPA for "the procedures ... to compute the amount of the escrow." 24 C.F.R. § 203.550(a). As previously discussed, DHIM complied with RESPA when calculating the amounts it collected for escrow.

Additionally, Plaintiffs cite the FHA Handbook, which states that "[t]he escrow account must be sufficient to meet [certain] obligations," which include "real estate taxes." Dkt. 1 at ¶ 93 (citing FHA Handbook 4000.1 II.A.6.a.viii(A)). But again, this Handbook provision offers no specificity regarding how to calculate these amounts, and there is no reason to think that the FHA wanted lenders to use anything other than the legally mandated RESPA calculation process. This Handbook does not—and legally cannot—override DHIM's previously discussed obligations to consumers under RESPA, TILA, or their implementing regulations, which have the force of law.

### C. Prior Consideration of Borrower "Payment Shock"

The issue of disclosing property tax estimates for properties that are assessed as unimproved at the time of the sale—but that will likely be reassessed at a higher value after closing—is not new. In 1998, HUD (which then had primary responsibility for the RESPA regulations) conducted a rulemaking to evaluate if there was a better way to address "payment shock" when escrow payment amounts increase significantly, such as when the taxable value of a formerly unimproved property is re-assessed at an improved value. *See* 63 Fed. Reg. 3214, 3214 (Jan. 21, 1998). HUD considered several options, including: 1) requiring borrowers to elect before closing whether to deposit additional funds into escrow to account for the expected increase; 2) allowing lenders to calculate property tax escrow payments amounts based on the expected future taxes instead of the

currently due taxes; and 3) making no change and keeping the regulations as they were. *See* 63 Fed. Reg. 3214, 3219 (Jan. 21, 1998). HUD selected option 3, keeping in place regulations that are substantially the same as those in effect today. *See* 63 Fed. Reg. 3214, 3225 (Jan. 21, 1998).

HUD observed that a lender is "encouraged, but not required," to provide a borrower with an additional notice explaining the anticipated property tax increase and to give the borrower the option to deposit additional funds into escrow. 63 Fed. Reg. 3214, 3226 (Jan. 21, 1998); *see* 12 C.F.R. § 1024.17(a). DHIM provided Plaintiffs with two of these voluntary notices—the Important Property Tax Notices—one at the time of application and one at closing. *See* Exs. D, E, J, K, P, Q, V, W, each at 1. Because DHIM adhered to its disclosure duties and voluntarily made additional disclosures, it is simply not plausible for Plaintiffs to allege that DHIM "violated the letter and intent" of applicable law—let alone that this was fraud intended to conceal the "true" amounts of property taxes.

### D. Disclosing Factually Accurate Property Tax Information Cannot Constitute an Affirmative Material Misrepresentation

Plaintiffs also fail to plausibly allege that Defendants made any materially false or misleading statement. Defendants' property tax disclosures and estimates were accurate and included the supposedly omitted information concerning the improved property taxes that might apply in the future. *See, e.g.*, Exs. B at 1; H at 1; N at 1; T at 1. As Plaintiffs concede, the actual property taxes in effect during the loan's origination and at the loan's closing were based on the unimproved property value. *See* Dkt. 1 at ¶ 36. DHIM's use of this tax amount in any disclosure reflected the true state of the world at the time and, thus, was not false or misleading. *See United Food & Com. Workers Cent. Pa. v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming dismissal of RICO claims when "complaint did not identify statements or representations ... that were literally false or misleading at the time they were made").

Additionally, several courts have determined that a lender does not make a misrepresentation to a borrower when the lender explicitly identifies that the escrow calculation was an estimate. *See, e.g.*, *Davis v. Mortg. Rsch. Ctr.*, No. 19-cv-02186, 2019 U.S. Dist. LEXIS 181676, at *9 (N.D. Ill. Oct. 16, 2019) ("The statute explicitly requires a disclosure of an estimate, and Plaintiffs submit exhibits establishing that they were told that the numbers were estimates."); *Abdel-Malak v. JP*

*Morgan Chase Bank, N.A.*, 748 F. Supp. 2d 505, 514 (D. Md. 2010) ("Plaintiffs should have been aware that [the escrow estimate] would change because the figure was an estimate."). Here, the LEs and CDs repeatedly state that the listed escrow amounts (including property taxes) are estimates and that the "[a]mount can increase over time." Exs. B, C, H, I, N, O, T, U, each at 1.

Further, multiple disclosures provided the estimated improved property taxes. *E.g.*, Exs. D, E, J, K, P, Q, V, W, each at 1. Plaintiffs had the information necessary for a complete view of both the current taxes, including amounts to be pre-paid at closing and in the months following closing, as well as estimates of the higher future taxes that might apply after reassessment.

### E. Wire Fraud Cannot Be Predicated on Breach of Regulation or Breach of Disclosure Duty Created by Statute with No Private Right of Action

Separately, Plaintiffs fail to plead RICO predicate acts because wire fraud premised on alleged nondisclosure can arise only if there is an independent duty to disclose the allegedly withheld information. *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987). The Ninth Circuit recognizes the existence of such a duty only if it is a fiduciary duty or arises under an explicit statutory obligation. *United States v. Dowling*, 739 F.2d 1445, 1449-50 (9th Cir. 1984) ("[Nondisclosure can] form the basis of a scheme to defraud *only* when there exists an independent duty (either fiduciary or derived from an explicit and independent statutory requirement) and such a duty has been breached." (Emphasis added).), *rev'd on other grounds*, 473 U.S. 207 (1985); *Flores v. United Parcel Serv.*, 768 F. App'x 677, 680 (9th Cir. 2019).

Although the Complaint suggests that Defendants maintain an "unfair advantage" because of their "unequal knowledge," Dkt. 1 at ¶¶ 98, 247(f), a mortgage lender in an arm's length transaction does not owe fiduciary duties to the borrower under Nevada law. *Barboni v. Radonjic*, No. A-24-884562-B, 2024 Nev. Dist. LEXIS 103, at *8-9 (Nev. Dist. Ct. June 6, 2024); *Weingartner v. Chase Home Fin., LLC*, 702 F. Supp. 2d 1276, 1288 (D. Nev. 2010) ("As a matter of law, lenders are not agents or fiduciaries of a borrower ....").

Because the Ninth Circuit has held that the only other acceptable basis for such duty must be "statutory," an agency rule or regulation cannot create a disclosure duty on which wire fraud can be predicated. *See Mst Mgmt., LLC v. Chicago Doughnut Franchise Co.*, 584 F. Supp. 3d 923, 932 (D. Nev. 2022) ("[Wire fraud] claims based on the omissions from the financial disclosures

required by the Federal Trade Commission's 'Franchise Rule' cannot amount to [RICO] predicate acts because an agency's rules and regulations cannot create the necessary *statutory* duty to disclose."). Plaintiffs do not identify any statutory obligation (as opposed to one based on an agency rule or regulation) creating the alleged disclosure duty regarding estimated property taxes and, thus, fail to plead wire fraud predicate acts premised on a purported failure to disclose information in violation of such a duty.

Moreover, wire fraud cannot be predicated on breach of a statutory disclosure duty if the underlying statute does not provide for a private right of action. *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521-22 (11th Cir. 2000); *Arruda v. Curves Int'l, Inc.*, 861 F. App'x. 831, 835 (5th Cir. 2021). Because the RESPA provision creating the disclosure duty that Defendants allegedly breached does not provide for a private right of action, *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006), wire fraud cannot be predicated on an alleged violation of this provision. *See Lennon v. NVR Mortg.*, No. 1:23-cv-22855, 2024 U.S. Dist. LEXIS 215462, at *13 (D.N.J. Nov. 26, 2024) (dismissing RICO claims when plaintiff premised wire fraud predicate acts on nondisclosure of information that RESPA purportedly required to be disclosed).

In any event, even if a regulation or statute without a private right of action could create the disclosure duty on which wire fraud could be predicated, DHIM calculated and disclosed the property tax–related information on the LE and CD in compliance with applicable law as discussed above. And only mortgage lender DHIM—and not homebuilder D.R. Horton—was required to provide these disclosures. Thus, even if there had been an issue with the disclosures—and there was not—that issue would involve at most only DHIM and would not implicate D.R. Horton in any alleged wire fraud.

## II.    Plaintiffs Fail to Plausibly Allege a RICO Enterprise

Plaintiffs claim that Defendants engaged in an enterprise that "consists of an association-in-fact" formed "for the common purpose of selling as many homes as quickly as possible for the maximum profit, including selling homes to Homebuyers at higher prices than these buyers would otherwise be willing to pay." Dkt. 1 at ¶¶ 218, 224. They maintain that "each Defendant performs different roles in the Enterprise, relying on a web of contractual and business relationships

designed to execute the Monthly Payment Suppression Scheme." *Id.* at ¶ 221.

An association-in-fact enterprise requires "a group of persons associated together for a common purpose of engaging in a course of conduct." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (quotations omitted). And a plaintiff must provide both "evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Id.* (quotations omitted). The Complaint, however, does not plausibly allege that Defendants functioned as a continuing unit with a common purpose of pursuing a course of conduct. Nor does it plausibly allege that each Defendant directed the enterprise, as opposed to its own business affairs as part of an ordinary affiliate relationship.

### A. Defendants Did Not Share a Common Purpose

Plaintiffs fail to plausibly allege that D.R. Horton and DHIM shared a common purpose in the purported RICO enterprise. Plaintiffs allege, in a conclusory manner, that Defendants had the common purpose of "selling as many homes as quickly as possible ... to Homebuyers at higher prices than these buyers would otherwise be willing to pay" and "benefited financially" as a result of "the Monthly Payment Suppression Scheme ... by making the deal look better than it actually is, enticing Homebuyers to buy homes they would not otherwise buy." Dkt. 1 at ¶¶ 34-38, 224.

Although D.R. Horton and DHIM are legally related entities, Plaintiffs do not allege a significant overlap in personnel and organizational structure that courts have determined is necessary to form a RICO enterprise. *See United States v. Feldman*, 853 F.2d 648, 658 (9th Cir. 1988) (holding that RICO enterprise existed because there was "overlap in personnel and organizational structure among the businesses" that was "significant considering the different businesses involved"). For example, the Complaint does not assert how Defendants' involvement in Plaintiffs' residential home purchases and mortgage originations "amount[s] to an organizational pattern or system of authority." *Id.* at 659 (quotations omitted). As discussed below, the Complaint offers no more than vague and conclusory assertions that D.R. Horton, as DHIM's parent company, "directs" DHIM's conduct or "works with" DHIM. Dkt. 1 at ¶¶ 50, 52.

In *Stitt v. Citibank, N.A.*, the Ninth Circuit held that homeowners failed to plausibly allege an enterprise among a mortgage lender, its parent company, and a third-party property inspection

17

vendor when the complaint connected the entities only through an allegation that the mortgage lender and its parent instructed the vendor to perform inspections on request.  748 F. App'x 99, 101 (9th Cir. 2018).  As the court explained, "[t]he mere existence of such a servicing contract between [defendants] does not establish a common purpose under RICO."  *Id.*  So, too, the mere existence of an affiliate relationship between a homebuilder and a mortgage lender to assist consumers with purchasing homes does not establish a common purpose.

Moreover, Plaintiffs do not allege facts plausibly supporting the inference that D.R. Horton and DHIM shared the common purpose of deceiving homebuyers by misrepresenting their monthly payments.  Conclusory allegations that D.R. Horton knew or participated in its subsidiary's activities—*see, e.g.*, Dkt. 1 at ¶¶ 60, 67—are legally insufficient to establish a continuing unit functioning with a common purpose.  *See Loomer v. Zuckerberg*, No. 23-3158, 2025 U.S. App. LEXIS 7096, at *4 (9th Cir. Mar. 27, 2025) (holding that conclusory RICO allegations that defendants had "common goals of making money, acquiring influence over other enterprises and entities, and other pecuniary and non-pecuniary interests" were insufficient).

**B. Failure to Distinguish Between D.R. Horton as Parent and DHIM as Its Subsidiary**

Plaintiffs make no meaningful distinction between Defendants' respective conduct, repeatedly lumping the two entities together as a single actor.  *See* Dkt. 1 at ¶¶ 65, 70-71, 80, 83-84, 89, 96-97.  The individual members of a RICO enterprise must be "separate and distinct" from the enterprise that they collectively form.  *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  Thus, relevant questions include: whether "[t]he associated in fact enterprise ... is a being different from, not the same as or part of, the person whose behavior [RICO] was designed to prohibit"; and whether "the enterprise can[] be either formally or practically separable from the person."  *Id.* at 362 (third alteration in original) (quotations omitted).

Here, however, Plaintiffs rely on vague allegations that D.R. Horton, as a parent, "directs" or "works with" DHIM, as its subsidiary, to create and transmit the allegedly fraudulent LEs and CDs.  Dkt. 1 at ¶¶ 50, 52.  They do not allege that D.R. Horton acted as a "separate and distinct" member of the enterprise in creating and transmitting the allegedly fraudulent LEs and CDs.  By ascribing DHIM's conduct to D.R. Horton simply because of their parent-subsidiary relationship,

Plaintiffs try to manufacture a RICO enterprise that, in reality, differs from the RICO person only in name. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[O]ne must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." (Citation omitted).).

### C. Plaintiffs Fail to Plausibly Allege that Each Defendant Directed the Affairs of the Enterprise, Rather Than Its Own

Plaintiffs fail to plausibly allege that each Defendant directed the enterprise's affairs. Each Defendant in a RICO enterprise "must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Participation requires directing the enterprise's affairs. *Id.* at 179. Plaintiffs cannot allege simply that each defendant conducted or participated in its own affairs. *Id.* at 185. Rather, they must allege that *each defendant* directed the enterprise's affairs. *Id.* And these allegations must be pleaded with particularity pursuant to Rule 9(b). *See Swartz*, 476 F.3d at 764-65.

Here, however, Plaintiffs allege only that Defendants directed their own affairs. And to the extent that they allege that Defendants directed the enterprise's affairs, their allegations are general or conclusory. The Complaint's factual allegations simply acknowledge that D.R. Horton builds homes and that DHIM originates mortgages. *See* Dkt. 1 at ¶¶ 22-24, 27. The only non-conclusory allegations tying D.R. Horton to the alleged "scheme" are that it markets and incentivizes buyers to use DHIM, its subsidiary, to obtain mortgage loans. *See id.* at ¶¶ 43-51.

As the Eleventh Circuit observed in a seminal RICO case, "there is nothing inconsistent or even particularly suspicious about a company both helping customers ... and helping [its franchises] improve their profits." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020). Indeed, as the Seventh Circuit observed, this conduct is consistent with a company's "going about its own business." *United Food & Com. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). Because only DHIM, as a mortgage lender, created and transmitted the LEs and CDs, the crux of the Complaint is that DHIM allegedly operated *its own* business illegally. *See Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (dismissing complaint for failure to state a RICO claim because, among other issues, "nub of the complaint [was] that [one defendant] operates *itself* unlawfully").

**III.    Plaintiffs Fail to Plausibly Allege Nevada Law Claims**

**A. Plaintiffs Fail to Plausibly Allege Nevada Deceptive Trade Practices Act Claims**

Plaintiffs claim that the allegedly misleading LEs and CDs violate several provisions of the Nevada Deceptive Trade Practices Act ("NDTPA").  An NDTPA claim has three elements: (1) a deceptive trade practice enumerated in the statute; (2) causation; and (3) damages.  *Goodlett v. Venetian Casino Resort LLC*, No. A-16-741603-C, 2020 Nev. Dist. LEXIS 692, at *19 (Nev. Dist. Ct. Oct. 5, 2020); *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019).  Because Plaintiffs' NDTPA claims sound in fraud, they must satisfy Rule 9(b).  *See Horner v. Mortg. Elec. Registr. Sys., Inc.*, 711 F. App'x 817, 818 (9th Cir. 2017).  For many of the same reasons that these disclosures do not constitute wire fraud predicate acts, they also fail to trigger NDTPA violations.  Further, Plaintiffs fail to plead these claims with particularity.

1.    A Real Estate Loan Does Not Involve a Good or Service under the NDTPA

As a threshold matter, certain NDTPA provisions apply only to transactions relating to "goods" or "services."  *See* Nev. Rev. Stat. §§ 598.0915, .0917.  But "a real estate loan is neither a good nor a service within the meaning of this statute."  *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 972 (9th Cir. 2017).  Here, the Complaint focuses on the originations of Plaintiffs' real estate mortgage loans.  Thus, sections 598.0915(6), (13) and 598.0917 (which refer to goods or services) do not apply here, and Plaintiffs' claims under these sections fail as a matter of law.

Apparently recognizing this flaw, the Complaint cites *Betsinger v. D.R. Horton, Inc.* for the proposition that the NDTPA applies to both the "deceptive sale and financing of real property." Dkt. 1 at ¶ 242 (citing 232 P.3d 433, 436 n.4 (Nev. 2010)).  But this assertion mischaracterizes *Betsinger*.  *Betsinger* concluded that the NDTPA could apply to the sale of real property but said nothing about whether the statute applies to mortgage lending.  *See* 232 P.3d at 436 n.4.  Indeed, subsequent cases—including from the Nevada Supreme Court—confirm that the NDTPA does not apply to mortgage lending, which is a different transaction from the real property sale.  *See, e.g.*, *Noonan v. Bayview Loan Servicing, LLC*, No. 73665, 438 P.3d 335 (Table), 2019 Nev. Unpub. LEXIS 428, at *3 (Nev. Apr. 8, 2019) (holding that NDTPA provision did not apply to mortgage loan servicer's conduct because conduct did not involve "sale or lease of goods or services");

*Muniz v. Wells Fargo & Co.*, No. 17-cv-04995, 2018 U.S. Dist. LEXIS 81040, at *13 (N.D. Cal. May 14, 2018) (concluding that NDTPA does not apply to allegations concerning mortgage loan rate lock and that *Betsinger* was factually distinguishable); *Reyna v. Wells Fargo Bank, N.A.*, No. 2:10-cv-01730, 2011 U.S. Dist. LEXIS 74456, at *23 (D. Nev. July 8, 2011) (concluding that NDTPA does not apply to allegations concerning mortgage loan modification and subsequent foreclosure).

Here, the Complaint focuses on the LEs and CDs, which mortgage lender DHIM prepared solely as part of the mortgage loan transactions, with no involvement from D.R. Horton. *See* Dkt. 1 at ¶¶ 62-64, 74-77. Likewise, the Complaint alleges that DHIM did not collect sufficient amounts in escrow to cover property taxes, which again related solely to the loan transactions and not the sales of the properties. *See id.* at ¶¶ 79, 82. Thus, Plaintiffs' claims under sections 598.0915(6), (13) and 598.0917 must be dismissed because they do not involve goods or services as is required to state a claim under these NDTPA provisions. Even if this requirement were not preclusive, these claims would still fail for the reasons explained below regarding the other NDTPA claims. Finally, because the Complaint focuses on LEs and CDs, which D.R. Horton had no role in preparing, there is no allegation of deceptive trade practices against D.R. Horton, and these claims against it must be dismissed.

### 2. Plaintiffs Fail to Plausibly Allege Deceptive Trade Practices

That leaves Plaintiffs' claims under sections 598.0915(15), 598.0923(1)(c), and 598.0923(1)(e). Plaintiffs' claims under section 598.0923(1)(c) are predicated on violations of TILA, RESPA, the FHA Handbook, and associated regulations. Because these NDTPA claims are based on the same alleged violations of federal law that Plaintiffs failed to plausibly allege, these NDTPA claims must also be dismissed. *See Cabral v. Caesars Entm't Corp.*, No. 78580, 467 P.3d 638 (Table), 2020 Nev. Unpub. LEXIS 746, at *6 (Nev. July 29, 2020) (holding that plaintiffs "failed to state a claim for a violation of the [N]DTPA because the claim [was] derivative of appellants' unviable causes of action for a violation of" two other statutes). As previously discussed, Defendants complied with TILA, RESPA, and FHA requirements when calculating and disclosing Plaintiffs' estimated property taxes, escrow amounts, and monthly payments.

Section 598.0915(15) deems it to be a deceptive trade practice when a person, "in the course of his or her business or occupation, ... [k]nowingly makes any other false representation in a transaction." As explained earlier, the Complaint does not identify any affirmative misrepresentation made by either Defendant. *See Noonan*, 2019 Nev. Unpub. LEXIS 428, at *2-3 (holding that no knowing misrepresentation supported NDTPA claim because defendant "neither made an affirmative false statement nor omitted a material fact it was bound to disclose"). When a borrower receives accurate disclosures, deception does not occur simply because the borrower fails to read or understand them. *See Land Baron Invs., Inc. v. Bonnie Springs Family Ltd.*, 356 P.3d 511, 518 (Nev. 2015) (explaining that nondisclosure claim requires seller to be "aware of materially adverse facts that could not be discovered by the buyer after diligent inquiry" (quotations omitted)). Plaintiffs have already conceded that the property tax information on the CD was based on the then-current property taxes and, thus, cannot plausibly allege that providing information accurately reflecting the facts at that time was deceptive.

Section 598.0923(1)(e) deems it to be a deceptive trade practice when a person, "in the course of his or her business or occupation, ... [u]ses an unconscionable practice in a transaction." Again, the Complaint does not allege how it is "grossly unfair," *id.* § 598.0923(2)(b), for a mortgage lender to estimate and accurately disclose property taxes based on the then-current property value while also providing multiple notices stating that these property taxes could increase after the property is reassessed and estimating those higher tax amounts. *See Decker*, 42 F.3d at 1548 (explaining that Rule 9(b) requires plaintiff to "set forth what is false or misleading about a statement, and why it is false"). Likewise, the Complaint does not allege how there was "gross disparity between the value [that Plaintiffs] received and the consideration [that Plaintiffs] paid." Nev. Rev. Stat. § 598.0923(2)(b)(2). After all, Plaintiffs do not allege that they overpaid for the properties themselves or that the property taxes that they owe do not provide them with corresponding value.

**B. Plaintiffs Fail to Plausibly Allege Negligence**

Plaintiffs allege that Defendants breached a purported duty of care in connection with the marketing and sales of homes and the marketing, sales, and origination of home loans by allegedly

"failing to accurately calculate the [monthly] PITI payment, by failing [to] include all taxes in the escrow analysis; and by thereby failing to disclose an accurate payment to borrowers." *Id.* at ¶¶ 253-54.  Under Nevada law, negligence requires "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158 (Nev. 2011).  "[W]hether a duty exists is actually a question of law to be determined solely by the courts." *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1177 (Nev. 2008).  Although Plaintiffs style this count as negligence, it effectively operates as a negligent misrepresentation claim because it reprises their wire fraud allegations that Defendants breached a disclosure duty. In turn, these negligent misrepresentation claims sound in fraud and must also satisfy Rule 9(b)'s heightened pleading standard.  *See Vess*, 317 F.3d at 1103.

      1.   <u>Plaintiffs Fail to Plausibly Allege Negligence Per Se</u>

Plaintiffs allege that "Defendants breached their duties to Plaintiffs and the Class and FHA Subclass by failing to comply with RESPA, TILA, and the FHA regulations and guidelines" and that they suffered harm as a proximate result.  Dkt. 1 at ¶ 270.  Under a negligence per se theory, violation of a duty created by civil statute "establishes the duty and breach elements of negligence when the injured party is in the class of persons whom the statute is intended to protect and the injury is of the type against which the statute is intended to protect." *Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1283 (Nev. 2009).  It follows that "proof of a deviation from an administrative regulation is ... not negligence per se." *Wiltse v. LoanCare, LLC*, No. 88420-COA, 579 P.3d 200 (Table), 2025 Nev. App. Unpub. LEXIS 579, at *8 (Nev. Ct. App. Oct 27, 2025) (quoting *Price v. Sinnott*, 460 P.2d 837, 840 (Nev. 1969)).  To the extent that Plaintiffs' claims rely on breach of regulations (such as those governing the LE and CD) or the FHA Handbook, these alleged breaches cannot constitute negligence per se.  Given that Plaintiffs' negligence per se claims are predicated on alleged violations of TILA and RESPA, these claims must also be dismissed because—as previously discussed—DHIM complied with TILA and RESPA when calculating and disclosing Plaintiffs' estimated property taxes, escrow amounts, and monthly payments.

      2.   <u>Plaintiffs Fail to Plausibly Allege Negligence</u>

Plaintiffs summarily assert that Defendants owed a duty of care to Plaintiffs in their home sales

and mortgage originations.  *See* Dkt. 1 at ¶ 253.  Yet they fail to clarify the source of these purported duties.  Where, as here, the parties entered into an arm's length transaction, a lender does not owe the borrower a fiduciary duty under Nevada law.  *Barboni*, 2024 Nev. Dist. LEXIS 103, at *8-9.  The only other duties that the Complaint mentions are those arising out of TILA and RESPA, the regulations promulgated under those statutes, and the FHA Handbook.  As previously discussed, DHIM complied with the regulations promulgated under TILA, RESPA, and the FHA Handbook when calculating and disclosing Plaintiffs' estimated property taxes, escrow amounts, and monthly payments.

**C.  Plaintiffs Fail to Plausibly Allege Unjust Enrichment**

Plaintiffs allege that the failure to disclose the "true monthly payment" amount "led Plaintiffs to believe that the monthly payments would be substantially lower, leading ultimately to payment shock for Plaintiffs and the Class, [and made] it inequitable for Defendants to retain the benefits of their scheme."  Dkt. 1 at ¶ 279.  Under Nevada law, "[a]n action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement."  *LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).  Here, Plaintiffs acknowledge that they entered into express contracts with Defendants by virtue of their mortgage loans with DHIM and their home sale agreements with D.R. Horton.  *See* Dkt. 1 at ¶¶ 105, 115, 130, 138, 153, 161, 181, 190.  Those agreements expressly set forth and govern the amounts that Plaintiffs paid.  Because Plaintiffs' unjust enrichment claims (that Defendants retained the proceeds from the home purchases and mortgage originations) are based on payments made pursuant to express contracts with Defendants (their mortgage loan agreements and home sale agreements), these claims must be dismissed.  *See Rhodes v. Designer Distrib. Servs., LLC*, Nos. 55522, 56615, 2012 Nev. Unpub. LEXIS 278, at *7-8 (Nev. Feb. 24, 2012) (affirming dismissal of unjust enrichment claim based on same subject matter as express contract, which was not separate and distinct).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety.

Dated: February 9, 2026

*/s/ Sharon A. Bauman*
Mitchel H. Kider
*pro hac vice* pending
Timothy P. Ofak
*pro hac vice* pending
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
Fax: (202) 628-2011
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc. and DHI Mortgage Company, Ltd.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on February 9, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Sharon A. Bauman*

Sharon A. Bauman