Mitchel H. Kider
*pro hac vice*
Timothy P. Ofak
*pro hac vice*
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN
LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc.
and DHI Mortgage Company, Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| KIM ROBINSON, BRADLEY SKOUGARD, DESIREE SKOUGARD, TAMMY SANTORII, ARTHUR WHITNEY, MICHELLE HINDS, BRADLEY HINDS, RUSTY STEFFNER, AMIE STEFFNER, and GAGE RADTKE, on behalf of themselves, and on behalf of all others similarly situated, | Case No: 2:25-cv-02394-RFB-NJK **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** **(ORAL ARGUMENT REQUESTED)** |
| Plaintiffs, vs. | |
| D.R. HORTON, INC. and DHI MORTGAGE COMPANY, LTD., | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants—D.R. Horton, Inc. ("D.R. Horton") and DHI Mortgage Company, Ltd. ("DHIM")—move to dismiss Plaintiffs' First Amended Complaint ("FAC"), Dkt. 29, in its entirety for failure to state a claim.

### MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs purchased newly constructed homes from D.R. Horton with mortgage loans from DHIM. As is typical with newly constructed homes, the properties purchased by Plaintiffs were still assessed by the local taxing authorities as "unimproved" properties—with lower property tax rates—at the time Plaintiffs' loans closed. Local taxing authorities have varying timetables for re-assessing property values for taxing purposes, and Plaintiffs were expressly informed that their homes would be reassessed at some point after closing as "improved" properties with higher property taxes and correspondingly higher monthly payments.

Despite having received all federally mandated disclosures and estimates, and additional notices regarding their future property taxes, Plaintiffs allege that DHIM provided fraudulent information related to their estimated property taxes. They bring claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), predicated on alleged wire fraud arising out of DHIM's sending allegedly fraudulent disclosures required under the federal Truth-in-Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA"). They also bring claims under Nevada and Florida consumer protection statutes and Nevada and Florida common law premised on DHIM's allegedly providing fraudulent information in the disclosures required under TILA and RESPA. None of Plaintiffs' claims can survive dismissal.

At the heart of the FAC is the assertion that DHIM did not collect additional funds in escrow to cover higher property taxes that might apply at some future time and did not include these additional funds in the monthly payment estimated on the closing disclosure ("CD"). Plaintiffs' theory is faulty because DHIM complied with RESPA's escrow and disclosure requirements. DHIM properly calculated estimated escrow payments required at closing based on the actual property tax values in effect at the time, in accordance with how TILA and its implementing regulations require those amounts to be calculated. Plaintiffs also disregard numerous disclosures that reflected estimated property taxes based on estimated improved property values. The

estimated property taxes based on improved property values—which Plaintiffs claim are the "True Estimates"—were disclosed in the documents on which the original complaint relied but from which the FAC now retreats.

Equally telling is the lack of any factual allegation, aside from conclusory statements, concerning any purported fraud by D.R. Horton, the company that built Plaintiffs' homes. Plaintiffs assert no factual allegation plausibly linking D.R. Horton to the escrow and property tax estimates on the disclosure forms in question. D.R. Horton's lack of any role in preparing the supposedly fraudulent mortgage disclosures undercuts Plaintiffs' efforts to manufacture the existence of a RICO enterprise predicated on these disclosures. An ordinary corporate relationship between a homebuilder and its wholly owned subsidiary mortgage lender cannot constitute a RICO enterprise. The lack of any plausibly alleged fraud is fatal to all of Plaintiffs' claims. Because Plaintiffs have not, and cannot, state a RICO claim against DHIM—much less D.R. Horton—these claims must be dismissed. In the same vein, Plaintiffs' state law claims based on the same deficient allegations must also be dismissed.

## BACKGROUND

D.R. Horton is a homebuilder that builds and sells newly constructed homes. FAC ¶ 23. DHIM is a mortgage lender and wholly owned subsidiary of D.R. Horton that provides financing for buyers and originates mortgages, including mortgages insured by the Federal Housing Administration ("FHA") and mortgages guaranteed by the Department of Veterans Affairs. *Id.* at ¶¶ 24, 30. The mortgage industry is heavily regulated, and lenders like DHIM must adhere to extensive regulations governing disclosures. *See id.* at ¶¶ 90, 92-94.

Borrowers receive numerous disclosures, including loan estimates ("LEs") (which are provided when a borrower applies for a loan) and CDs (which are provided before the loan's closing) prepared by DHIM, both of which list an "Estimated Total Monthly Payment" for the mortgage. *Id.* at ¶¶ 73, 77, 121. These disclosures are "standardized forms" that were "created by the federal government." *Id.* at ¶¶ 74, 121. The Consumer Financial Protection Bureau ("CFPB") promulgated these forms after a multi-year notice-and-comment rulemaking process, and they are subject to exacting regulations governing the calculation and disclosure of various mortgage-

related costs and payment amounts (including estimated escrow and estimated property taxes). *See* 12 C.F.R. §§ 1026.37, .38. On the front page of both the LE and the CD, escrow payment amounts (which include estimated monthly property taxes that will be due at the time of closing) are reflected in a box showing "Estimated Escrow," which is caveated with the statement "[a]mount can increase over time." Exs. B, D, I, J, O, P, U, V, AA, CC, HH, & II, at 1. Another box on the first page titled "Estimated Taxes, Insurance & Assessments" also provides information on property taxes and, again on the same page, caveats that "[a]mount can increase over time." *Id.*

The property taxes shown on the Plaintiffs' LEs are calculated based on the estimated future (improved) property values—the very amounts that plaintiffs claim were "suppressed." Exs. B, I, O, U, AA, & HH, at 1-2.   As shown on Plaintiffs' LEs after application, *id.*[1]:

| LOAN ESTIMATES | Monthly Property Taxes | Estimated Escrow | Est. Total Payment |
|---|---|---|---|
| Kim Robinson | $362.37 | $379 | $2,195 |
| Bradley & Desiree Skougard | $346.80 | $382 | $2,479 |
| Tammy Santorii & Arthur Whitney | $468.63 | $527 | $3,259 |
| Bradley & Michelle Hinds | $353.24 | $393 | $2,410 |
| Rusty & Amie Steffner | $444.50 | $545 | $2,987 |
| Gage Radtke | $585.12 | $705 | $2,400 |

After misstating these figures in their original complaint, Plaintiffs omit them from the FAC. *Compare* Dkt. 1 at ¶¶ 109, 134, 157, 184, *with* FAC ¶¶ 112, 135, 164, 194.

The property taxes shown on the CD are calculated based on the current (unimproved) property values in effect at the time of closing, and the monthly payment amount and property tax escrow amounts shown are designed to reflect exact amounts that the borrower will need to pre-pay at closing and amounts that will be due in the months immediately following the loan's closing. *See* 78 Fed. Reg. 79730, 79730, 79999 (Dec. 31, 2013). As shown on Plaintiffs' CDs (Exs. D, J, P V, CC, & II, at 1-2):

---

[1] Robinson received an initial LE and a revised LE, each listing the same estimated improved property taxes ($362.37/month) and escrow amounts ($379/month). Exs. B & C, at 1-2. The Steffners also received initial and revised LEs in the months before closing, which listed the same estimated improved property taxes ($444.50/month) and escrow amounts ($545/month). Exs. AA & BB, at 1-2.

| CLOSING DISCLOSURES | Monthly Property Taxes | Estimated Escrow | Est. Total Payment |
|---|---|---|---|
| Kim Robinson | $76.49 | $93.24 | $1,780.60 |
| Bradley & Desiree Skougard | $14.42 | $101.59 | $2,198.77 |
| Tammy Santorii & Arthur Whitney | $88.27 | $146.27 | $2,878.57 |
| Bradley & Michelle Hinds | $21.33 | $58.83 | $2,076.24 |
| Rusty & Amie Steffner | $47.63 | $209.92 | $2,805.84 |
| Gage Radtke | $172.77 | $247.94 | $1,888.69 |

Plaintiffs also received Uniform Residential Loan Applications ("URLAs") which broke down their expected monthly mortgage payments, including property tax amounts based on estimated future improved property values after reassessments—again, the same estimated future property taxes that were supposedly concealed (Exs. A at 10, H at 13, N at 11, 22, T at 14, Z at 13, & GG at 11):

| Named Plaintiff URLAs | Monthly Property Taxes | Total Payment |
|---|---|---|
| Kim Robinson | $362.37 | $2,237.48 |
| Bradley & Desiree Skougard | $346.80 | $2,572.15 |
| Tammy Santorii & Arthur Whitney | $468.63 | $3,312.93 |
| Bradley & Michelle Hinds | $353.23 | $2,449.14 |
| Rusty & Amie Steffner | $444.50 | $3,223.54 |
| Gage Radtke | $585.12 | $2,326.04 |

Additionally, Plaintiffs received two "Important Property Tax Notices"—one at the time of application and one before closing.  Exs. E, F, K, L, Q, R, W, X, DD, EE, JJ, & KK, at 1.  These notices explained that their estimated property tax escrow amounts may be based on the current "unimproved" property taxes that will be due at the time of their next property tax payment but that, eventually, "the Escrow Account will be reanalyzed using the new, higher taxes (improved)" and that "[s]uch analysis will likely result in a substantial increase in your monthly escrow account payment." *Id.*  Plaintiffs signed these notices, acknowledging the use of "unimproved or partially improved taxes due to establish the Escrow/Impound Account" and "that when the Account is re-analyzed the amount of the monthly escrow account payments may increase substantially." *Id.*

Finally, Plaintiffs each received before closing a "First Payment Letter" (Exs G, M, S, Y, FF, LL, at 1) with a breakdown of their monthly payment, including estimated taxes, which explained:

> The Estimated Taxes shown above are based on the unimproved assessed value of your home.  When your home is assessed based on its full value, the tax is estimated to be $[X] per month.  To avoid a shortage in your escrow account, it is

4

recommended that you put an additional $[X] per month in your escrow account.[2]

Contrary to Plaintiffs' contention, the disclosures that they received throughout the loan process are replete with information concerning their estimated property taxes based on estimated improved property values.  In turn, the Court, when ruling on a motion to dismiss, need not accept as true allegations purporting to characterize the contents of these documents and can instead consider the documents themselves, which the FAC references.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("[Court] need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint."); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (holding that court can consider documents attached to a motion to dismiss if the complaint references them).

The FAC de-emphasizes and excludes express references to numerous disclosures (URLAs, LEs, First Payment Letters, and Important Property Tax Notices) that the original complaint included.  But because Plaintiffs' fraud claims turn on the contents of these documents—which show that Plaintiffs received the information that they claim was concealed—the Court may nonetheless consider them under the incorporation by reference doctrine.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (extending incorporation by reference doctrine "to situations in which the plaintiff's claim depends on the contents of a document ..., even though the plaintiff does not explicitly allege the contents of that document in the complaint").  The FAC also still references them generally.  FAC ¶¶ 36, 66-68, 71, 84, 121, 149, 178, 209, 235, 261, 293.

After Defendants attached to their prior motion to dismiss these documents showing that Plaintiffs received the information that they claim was concealed, Plaintiffs apparently recognized that these disclosures contradicted their core allegations and omitted most references to them in the FAC.  *Compare* Dkt. 1 at ¶¶ 109, 134, 157, 184, *with* FAC ¶¶ 112, 135, 164, 194.  Plaintiffs

---

[2] The bracketed (post-reassessment) amounts shown in the Plaintiffs' First Payment Letters are:
- Robinson: est. future property tax $362.37/mo.; $285.88/mo. recommended extra escrow.
- Skougard: est. future property tax $346.80/mo.; $332.28/mo. recommended extra escrow.
- Santorii: est. future property tax $468.63/mo.; $380.36/mo. recommended extra escrow.
- Hinds: est. future property tax $353.23/mo.; $331.90/mo. recommended extra escrow.
- Steffner: est. future property tax $444.50/mo.; $396.87/mo. recommended extra escrow.
- Radtke: est. future property tax $585.12/mo.; $412.35/mo. recommended extra escrow.

cannot now simply abandon these allegations, which relied upon and incorporated by reference these disclosures that undermine their fraud claims. *See, e.g.*, *Joyce v. Patel*, No. 24-00422, 2026 U.S. Dist. LEXIS 55740, at *7 (E.D. Cal. Mar. 16, 2026) ("Plaintiff may not simply omit allegations from his amended complaint in an effort to state a cognizable claim for relief."); *Shellenberger v. AIG WarrantyGuard, Inc.*, No. 24-0657, 2024 U.S. Dist. LEXIS 163759, at *32 (W.D. Wash. Sept. 11, 2024) (cautioning against "strategic omission of pertinent facts that may undermine [plaintiff's] claims" and stating that "[a]ny amended complaint reasserting a [fraud] claim must ... provid[e] the most complete, clear picture of the alleged facts as possible").

ARGUMENT

Plaintiffs' central claim is that Defendants breached their legal duties by failing to disclose on their CDs the estimated property taxes based on estimated improved property values that Plaintiffs might owe at some point in the future and by not requiring Plaintiffs to pay extra amounts into escrow in advance to cover future increased property taxes. FAC ¶¶ 38, 42, 90, 95, 265. This claim is demonstrably false. The FAC is plagued by legal errors, inadequate factual allegations, and pleading deficiencies that warrant dismissal of all counts. As an initial matter, there is no specific factual allegation, aside from conclusory assertions, of any impropriety as to D.R. Horton.

As to DHIM, the applicable mortgage disclosure laws instruct DHIM to base estimated escrow payments at closing on the currently assessed property value. Additionally, DHIM provided Plaintiffs with the estimated "improved" property taxes—the figures that Plaintiffs claim were withheld—in the very disclosures that Plaintiffs purported to rely on in the original complaint but that the FAC now largely omits. DHIM also voluntarily provided Plaintiffs with additional disclosures (Important Property Tax Notices and First Payment Letters) to alert them to the anticipated future property tax increases and to consider placing additional funds into escrow to prepare for the future increases.

That Plaintiffs seemingly ignored these many disclosures does not render DHIM's conduct fraudulent or misleading. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) ("Plaintiffs' omissions theory fails to state a claim because ... Defendants clearly disclosed material information to [Plaintiffs]."). DHIM's compliance with both the letter and

6

intent of applicable mortgage laws undercuts the entire basis of the FAC.

## I. Plaintiffs Fail to Plausibly Allege Wire Fraud Predicate Acts under RICO

Plaintiffs claim that Defendants conducted a "pattern ... of numerous related acts of wire fraud" by engaging in a "scheme" allegedly "designed to induce Plaintiffs and the Class to enter the home sales and financing transactions with Defendants which do not conform with industry practices, borrower expectations, and/or legal requirements." FAC ¶¶ 294, 299. A wire fraud claim must be based on affirmative material misrepresentation or breach of an independent duty to disclose. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015); *U.S. v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010). DHIM's tax and escrow estimates in the CDs, however, were consistent with legal requirements as to how those forms must be completed, so it fulfilled the relevant disclosure duties. And the FAC does not identify any affirmative material misrepresentation made by either Defendant. Because Plaintiffs fail to plead with particularity either basis for wire fraud predicate acts as Rule 9(b) requires, the RICO claims must be dismissed.

### A. Plaintiffs' Wire Fraud Allegations Do Not Satisfy Rule 9(b)

Given that these claims allege fraud, Plaintiffs must satisfy Rule 9(b) by identifying "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation" and "the role of each defendant in each [alleged] scheme." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). The FAC, however, sets forth only "conclusory allegations of fraud ... punctuated by a handful of neutral facts." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

#### 1. Allegations Against D.R. Horton Do Not Satisfy Rule 9(b)

As to D.R. Horton, the FAC does not include any factual allegation, aside from conclusory assertions, of wrongdoing sufficient to satisfy Rule 9(b). Under Rule 9(b), "a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction." *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds*. Here, Plaintiffs simply describe the standard process for purchasing a home and obtaining a mortgage.

Plaintiffs' allegations referring to D.R. Horton are general in nature and frequently refer to "Defendants," rather than D.R. Horton specifically. For example, the allegation that, pursuant to

7

Defendants' agreement, "DR Horton's sales personnel should emphasize how their 'preferred' partner, DHI Mortgage, offers deals for Homebuyers through its lending program," FAC ¶ 53, does not contain "specific content of the false representations" to homebuyers, *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (quotations omitted).  And vague allegations that D.R. Horton "assured" Plaintiffs that homes would "fit in their budget" or that "the total monthly payment on the house will match the [borrower's] Target Monthly Payment," Dkt. 29 at ¶¶ 57, 61, 110, are insufficiently particular to satisfy Rule 9(b).  *See Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 726 (9th Cir. 2026) (allegations that company engaged in fraud "by assuring the Forest Service in its written proposal that it would administer the contract in a [particular] manner" did not satisfy Rule 9(b) because they "did not explain the specific content of the false representations" (quotations omitted)).

Likewise, claims that D.R. Horton employed and trained sales representatives to promote a relationship with DHIM, *id.* at ¶¶ 46-50, are not "accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (quotations omitted).  This lack of detail as to D.R. Horton's alleged fraudulent conduct does not satisfy Rule 9(b).  *See U.S. ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (fraud allegations failed to state claim when complaint "provide[d] no additional detail as to the nature of the Individual Defendants' involvement in the fraudulent acts" and "attribute[d] wholesale all of the allegations against [corporate defendant] to the Individual Defendants," as "Rule 9(b) undoubtedly requires more").

Plaintiffs' central claim is that DHIM did not include in the monthly payment estimated on the CD additional amounts to cover higher property taxes that might apply after local taxing authorities' reassessments.  FAC ¶¶ 38, 42, 90, 95, 265.  Yet Plaintiffs do not allege that D.R. Horton was involved in preparing the CD.  By conflating Defendants' actions in the FAC, Plaintiffs ignore Rule 9(b)'s core purpose of informing each Defendant separately of the allegations surrounding that Defendant's participation in the alleged fraud.  *See, e.g.*, *U.S. ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) ("[W]ith different actors playing different parts, it is not enough [under Rule 9(b)] to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'"); *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)

8

(complaint failed to state a fraud claim "with general allegations that the 'defendants' engaged in fraudulent conduct but attribute[d] specific misconduct only to" some defendants).

### 2. Allegations Against DHIM Do Not Satisfy Rule 9(b)

Plaintiffs also cannot allege with particularity that DHIM made any false or misleading statement. Rule 9(b) requires a plaintiff to "set forth what is false or misleading about a statement, and why it is false." *Decker*, 2 F.3d at 1548. And where, as here, companies enter into "transactions that are facially legitimate, ... operate legitimate businesses for years thereafter, and otherwise act as routine participants in American commerce, a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997-98 (9th Cir. 2014). The FAC does not carry this heavy burden and "set forth an explanation as to why the [disclosures] complained of [were] false or misleading." *Decker*, 2 F.3d at 1548. Plaintiffs conclusorily allege that DHIM violated the applicable statutes and regulations but ignore the disclosure framework that Congress and federal agencies carefully crafted.

### B. DHIM Prepared Its Disclosures as Required by TILA and RESPA

DHIM complied with the relevant statutory and regulatory disclosure requirements, so Plaintiffs' wire fraud claims cannot be premised on breach of a disclosure duty. TILA's regulations (known as Regulation Z) govern the LE and CD forms.[3] DHIM is not free to include whatever information it wants on the LE or CD.

### 1. Loan Estimate

The LE provides a projected monthly payment, which includes estimated escrow payments. *See* 12 C.F.R. § 1026.37(c). In a separate section, the LE includes an estimate of property taxes, insurance, and assessments, which can include amounts that are not covered in the estimated escrow payment amount. *See id.* § 1026.37(c)(4)(iv). Notably, DHIM could have shown the unimproved property tax amounts then in effect on the LEs and satisfied its legal obligation. But

---

[3] Plaintiffs do not bring claims under TILA itself. *See* 15 U.S.C. § 1640. Likewise, the relevant provision in RESPA governing escrow calculations does not provide for a private right of action. *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006).

DHIM took the extra step of including the estimated improved property tax amounts that might apply after reassessment in the estimated monthly payments to provide additional information to Plaintiffs. *See* Exs. B, I, O, U, AA, & HH, at 1-2. Plaintiffs received both what they were legally entitled to and what they now claim DHIM withheld.

2. Closing Disclosure

Plaintiffs' core claim is that the estimated monthly payments in their CDs did not include additional escrow amounts needed to cover higher property taxes that might apply at some point after a future property value reassessment. The regulations governing calculation and disclosure of the amounts shown in the CD—including for escrowed property taxes—incorporate by reference the RESPA regulations that restrict the maximum amounts that may be collected to fund the escrow account. 12 C.F.R. 1026.38(c)(1)(i). The RESPA regulations state:

> If the servicer ***knows*** the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts. If the charge is ***unknown*** to the servicer, the servicer may base the estimate on ***the preceding year's charge*** ....

12 C.F.R. § 1024.17(c)(7) (emphases added). The charge for an escrow item shall be used if "known," but if "unknown," it may be based on "the preceding year's charge." *Id.* For escrowed property taxes, the "known" amount would be the then-current unimproved property tax, and not some future amount that has not yet been assessed by the local taxing authority. This information is listed in a section of the CD titled "Initial Escrow Payment at Closing."

The regulation also provides that, for "unassessed new construction," the lender "***may*** base" the property tax escrow calculation "on the assessment of comparable residential property in the market area." *Id.* § 1024.17(c)(7) (emphases added). Plaintiffs do not allege that DHIM conducted an analysis on the assessments of comparable residential properties in the market area. Nor did DHIM violate any legal requirement or breach any disclosure duty by not conducting this type of assessment because it is only something that lenders "may" do, not must do.

Moreover, the CDs for all Plaintiffs make clear that the monthly payment amounts do not include all estimated property taxes that might be due during the first year of the loan. On the first page, the CDs show that the "Estimated Taxes, Insurance & Assessments" are much higher than the "Estimated Escrow" included in the monthly payment amount and that only "SOME" of the

total estimated property taxes are included in the estimated escrow amount used for the monthly payment calculation. Exs. D, J, P V, CC, & II, at 1-2. Page four of the CDs provides additional detail on the "Non-Escrowed Property Costs over Year 1," which include estimated "Property Taxes" that are Plaintiffs' responsibility to pay. *Id.* at 4. DHIM appropriately used the then-current property taxes to calculate the funds that the RESPA regulations require to be deposited into escrow at closing and disclosed on the CD the estimated improved property taxes not deposited into escrow that might be due later.

Basing escrow estimates on "then-current" property taxes that were set by local taxing authorities effectuates RESPA's congressional purpose, which is to protect homebuyers "from unnecessarily high settlement charges" by reducing "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes." 12 U.S.C. § 2601. RESPA prohibits lenders from collecting excessive funds for escrow. *See id.* § 2609(a)(1) ("A lender ... may not require the borrower ... to deposit in any escrow account ... an aggregate sum (for such purpose) in excess of a sum that will be sufficient to pay such taxes ...."). DHIM is not required to force Plaintiffs to deposit more funds into escrow to cover property taxes based on future property valuations that had not yet been assessed by local taxing authorities. DHIM nonetheless provided Important Property Tax Notices and First Payment Letters to encourage borrowers to voluntarily place additional funds into escrow in anticipation of the future increase.

Moreover, the CFPB's official interpretation of relevant TILA regulations states that property tax "[e]stimates of mortgage-related obligations should be based upon information that is known to the creditor at the time the creditor underwrites the mortgage obligation" and that "the creditor ***need not project potential changes, such as by estimating possible increases in taxes***." Official Interpretation of 12 C.F.R. § 1026.43(c)(2)(v) at ¶ 5 (emphases added). Even when the lender expects that property taxes will be reassessed at a higher amount within the next year:

> The creditor complies ... by determining the annual property tax amount owed in the prior [taxing period] .... The creditor complies ***even if the consumer will likely owe more in the next year than the amount owed the prior [taxing period] because the jurisdiction normally increases the property tax rate annually***, provided that the creditor does not have knowledge of an increase in the property tax rate ***at the time of underwriting***.

11

*Id.* at ¶ (4)(i) (emphases added).  Plaintiffs do not allege that DHIM knew local taxing authorities reassessed their properties at higher values before closing.  To the contrary, Plaintiffs allege that DHIM's estimated escrow payments at closing were based on the then-current actual "tax assessment for the unimproved land before DR Horton built the home."  FAC ¶ 36.  These estimates complied with the relevant regulations and were not otherwise misleading.  *See Clarke v. Fid. Bank*, No. 14-3287, 2015 U.S. Dist. LEXIS 184104, at *9-10 (N.D. Ga. June 4, 2015), *adopted in relevant part by* 2015 U.S. Dist. LEXIS 184086 (N.D. Ga. June 30, 2015) (rejecting alleged TILA violation when lender based estimated property taxes on prior taxes).

### 3. FHA Requirements

Plaintiffs claim that FHA regulations require escrow payments to include "the estimated amount of all property taxes."  FAC ¶ 93 (internal quotation marks omitted) (citing 24 C.F.R. § 203.23).  But these regulations do not offer any specificity regarding how that amount is to be calculated and state nothing about using current taxes versus future estimated taxes.  Plaintiffs also ignore that the FHA regulations explicitly require lenders to follow RESPA for "the procedures ... to compute the amount of the escrow."  24 C.F.R. § 203.550(a).  As previously discussed, DHIM complied with RESPA when calculating the amounts it collected for escrow.  Plaintiffs' citation of the FHA Handbook also does not—and legally cannot—override DHIM's previously discussed obligations under RESPA, TILA, or their implementing regulations, all of which have the force of law.  FAC ¶ 93 (citing FHA Handbook 4000.1 II.A.6.a.viii(A)).

**C. Prior Consideration of Borrower "Payment Shock"**

The issue of disclosing property tax estimates for properties that are assessed as unimproved at the time of the sale—but that will likely be reassessed at a higher value after closing—is not new.  In 1998, HUD (which then had primary responsibility for RESPA regulations) conducted rulemaking to evaluate if there was a better way to address "payment shock" when escrow payment amounts increase significantly, such as when the taxable value of a formerly unimproved property is re-assessed at an improved value.  *See* 63 Fed. Reg. 3214, 3214 (Jan. 21, 1998).  HUD considered several options, including: 1) requiring borrowers to elect before closing whether to deposit additional funds into escrow to account for the expected increase; 2) allowing lenders to calculate

12

and collect property tax escrow payments amounts based on the expected future taxes instead of the currently due taxes; and 3) making no change and keeping the regulations as they were. *See* 63 Fed. Reg. 3214, 3219 (Jan. 21, 1998). Plaintiffs allege that DHIM should have done what was proposed as option 2. HUD, however, selected option 3, keeping in place regulations that are substantially the same as those in effect today. *See* 63 Fed. Reg. 3214, 3225 (Jan. 21, 1998).

HUD observed that a lender is "encouraged, but not required," to provide a borrower with an additional notice explaining the anticipated property tax increase and to give the borrower the option to deposit additional funds into escrow. 63 Fed. Reg. 3214, 3226 (Jan. 21, 1998); *see* 12 C.F.R. § 1024.17(a). DHIM provided Plaintiffs with two of these voluntary notices—the Important Property Tax Notices—one at the time of application and one at closing. Exs. E, F, K, L, Q, R, W, X, DD, E, JJ, & KK, at 1. Because DHIM adhered to its disclosure duties and voluntarily made additional disclosures, Plaintiffs cannot plausibly allege that DHIM "violated the letter and intent" of applicable law or intended to conceal the "true" amounts of property taxes.

### D. Disclosing Accurate Property Tax Information Cannot be a Misrepresentation

Plaintiffs also fail to plausibly allege that DHIM made any materially false or misleading statement. DHIM's property tax disclosures and estimates were accurate and included the supposedly omitted information concerning the improved property taxes that might apply in the future. *See, e.g.*, Exs. B, I, O, U, AA, HH, at 1-2. As Plaintiffs acknowledge, the actual property taxes in effect during the loan's origination and at the loan's closing were based on the unimproved property value. *See* FAC ¶ 36. DHIM's use of this tax amount in any disclosure reflected the true state of the world at the time and, thus, was not false or misleading. *See United Food & Com. Workers Cent. Pa. v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming dismissal of RICO claims when "complaint did not identify statements or representations ... that were literally false or misleading at the time they were made").

Several courts have determined that a lender does not make a misrepresentation to a borrower when the lender explicitly identifies that the escrow calculation was an estimate. *See, e.g.*, *Davis v. Mortg. Rsch. Ctr.*, No. 19-02186, 2019 U.S. Dist. LEXIS 181676, at *9 (N.D. Ill. Oct. 16, 2019) ("The statute explicitly requires a disclosure of an estimate, and Plaintiffs submit exhibits

13

establishing that they were told that the numbers were estimates."); *Abdel-Malak v. JP Morgan Chase Bank, N.A.*, 748 F. Supp. 2d 505, 514 (D. Md. 2010) ("Plaintiffs should have been aware that [the escrow estimate] would change because the figure was an estimate."). Here, the CDs repeatedly state that the listed escrow amounts (including property taxes) are estimates and that the "[a]mount can increase over time." Exs. D, J, P, V, CC, & II, at 1.

As described above, multiple other pre-closing documents disclosed the estimated improved property taxes. The alleged and conclusory promise that Plaintiffs' claim to have received—that their loan payments would fall within a certain range—cannot displace the parties' written agreements and accompanying disclosures. *See Rd. & Highway Builders, LLC v. Northern Nev. Rebar, Inc.*, 284 P.3d 377, 380 (Nev. 2012) ("[Nevada] law precludes assertions of fraud when the alleged misrepresentation is contradicted by the parties' bargained-for terms [of the written instrument]."); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542-43 (Fla. Dist. Ct. App. 2003) ("[A] party may not recover in fraud [under Florida law] for an alleged false statement when proper disclosure of the truth is subsequently revealed in a written agreement between the parties."). Likewise, "oral misrepresentations—common law fraud—are not predicate acts." *Missaghi v. Apple Inc.*, No. 13-02003, 2013 U.S. Dist. LEXIS 201724, at *27 (C.D. Cal. Aug. 28, 2013). Plaintiffs had the information necessary for a complete view of both the current taxes, including amounts to be pre-paid at closing and in the months following closing, as well as estimates of the higher future taxes that might apply after reassessment.

### E. Wire Fraud Cannot Be Predicated on Breach of Regulation or Breach of Disclosure Duty Created by Statute with No Private Right of Action

Separately, Plaintiffs fail to plead RICO predicate acts because wire fraud premised on alleged nondisclosure can arise only if there is an independent duty to disclose the allegedly withheld information. *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987). The Ninth Circuit recognizes the existence of such a duty only if it is a fiduciary duty or arises under an explicit statutory obligation. *United States v. Dowling*, 739 F.2d 1445, 1449-50 (9th Cir. 1984) ("[Nondisclosure can] form the basis of a scheme to defraud *only* when there exists an independent duty (either fiduciary or derived from an explicit and independent statutory requirement) and such a duty has been breached." (Emphasis added).), *rev'd on other grounds*,

473 U.S. 207 (1985); *Flores v. United Parcel Serv.*, 768 F. App'x 677, 680 (9th Cir. 2019).

Although the FAC suggests that Defendants maintain an "unfair advantage" because of their "unequal knowledge," FAC ¶¶ 98, 312(f), a mortgage lender in an arm's length transaction does not owe fiduciary duties to the borrower under Nevada law or Florida Law. *Barboni v. Radonjic*, No. A-24-884562-B, 2024 Nev. Dist. LEXIS 103, at *8-9 (Nev. Dist. Ct. June 6, 2024); *Cap. Bank v. Mvb*, 644 So. 2d 515, 518, 521 (Fla. Dist. Ct. App. 1994).

Because the Ninth Circuit has held that the only other acceptable basis for such duty must be statutory, an agency rule or regulation cannot create a disclosure duty on which wire fraud can be predicated. *See Mst Mgmt., LLC v. Chicago Doughnut Franchise Co.*, 584 F. Supp. 3d 923, 932 (D. Nev. 2022) ("[Wire fraud] claims based on the omissions from the financial disclosures required by the Federal Trade Commission's 'Franchise Rule' cannot amount to [RICO] predicate acts because an agency's rules and regulations cannot create the necessary *statutory* duty to disclose."). Plaintiffs do not identify any statutory obligation creating the alleged disclosure duty regarding estimated property taxes and, thus, fail to plead wire fraud predicate acts.

Moreover, wire fraud cannot be predicated on breach of a statutory disclosure duty if the underlying statute does not provide for a private right of action. *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521-22 (11th Cir. 2000); *Arruda v. Curves Int'l, Inc.*, 861 F. App'x. 831, 835 (5th Cir. 2021). Because the RESPA provision creating the disclosure duty that Defendants allegedly breached does not provide for a private right of action, *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006), wire fraud cannot be predicated on an alleged violation of this provision. *See Lennon v. NVR Mortg.*, No. 1:23-22855, 2024 U.S. Dist. LEXIS 215462, at *13 (D.N.J. Nov. 26, 2024) (dismissing RICO claims when plaintiff premised wire fraud predicate acts on nondisclosure of information that RESPA purportedly required to be disclosed).

In any event, only mortgage lender DHIM was required to provide these disclosures. Thus, even if there had been an issue with the disclosures—and there was not—that issue would involve at most only DHIM and would not implicate D.R. Horton in any alleged wire fraud.

## II. Plaintiffs Fail to Plausibly Allege a RICO Enterprise

Plaintiffs claim that Defendants engaged in an enterprise that "consists of an association-in-

fact" formed "for the common purpose of selling as many homes as quickly as possible for the maximum profit, including selling homes to Homebuyers at higher prices than these buyers would otherwise be willing to pay." FAC ¶¶ 283, 289. An association-in-fact enterprise is comprised of a group of persons who associate to pursue the common purpose of engaging in a criminal course of conduct. *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007). To this end, a plaintiff must provide both "evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Id.* (quotations omitted). The FAC does not, however, plausibly allege that Defendants functioned as a continuing unit with a common purpose of pursuing a criminal course of conduct. Nor does it plausibly allege that each Defendant directed the enterprise, as opposed to its own business affairs as part of an ordinary affiliate relationship.

### A. Defendants Did Not Share a Common Purpose

Plaintiffs fail to plausibly allege that D.R. Horton and DHIM shared a common purpose in the purported RICO enterprise. Plaintiffs allege, in a conclusory manner, that Defendants had the common purpose of "selling as many homes as quickly as possible ... to Homebuyers at higher prices than these buyers would otherwise be willing to pay" and "benefited financially" as a result of "the Monthly Payment Suppression Scheme ... by making the deal look better than it actually is, enticing Homebuyers to buy homes they would not otherwise buy." FAC ¶ 289.

Although D.R. Horton and DHIM are legally related entities, Plaintiffs do not allege a significant overlap in personnel and organizational structure that courts have determined is necessary to form a RICO enterprise. *See United States v. Feldman*, 853 F.2d 648, 658 (9th Cir. 1988) (holding that RICO enterprise existed because there was "overlap in personnel and organizational structure among the businesses" that was "significant considering the different businesses involved"). For example, the FAC does not allege how Defendants' involvement in Plaintiffs' residential home purchases and mortgage originations "amount[s] to an organizational pattern or system of authority." *Id.* at 659 (quotations omitted). As discussed below, the FAC offers no more than vague and conclusory assertions that D.R. Horton, as DHIM's parent company, "directs" DHIM's conduct or "works with" DHIM. FAC ¶¶ 53, 59.

In *Stitt v. Citibank, N.A.*, the Ninth Circuit held that homeowners failed to plausibly allege an

enterprise among a mortgage lender, its parent company, and a third-party property inspection vendor when the complaint connected the entities only through an allegation that the mortgage lender and its parent instructed the vendor to perform inspections on request. 748 F. App'x 99, 101 (9th Cir. 2018). As the court explained, "[t]he mere existence of such a servicing contract between [defendants] does not establish a common purpose under RICO." *Id.* So, too, the mere existence of an affiliate relationship between a homebuilder and a mortgage lender to assist consumers with purchasing homes does not establish a common purpose.

Moreover, Plaintiffs do not allege facts plausibly supporting the inference that D.R. Horton and DHIM shared the common purpose of deceiving homebuyers by misrepresenting their monthly payments. Conclusory allegations that D.R. Horton knew or participated in its subsidiary's activities—*see, e.g.*, FAC ¶¶ 64, 70-72—are legally insufficient to establish a continuing unit functioning with a common purpose. *See Loomer v. Zuckerberg*, No. 23-3158, 2025 U.S. App. LEXIS 7096, at *4 (9th Cir. Mar. 27, 2025) (holding that conclusory RICO allegations that defendants had "common goals of making money, acquiring influence over other enterprises and entities, and other pecuniary and non-pecuniary interests" were insufficient).

**B. Failure to Distinguish Between D.R. Horton as Parent and DHIM as Its Subsidiary**

Plaintiffs make no meaningful distinction between Defendants' respective conduct, repeatedly lumping the two entities together as a single actor. *See* FAC ¶¶ 76, 82-83, 86, 88-89, 96-98. The individual members of a RICO enterprise must be "separate and distinct" from the enterprise that they collectively form. *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). Thus, relevant questions include: whether "[t]he associated in fact enterprise ... is a being different from, not the same as or part of, the person whose behavior [RICO] was designed to prohibit"; and whether "the enterprise can[] be either formally or practically separable from the person." *Id.* at 362 (third alteration in original) (quotations omitted).

Here, Plaintiffs rely on vague allegations that D.R. Horton, as a parent, "directs" or "works with" DHIM, as its subsidiary, to create and transmit the allegedly fraudulent CDs. FAC ¶¶ 53, 59. They do not allege that D.R. Horton acted as a "separate and distinct" member of the enterprise in creating and transmitting the allegedly fraudulent CDs. By ascribing DHIM's conduct to D.R.

17

Horton simply because of their parent-subsidiary relationship, Plaintiffs try to manufacture a RICO enterprise that, in reality, differs from the RICO person only in name. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[O]ne must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." (Citation omitted).).

**C. Plaintiffs Fail to Plausibly Allege Each Defendant Directed the Enterprise Affairs**

Plaintiffs fail to plausibly allege that each Defendant directed the enterprise's affairs. Each Defendant in a RICO enterprise "must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Participation requires direction of the enterprise's affairs. *Id.* at 179. But "[s]imply performing services for the enterprise does not rise to the level of direction." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). And these allegations must be pleaded with particularity pursuant to Rule 9(b). *Swartz*, 476 F.3d at 764-65.

Here, Plaintiffs allege only that Defendants directed their own affairs. And to the extent that they allege that Defendants directed the enterprise's affairs, their allegations are general or conclusory. The FAC's allegations simply acknowledge that D.R. Horton builds homes and that DHIM originates mortgages. *See* FAC ¶¶ 23-24, 30. Defendants' alleged information sharing to more effectively sell homes and originate mortgage loans implies nothing more than "the ordinary operation of a garden-variety marketing arrangement." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009). Nor does sharing of customer information between related entities constitute direction of a RICO enterprise. *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034 (C.D. Cal. 2011) ("[S]ubmission of its own data does not plausibly show that [defendant] controlled ... other members in the associated-in-fact enterprise.").

As the Eleventh Circuit observed in a seminal RICO case, "there is nothing inconsistent or even particularly suspicious about a company both helping customers ... and helping [its franchises] improve their profits." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020). Indeed, as the Seventh Circuit observed, this conduct is consistent with a company's "going about its own business." *United Food & Com. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). Because only DHIM, as a mortgage lender,

created and transmitted the CDs, the crux of the FAC is that DHIM allegedly operated *its own* business illegally. *See Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (dismissing complaint for failure to state a RICO claim because, among other issues, "nub of the complaint [was] that [one defendant] operates *itself* unlawfully").

### III. Plaintiffs Fail to Plausibly Allege Nevada and Florida State Law Claims

#### A. Plaintiffs Fail to Plausibly Allege Nevada and Florida Unfair or Deceptive Claims

Plaintiffs' claims that their allegedly misleading mortgage disclosures violate the Nevada Deceptive Trade Practices Act ("NDTPA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") fail for many of the same reasons for which their federal fraud-based claims fail. Deceptive or unfair trade practice claims under both states' statutes must satisfy Rule 9(b) because they sound in fraud. *See Horner v. Mortg. Elec. Registr. Sys., Inc.*, 711 F. App'x 817, 818 (9th Cir. 2017); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1293 (11th Cir. 2025).

#### 1. A Real Estate Loan Does Not Involve a Good or Service under the NDTPA

NDTPA sections 598.0915(6), (13) and 598.0917 apply only to transactions relating to "goods" or "services." Nev. Rev. Stat. §§ 598.0915, .0917. But "a real estate loan is neither a good nor a service within the meaning of this statute." *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 972 (9th Cir. 2017). Because the FAC focuses on the originations of Plaintiffs' real estate mortgage loans, their claims under these sections fail as a matter of law.

Recognizing this flaw, the FAC cites *Betsinger v. D.R. Horton, Inc.* for the proposition that the NDTPA applies to both the "deceptive sale **and financing** of real property." FAC ¶ 307 (emphasis added) (citing 232 P.3d 433, 436 n.4 (Nev. 2010)). But this assertion mischaracterizes *Betsinger*. *Betsinger* held that the NDTPA could apply to the **sale** of real property but did not extend this holding to mortgage **financing**. *See* 232 P.3d at 436 n.4. Subsequent cases—including from the Nevada Supreme Court—confirm that the NDTPA does not apply to mortgage financing, which is a different transaction from a real property sale. *See, e.g.*, *Noonan v. Bayview Loan Servicing, LLC*, No. 73665, 438 P.3d 335 (Table), 2019 Nev. Unpub. LEXIS 428, at *3 (Nev. Apr. 8, 2019) (rejecting NDTPA claim over servicing of mortgage loan because it did not involve "sale or lease of goods or services"); *Muniz v. Wells Fargo & Co.*, No. 17-04995, 2018 U.S. Dist. LEXIS 81040,

19

at *13 (N.D. Cal. May 14, 2018) (NDTPA does not apply to allegations concerning mortgage loan rate lock, and *Betsinger* is factually distinguishable); *Reyna v. Wells Fargo Bank, N.A.*, No. 10-01730, 2011 U.S. Dist. LEXIS 74456, at *23 (D. Nev. July 8, 2011) (NDTPA does not apply to allegations concerning mortgage loan modification and subsequent foreclosure).

Here, the FAC focuses on mortgage disclosure forms, which only mortgage lender DHIM prepared for the mortgage loan transactions, with no involvement by D.R. Horton. Likewise, the allegation that lender DHIM did not disclose or collect sufficient property taxes as part of a loan's closing addresses the lender's purported obligations, and not D.R. Horton's obligations as to its real property sales. In addition to the other reasons described below why the deceptive trade practice claims fail substantively, the claims under sections 598.0915(6), (13) and 598.0917 fail because they do not involve goods or services.

2.    Plaintiffs Fail to Plausibly Allege Other NDTPA Violations

Plaintiffs' section 598.0923(1)(c) claims are predicated on violations of TILA, RESPA, the FHA Handbook, and associated regulations. These NDTPA claims must be dismissed because they are based on the same alleged violations of federal law that Plaintiffs failed to plausibly allege. *See Cabral v. Caesars Entm't Corp.*, No. 78580, 467 P.3d 638 (Table), 2020 Nev. Unpub. LEXIS 746, at *6 (Nev. July 29, 2020) (Plaintiffs' NDTPA claims failed because they were "derivative of [their] unviable causes of action for a violation of" two other statutes). As previously discussed, Defendants complied with TILA, RESPA, and FHA requirements when calculating and disclosing Plaintiffs' estimated property taxes and escrow amounts.

Under section 598.0915(15), a person engages in a deceptive trade practice when such person, in the course of their business or occupation, "[k]nowingly makes any other false representation in a transaction." The FAC does not, however, identify any affirmative misrepresentation made by either Defendant. *See Noonan*, 2019 Nev. Unpub. LEXIS 428, at *2-3 (no knowing misrepresentation existed when defendant "neither made an affirmative false statement nor omitted a material fact it was bound to disclose"). When a borrower receives accurate disclosures, deception does not occur simply because the borrower fails to read or understand them. *See Land Baron Invs., Inc. v. Bonnie Springs Family Ltd.*, 356 P.3d 511, 518 (Nev. 2015) (nondisclosure

claim requires seller to be "aware of materially adverse facts that could not be discovered by the buyer after diligent inquiry"). DHIM disclosed on the CDs property tax information based on the then-current property taxes in effect at the time of the transaction. These disclosures could not have been deceptive because they accurately reflected the true state of the world at the time.

Under section 598.0923(1)(e), a person engages in a deceptive trade practice when such person, in the course of their business or occupation, "[u]ses an unconscionable practice in a transaction." An unconscionable practice is one that takes advantage of the consumer to a "grossly unfair degree" or results "in a gross disparity between the value received and the consideration paid." *Id.* § 598.0923(2)(b). Here, it is not "grossly unfair" for a mortgage lender, in accordance with RESPA, to estimate and accurately disclose property taxes based on the then-current property value while also providing multiple notices that these property taxes could increase after reassessment and estimating those higher future payment amounts. Nor do Plaintiffs allege how there was gross disparity between the value that they received and what they paid. After all, Plaintiffs do not claim that their home sale prices exceeded fair market values or that their mortgage loan interest rates exceeded fair market rates. And their property taxes were paid to local governments (not to Defendants), were paid at the same rates paid by other area residents, and entitled them to the same government services as other area residents.

### 3. Plaintiffs Fail to Plausibly Allege FDUTPA Claims

Plaintiffs allege FDUTPA violations under three theories: (i) per se violations; (ii) deceptive acts or practices; and (iii) unfair acts or practices. Each theory fails. Plaintiffs' per se FDUTPA claims are based on violations of the same FHA handbook, TILA, and RESPA provisions that Plaintiffs failed to plausibly allege in connection with their federal claims. As discussed above, Defendants complied with the applicable legal requirements, which precludes Plaintiffs' per se FDUTPA claims as a matter of law. *See Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 21-448, 2024 U.S. Dist. LEXIS 21800, at *58 (M.D. Fla. Feb. 6, 2024).

Plaintiffs' FDUTPA deceptive acts or practices claims are based on Defendants' allegedly concealing their future property tax and corresponding monthly payment amounts. A deceptive act or practice is one that is "likely to deceive a [person] acting reasonably in the same

21

circumstances." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000). But when a borrower receives accurate disclosures (including ones providing the very information that was allegedly concealed), the borrower cannot claim deception simply because the borrower failed to read them. *See Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1285 (11th Cir. 2007) (no deception occurred when property developer canceled prospective buyer's reservation in order to raise purchase price, because agreement "did not constitute a guaranteed purchase contract" and included "no assurances that the purchase price would remain the same if [developer] canceled").

An unfair act or practice under FDUTPA is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious." *Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. Dist. Ct. App. 2001) (quotations omitted). DHIM's disclosure and escrow practices, however, did not offend public policy because they complied with applicable law and even provided additional "encouraged" disclosures beyond the required disclosures. Moreover, using disclosures like the CD cannot constitute an unfair act or practice because these forms expressly state that "Fees are Estimated" and that "Buyer may be responsible for any shortage." *Angelo v. Parker*, 275 So. 3d 752, 755-56 (Fla. Dist. Ct. App. 2019).

**B. Plaintiffs Fail to Plausibly Allege Negligence under Nevada Law and Florida Law**

Plaintiffs allege that Defendants were negligent because they breached purported duties of care by failing to accurately calculate and disclose monthly payment amounts, including escrowed property taxes. FAC ¶¶ 352-53. These claims fail as a matter of both states' laws. While Plaintiffs style these counts as negligence, they effectively operate as negligent misrepresentation claims because they reprise the wire fraud allegations based on Defendants' alleged breach of disclosure duties. Negligent misrepresentation claims must satisfy Rule 9(b)'s heightened pleading standard because they sound in fraud. *See Vess*, 317 F.3d at 1103; *Pop*, 145 F.4th at 1293.

Under Nevada law, negligence requires "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158 (Nev. 2011). Under Florida law, negligence requires a plaintiff to allege "[a] duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d

22

1182, 1185 (Fla. 2003).  Whether a legal duty exists is a question of law.  *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1177 (Nev. 2008); *Oleckna v. Daytona Discount Pharm.*, 162 So. 3d 178, 180-81 (Fla. Dist. Ct. App. 2015).

### 1.  Plaintiffs Fail to Plausibly Allege Negligence Per Se

Under Nevada law, negligence per se "establishes the duty and breach elements of negligence when the injured party is in the class of persons whom the statute is intended to protect and the injury is of the type against which the statute is intended to protect." *Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1283 (Nev. 2009).  Alleged breach of an administrative regulation, however, cannot constitute negligence per se.  *Wiltse v. LoanCare, LLC*, No. 88420, 2025 Nev. App. Unpub. LEXIS 579, at *8 (Nev. App. Oct 27, 2025) (quoting *Price v. Sinnott*, 460 P.2d 837, 840 (Nev. 1969)).  Under Florida law, the breach element can be satisfied through negligence per se if the plaintiff establishes "1) that he is of a class the statute was intended to protect; 2) that he suffered injury of the type the statute was designed to prevent; and 3) that violation of the statute was the proximate cause of the injury." *Faircloth v. Main St. Ent., Inc.*, 392 So. 3d 1042, 1046 (Fla. 2024).  But violation of a statute or regulation does not constitute negligence per se without evidence of legislative intent to create a private right of action under that statute or regulation.  *Fields v. Walgreen Co.*, No. 19-727, 2019 U.S. Dist. LEXIS 249651, at *8-9 (M.D. Fla. Oct. 24, 2019); *see Jupiter Inlet Corp. v. Brocard*, 546 So. 2d 1, 2-3 (Fla. Dist. Ct. App. 1988) ("OSHA does not provide the basis for a private right of action" so a violation thereof is not *per se* negligence).

To the extent the Nevada claims rely on breach of regulations (such as those governing the CD) or a sub-regulation document like the FHA Handbook, violations of these authorities cannot constitute negligence per se under Nevada law.  As to the Florida Plaintiffs' claims, the applicable section of RESPA does not provide for a private right of action—*Hardy*, 449 F.3d at 1359—and the FHA Handbook cannot provide for a private right of action because it is not even a regulation.  Violations of these authorities cannot constitute negligence per se under Florida law.

### 2.  Plaintiffs Fail to Plausibly Allege Negligence

Plaintiffs summarily assert that Defendants owed a duty of care to Plaintiffs in their home sales and mortgage originations.  Where, as here, the parties entered into arm's length ordinary

commercial transactions, a lender does not owe the borrower fiduciary duties under either Nevada law or Florida law. *Barboni*, 2024 Nev. Dist. LEXIS 103, at \*8-9; *Capital Bank v. Mvb*, 644 So. 2d 515, 520-21 (Fla. Dist. Ct. App. 1994); *see Linville v. Ginn Real Estate Co.*, 697 F. Supp. 2d 1302, 1307-08 (M.D. Fla. 2010) (rejecting negligent misrepresentation claims against a real estate company and its "preferred lender" because, under Florida law, a lender does not ordinarily owe a borrower fiduciary duties). The only other duties that the FAC mentions are those arising out of TILA and RESPA, the regulations promulgated under those statutes, and the FHA Handbook. As previously noted, DHIM complied with these statutory and regulatory requirements.

### C. Plaintiffs Cannot Allege Unjust Enrichment under Nevada Law or Florida Law

Plaintiffs allege that the failure to disclose the "true monthly payment" amount "led Plaintiffs to believe that the monthly payments would be substantially lower, leading ultimately to payment shock for Plaintiffs and the Class, [and made] it inequitable for Defendants to retain the benefits of their scheme." FAC ¶ 380. Under Nevada law, "[a]n action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *LeasePartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997). Florida law applies the same rule. *Paschen v. B&B Site Dev., Inc.*, 311 So. 3d 39, 49 (Fla. Dist. Ct. App. 2021).

Here, Plaintiffs entered into express contracts with Defendants by virtue of their mortgage loans with DHIM and their home sale agreements with D.R. Horton. These agreements expressly set forth and govern Plaintiffs' payment obligations. Because Plaintiffs' unjust enrichment claims (that Defendants retained the proceeds from the home purchases and mortgage originations) are based on payments made pursuant to express contracts with Defendants, these claims must be dismissed. *See Rhodes v. Designer Distrib. Servs., LLC*, Nos. 55522, 56615, 2012 Nev. Unpub. LEXIS 278, at \*7-8 (Nev. Feb. 24, 2012); *Degutis v. Fin. Freedom, LLC*, 978 F. Supp. 2d 1243, 1266 (M.D. Fla. 2013) ("Plaintiff does not contest that there was a valid mortgage contract between the Parties. Thus, Plaintiff's claim for unjust enrichment fails.").

### CONCLUSION

For these reasons, Defendants respectfully request the Court to dismiss the FAC in its entirety.

Dated: May 8, 2026

/s/ Timothy P. Ofak
Mitchel H. Kider
*pro hac vice*
Timothy P. Ofak
*pro hac vice*
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc. and DHI Mortgage Company, Ltd.*

25

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 8, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Timothy P. Ofak</u>

Timothy P. Ofak