**LEGAL AID CENTER OF SOUTHERN NEVADA**
Elizabeth Mikesell, Esq. (NV Bar No. 8034)
*EMikesell@lacsn.org*
Peter Aldous, Esq. (NV Bar No. 11346)
*paldous@lacsn.org*
725 E. Charleston Blvd.
Las Vegas, NV 89104
(702) 386-1533

**VARNELL AND WARWICK PA**
Jeffrey L. Newsome II (*pro hac vice*)
*jnewsome@vandlwlaw.com*
Janet R. Varnell (*pro hac vice*)
*jvarnell@vandlwlaw.com*
Brian Warwick (*pro hac vice*)
*bwarwick@vandlwlaw.com*
400 N. Ashley Drive, Suite 1900
Tampa, FL 33602
Tel.: 352-753-8600
Fax: 352-504-3301

**NATIONAL CONSUMER LAW CENTER**
Jennifer Spieler Wagner (*pro hac vice*)
*jwagner@nclc.org*
Shennan Kavanagh (*pro hac vice*)
*skavanagh@nclc.org*
7 Winthrop Square, 4th Floor
Boston, MA 02110
Tel.: 617-542-8010

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (*pro hac vice*)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Ave. NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299

**CLARKSON LAW FIRM, P.C.**
Roke Iko (*pro hac vice*)
*riko@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel.: (213) 788-4050

**CLARKSON LAW FIRM, P.C.**
Molly L. Zhu (*pro hac vice*)
*mzhu@clarksonlawfirm.com*
260 Madison Ave., 8th Floor
New York, NY 10016
Tel.: (213) 788-4050

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KIM ROBINSON, BRADLEY SKOUGARD, DESIREE SKOUGARD, TAMMY SANTORII, ARTHUR WHITNEY, MICHELLE HINDS, BRADLEY HINDS, RUSTY STEFFNER, AMIE STEFFNER, and GAGE RADTKE, on behalf of themselves, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., and DHI MORTGAGE COMPANY, LTD.,<br><br>Defendants. | Case No. 2:25-cv-02394-RFB-NJK<br><br>*Assigned to District Judge Richard F. Boulware, II and Magistrate Judge Nancy J. Koppe*<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

Page No.

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................2

III.    ARGUMENT ........................................................................................................4

        A.      The Families state a civil RICO claim...................................................5

                1.      The Families allege a RICO enterprise.........................................6

                2.      The Families have plausibly alleged DR Horton and DHIM are separate entities distinct from the enterprise.................................8

                3.      The Families have plausibly alleged DHIM and DR Horton participated in and controlled the enterprise's affairs.........................................9

                4.      The Families' wire fraud allegations satisfy Rule 9(b).................10

                5.      The Families' fraud allegations rest on affirmative misrepresentations, not a breach of a duty..........................................................14

                6.      The Families plausibly allege Defendants' non-compliance with TILA and RESPA. .................................................................................15

                7.      The Families plausibly allege Defendants' non-compliance with FHA loan regulations.................................................................................18

                8.      Even assuming federal law compliance, regulatory compliance is not a defense to a scheme to defraud. ...................................................19

        B.      The Families plausibly allege violations of NDTPA.............................20

                1.      The Families plausibly allege violations of NDTPA §§ 598.0915(5), (13) and 598.0917...................................................................20

                2.      The Families plausibly allege violations of §§ 598.0915(15), 598.0923(1)(e), and 598.0923(1)(c)...........................................21

        C.      The Families plausibly allege violations of the FDUTPA......................22

        D.      The Families plausibly allege negligence under Nevada and Florida law................23

        E.      The Families plausibly allege negligence per se under Nevada law. .......................24

IV.     CONCLUSION....................................................................................................24

**TABLE OF AUTHORITIES**

**Cases** **Page No.**

*Argentena Consol. Min. Co. v. Jolley Urga Wirth Woodbury & Standish*,
125 Nev. 527, 216 P.3d 779 (2009) ...............................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................................4

*Baker v. IBP, Inc.*,
357 F.3d 685 (7th Cir. 2004) ...........................................................................................10

*Betsinger v. D.R. Horton, Inc.*,
126 Nev. 162, 232 P.3d 433 (2010) .............................................................................20, 21

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639 (2008) ...........................................................................................5, 6, 11, 14

*Boyle v. U.S.*,
556 U.S. 938 (2009) ..........................................................................................................6

*Bui v. Nguyen*,
712 Fed. Appx. 606 (9th Cir. 2017) .................................................................................6

*Cap. Bank v. MVB, Inc.*,
644 So. 2d 515 (Fla. 3d DCA 1994) ................................................................................23

*Carey v. J.A.K's Puppies, Inc.*,
763 F. Supp.3d 952 (C.D. Cal. 2025) ..............................................................................19

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ......................................................................................................8, 9

*Cisneros v. Petland, Inc.*,
972 F.3d 1204 (11th Cir. 2020) ........................................................................................10

*Clarke v. Fid. Bank*,
No. 1:14-CV-3287-AT-ECS,
2015 U.S. Dist. LEXIS 184104 (N.D. Ga. June 4, 2015) .................................................18

*Dowers v. Nationstar Mortg.*,
No. 2:14-CV-1679 JCM PAL,
2014 U.S. Dist. LEXIS 179025 (D. Nev. Dec. 31, 2014) .................................................21

*Dowers v. Nationstar Mortg.*,
852 F.3d 964 (9th Cir. 2017) ............................................................................................21

*Eller v. EquiTrust Life Ins. Co.*,
778 F.3d 1089 (9th Cir. 2015) .....................................................................................14, 15

*Escue v. United Wholesale Mortg., LLC*,
No. 2:24-cv-10853,
2025 U.S. Dist. LEXIS 193344 (E.D. Mich. Sep. 30, 2025) ............................................7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

*First Nat. Bank & Tr. Co. of Treasurer Coast v. Pack*,
   789 So. 2d 411 (Fla. 4th DCA 2001) ................................................................................23

*Fondren v. Schmidt*,
   626 F. Supp. 892 (D. Nev. 1986) ......................................................................................11

*H.J. Inc. v. Nw. Bell Tel. Co.*
   492 U.S. 229 (1989)............................................................................................................5

*Harmoni Int'l Spice, Inc. v. Hume*,
   914 F.3d 648 (9th Cir. 2019) ............................................................................................14

*Howard v. Murray*,
   184 So. 3d 1155 (Fla. 1st DCA 2015) ..............................................................................23

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ............................................................................................19

*In re WellPoint, Inc.*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011) ...........................................................................10

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ....................................................................................10, 13

*Ketayi v. Health Enrollment Grp.*,
   516 F. Supp. 3d 1092 (S.D. Cal. 2021)..........................................................................5, 19

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..............................................................................................4

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ............................................................................................4

*Kousisis v. U.S.*,
   605 U.S. 114 (2025)..........................................................................................................14

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005) ..........................................................................................8, 9

*Loomer v. Zuckerberg*,
   No. 23-3158,
   2025 U.S. App. LEXIS 7096 ( 9th Cir. Mar. 27, 2025)......................................................7

*L.V. Transit Sys., Inc. v. L.V. Strip Trolley*,
   780 P.2d 1145 (1989)........................................................................................................20

*Mackintosh v. Cal. Fed. Sav. & Loan Ass'n*,
   935 P.2d 1154 (1997)........................................................................................................23

*Moore v. Kayport Package Express*,
   885 F.2d 531 (9th Cir. 1989) ............................................................................................12

*MST Mgt., LLC v. Chi. Doughnut Fran. Co., LLC*,
   584 F. Supp. 3d 923 (D. Nev. 2022)................................................................................22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

*Nelson v. Heer*,
163 P.3d 420 (2007)..............................................................................................................20

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ...........................................................................5, 6, 7, 11, 13

*Ogdon v. Grand Canyon Univ. Inc.,*
No. CV-22-00477-PHX-DLR,
2024 U.S. Dist. LEXIS 57494 (D. Ariz. Mar. 29, 2024) ................................................9

*Poole v. Nev. Auto Dealership Invs. LLC,*
449 P.3d 479 (Nev. App. 2019) ........................................................................................20

*R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct.*,
514 P.3d 425 (2022).........................................................................................................21

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)...........................................................................................................9

*Roman v. Chase*,
No. 2:09-CV-1476 JCM (LRL),
2010 U.S. Dist. LEXIS 147809 (D. Nev. Dec. 21, 2010).................................................6

*Schmuck v. U.S.,*
489 U.S. 705 (1989)...........................................................................................................5

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)...........................................................................................................5

*Stitt v. Citibank, N.A.*,
748 F. App'x 99 (9th Cir. 2018) ........................................................................................7

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ..........................................................................................11

*Taddeo v. Taddeo,*
No. 2:08-CV-01463-KJD,
2011 U.S. Dist. LEXIS 103649 (D. Nev. Sept. 13, 2011) ...............................................20

*U.S. Bank, N.A., v. White Horse Estates Homeowners Ass'n.*,
987 F.3d 858 (9th Cir. 2021) ..........................................................................................20

*U.S. v. Bohonus,*
628 F.2d 1167 (9th Cir. 1980) ....................................................................................5, 19

*U.S. v. Feldman*,
853 F.2d 648 (9th Cir. 1988) .............................................................................................7

*U.S. v. Green*,
592 F.3d 1057 (9th Cir. 2010) ........................................................................................15

*U.S. v. Jesenik,*
152 F.4th 924 (9th Cir. 2025) ....................................................................................14, 15

*U.S. v. Jinian*,
  725 F.3d 954 (9th Cir. 2013) ..............................................................................................11

*U.S. v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) ..............................................................................................6

*Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ..............................................................................................10

*Vega v. E. Courtyard Assocs.*,
  117 Nev. 436, 24 P.3d 219 (2001) ......................................................................................24

*Waldrup v. Countrywide Fin. Corp.*,
  No. 2:13-cv-08833-CAS (AGRx); 216-cv-04166-CAS (AGRx),
  2018 U.S. Dist. LEXIS 23060 (C.D. Cal. Feb. 6, 2018)...........................................6, 14

**Federal Statutes**

12 C.F.R. § 1024.17 ...........................................................................................16, 17, 18

12 C.F.R. § 1026 ......................................................................................................17, 18

12 U.S.C. § 2609 ..............................................................................................................16

15 U.S.C. §§ 1638 ......................................................................................................17, 18

18 U.S.C. § 1961 ..............................................................................................................11

18 U.S.C §1962 ..................................................................................................................5

24 C.F.R. § 203 ................................................................................................................15

80 FR 8767 (Feb. 19, 2015) ...........................................................................................17

81 FR 54318 (Aug. 15, 2016) .........................................................................................17

Pub. L. No. 91-452, § 904 ................................................................................................5

**State Statutes**

Nev. Rev. Stat. §§ 598 *et seq*. .............................................................................20, 21, 22

## I.   INTRODUCTION

Defendants DR Horton, Inc. ("DR Horton") and DHI Mortgage Company, Ltd. ("DHIM")'s Motion to Dismiss the First Amended Complaint ("FAC") should be denied in its entirety.

Defendants operate a sophisticated bait-and-switch scheme that conceals the true monthly cost of buying DR Horton homes, leading homebuyers to take on DHIM mortgage loans they struggle to afford. DR Horton steers prospective buyers, including the ten Plaintiffs from six families in Nevada and Florida ("the Families"), to its preferred lender, DHIM, with the promise of a low monthly mortgage payment. From the first pitch, DR Horton assures buyers that their chosen homes will fit their budget, and DHIM reassures homebuyers throughout the lending process, anchoring each buyer on an initial low monthly payment — the bait. But Defendants artificially lower the payments using suppressed property tax amounts despite having already calculated the true property taxes each homebuyer will owe and knowing that the quoted payment will sharply increase once those taxes are due — the switch.

And so emerges the scheme: Defendants conspire to make homebuyers' monthly mortgage payment look more affordable than they *know* it would be, and each Defendant repeatedly misrepresents, orally and in writing, that the homebuyers' payments will meet their respective budget, when Defendants *know* that they would not. Defendants have run this scheme thousands of times and did so to close more home sales and extract higher prices for these homes (and larger loans) from homebuyers.

The Families, many of whom are first-time homebuyers with moderate income, were all victims of Defendants' scheme. They paid the lower monthly payment before their escrow accounts fell short and the amount they were required to escrow skyrocketed. Their monthly payments increased dramatically, causing serious hardship and requiring them to scrape together hundreds more dollars every month to stay current and to avoid default. On behalf of similarly situated homebuyers, they filed this class action to hold Defendants accountable.

Defendants now attempt the same bait-and-switch on this Court, recasting a scheme to defraud as a dispute over regulatory paperwork. They anchor their motion on unauthenticated, cherry-picked documents not included in the FAC to argue that they complied with federal

regulations. Even if these extrinsic documents could be considered at this stage, they are no defense because they show Defendants did *not* comply with federal law in calculating payments or disclosing them. But even if they had complied, nothing in federal law allows sophisticated operators like Defendants to knowingly make repeated deceptive statements about the true cost of the homes to entice homebuyers to purchase properties outside their price range. At a minimum, whether any disclosure cured the deception cannot be resolved on the pleadings. At this stage, the Families' well-pleaded allegations control.

The Families state a valid claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), premised on the predicate acts of wire fraud, and adequately plead their claims for violations of the Nevada Deceptive Trade Practices Act ("NDTPA"), Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and Nevada and Florida negligence claims.

## II.    FACTUAL BACKGROUND

The Families have alleged the Defendants' scheme, and each Family's experience of it, in full, and the Court must accept those allegations as true. Nevertheless, several facts bear emphasis.

DR Horton is one of the largest homebuilders in the country, and DHIM is its wholly owned subsidiary and mortgage lender. FAC ¶¶ 1, 23, 24. The two entities operate as an easy "one-stop" shop for homebuyers, and a substantial majority of DR Horton homebuyers finance through DHIM. *See id.* ¶¶ 4, 29, 44. Through this integrated business model, Defendants steer homebuyers into both the home and loan, and control every number a buyer sees before closing. *Id.* ¶¶ 4, 57, 60, 61, 63.

Defendants market to first-time homebuyers of moderate income and make an affordable monthly payment a key part of their marketing strategy. *Id.* ¶ 44. At intake, DR Horton personnel ask each buyer what they can afford each month and represent that a home financed through DHIM will fit within that budget. *Id.* ¶¶ 54, 61. Once a house is selected, DHIM prepares the paperwork and reassures homebuyers that the monthly payment will fit in their budget. *Id.* ¶¶ 64, 66-72. However, Defendants actually provide a lowered monthly payment projection that appears to fit the homebuyer's budget but does not reflect the true monthly cost of the mortgage payment on the home, the Suppressed Estimate. *Id.* ¶¶ 3, 36, 62. To prepare the Suppressed Estimate, DHIM uses an artificially low property tax estimate to arrive at an estimated monthly payment that aligns with

the amount the homebuyers told DR Horton they could afford each month. *Id.* ¶¶ 36, 56. Defendants know this amount is deceptive because during this time, DHIM also calculates a "True Estimate" for property taxes on the home. *Id.* ¶¶ 37, 62. If Defendants used the True Estimate to calculate the monthly mortgage payment, the payment would only fit in the homebuyers' monthly budget if DR Horton charged a lower price for the home. Upon information and belief, no other mortgage lender in the United States engages in the practice of partially escrowing property taxes by deliberately including only a small portion of a homebuyer's property taxes in their monthly payment. *Id.* ¶ 80.

With the anchored, promised payment in mind, homebuyers purchase a DR Horton home. FAC ¶¶ 61, 84–85. After closing, DR Horton pockets the cost of the home and DHIM sells the mortgage, and a new servicer takes over. *Id.* ¶¶ 86–88. When that servicer does a correct escrow analysis, months later, the homebuyer's monthly payment skyrockets, frequently by hundreds of dollars a month, and the buyer must scramble to keep the home or risk foreclosure. *Id.* ¶¶ 2, 89, 91.

Each of the six Families experienced this pattern. *See generally id.* ¶¶ 99 –264. Each Family wanted a home with a monthly payment that fit within their budget. The Santorii-Whitney Family, for example, was promised a monthly payment of $2,878.57, chose a DR Horton home on that basis because Defendants represented it was more affordable than comparable homes, and saw the payment jump less than a year after closing. *Id.* ¶ 5. By using the Suppressed Estimate, DHIM's loan terms and disclosed payment deceptively appeared to align with the Target Monthly Payment, allowing DR Horton to increase the price of the home and DHIM to increase the amount of the mortgage loan. *Id.* ¶¶ 62, 289. Such loan terms that used the True Estimate would only fall within the homebuyer's target monthly payment if the price of the home was low enough.

Thus, Defendants used misleading disclosures to obscure the full cost of the homes. *See, e.g.*, FAC ¶¶ 309, 342. The disclosures deceived the Families into purchasing the homes, and Defendants knew the homebuyers would rely on these deceptively low estimated payments in the disclosures. *See id.* This scheme delivered Defendants a windfall, leaving homebuyers struggling to afford their payments. FAC ¶¶ 310, 343.

## III.  ARGUMENT

The FAC pleads each element of the RICO claim. And the Families' remaining claims under state consumer protection and common law rest on the same conduct and are equally well pleaded.[1] Defendants' Motion should be denied.[2]

Defendants' Rule 12(b)(6) challenges depend in substantial part on documents that fall outside the four corners of the FAC and are never referenced in it. Mot. at 2-4, 10-14. Defendants use these extrinsic documents to argue that the Families (1) received adequate disclosures of the True Estimates; and (2) Defendants' use of the Suppressed Estimates in the federal closing disclosure forms follows the federal disclosure rules, purportedly shielding them. *See* Mot. at 6-7. As discussed in more detail in Section III.A.6–7, federal law does not permit Defendants' conduct.

But the Court can disregard these extrinsic documents. Under the incorporation-by-reference doctrine, courts can consider extrinsic documents only in rare instances where they form the basis of the plaintiff's claim. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Where a document "merely creates a defense to the well-pleaded allegations," courts should not consider them. *Id.* at 1002-003. Here, the FAC *at most* relies only on the closing disclosures (Def. Exhs. C, I, O, U). Defendants do not identify any paragraphs in the FAC that incorporate any of the other extrinsic documents they use, nor explain how Plaintiffs' claims – rather than Defendants' defense – depends on them.[3]

Second, extrinsic documents can only be considered on a Rule 12(b)(6) motion if authenticity is not disputed. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Defendants supply no authenticating evidence that that the electronic signatures on the extrinsic documents were signed by each Plaintiff on the dates therein and *in the form that these documents have been*

---

[1] The Families seek to no longer pursue their unjust enrichment claims or Florida negligence per se claim and will voluntarily dismiss those claims.

[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 664.

[3] To the extent there is an incidental reference to any of these other extrinsic documents, "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Khoja,* 899 F.3d at 1002 (internal quotations omitted).

*provided to the Court.* As the FAC alleges Defendants often group multiple documents together into single PDF files that exceed 100 pages, FAC ¶¶ 68-82, authenticating testimony will show if the purported disclosures in these extrinsic documents are being presented here as short, standalone documents to suggest purported disclosures were more conspicuous than they actually were.

## A.    The Families state a civil RICO claim.

Congress devised RICO to reach coordinated schemes that injure ordinary people in their business and property, and directed that the statute shall be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a); *Odom v. Microsoft Corp.*, 486 F.3d 541, 546-47 (9th Cir. 2007) (en banc). *See also H.J. Inc. v. Nw. Bell Tel. Co.* 492 U.S. 229, 248-249 (1989) (Congress designed RICO to reach conduct by actors operating within legitimate enterprises). The statute's "self-consciously expansive language and overall approach" is meant to make whole those injured by racketeering activity and provide its victims with "new weapons of unprecedented scope." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985).

The elements of civil RICO claim under 18 U.S.C. §1962(c) are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts"). *See Odom,* 486 F.3d at 547-48. Defendants dispute the existence of an enterprise, and whether each Defendant conducted it. They further dispute whether Plaintiffs' allegations of wire fraud (a predicate act) are sufficient. But each of Defendants' arguments depend on a flawed assumption that the RICO theory rests solely on DHIM's transmission of deceptive Closing Disclosures over the interstate wires.

Under RICO, "[t]he gravamen of the offense is the scheme to defraud." *See, e.g., Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 648 (2008). Fraudulent schemes are measured "by a non-technical standard," and perpetrators are condemned where they fail to reflect "fair play and right dealing in the general and business life of members of society." *U.S. v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980). A scheme to defraud is evaluated as the perpetrator devised it, as a whole, and not analyzed document by document. *See Schmuck v. U.S.*, 489 U.S. 705, 710-11 (1989) (a mailing "need not be an essential element of the scheme;" it is enough that it be "incident to an essential part of the scheme"); *Ketayi v. Health Enrollment Grp.*, 516 F. Supp. 3d 1092, 1123–24 (S.D. Cal. 2021) (in RICO case, finding plaintiffs' receipt of disclosures irrelevant to whether fraud

was pled in light of nature of the claims). As such, Defendants' oral and written misrepresentations are all part of this central scheme, *see, e.g.,* FAC ¶¶ 35, 46-50, 62, 76, and any extrinsic documents introduced by Defendants must be evaluated in the broader context of these allegations.

Moreover, Defendants' effort to narrow the scheme to the Closing Disclosures that DHIM transmitted shortly before finalizing the sale of the homes and mortgages is based on a mistaken belief that a RICO claim predicated on a pattern of mail and wire fraud does not require allegations or proof that (1) the plaintiff relied on fraudulent information transmitted over the mail or wires or that (2) a defendant transmitted fraudulent information over the mail or wires. *See Bridge*, 553 U.S. at 648; *U.S. v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (observing that there is no requirement any defendant be the sender or recipient of the fraudulent communications, as "knowing participants in the scheme are legally liable for their co-schemers' use of the mails or wires"). In other words, a RICO violation does not require proving one's injuries were caused in reliance on fraud sent through the wires. *See Bridge*, 553 U.S. at 649. Rather, the violation is proven where one's injuries were proximately caused by the broader RICO violation. *See id.* at 654-61. *See also Waldrup v. Countrywide Fin. Corp.,* 2018 U.S. Dist. LEXIS 23060, at \*35-36 (C.D. Cal. Feb. 6, 2018) (collecting cases on flexible scheme-based causation theories in RICO).

With that understanding, Defendants' RICO challenges fail.

### 1.     The Families allege a RICO enterprise.

To plead an associated-in-fact enterprise, a plaintiff must show: "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Bui v. Nguyen*, 712 Fed. Appx. 606, 608 (9th Cir. 2017); *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). Defendants challenge the first element only and concede the second and third. Mot. 16-18. But the requirement to prove such an enterprise is "not very demanding" and "the very concept of an association in fact is expansive." *Odom,* 486 F.3d at 548. The Families meet this standard.

Courts in the Ninth Circuit have found a common purpose to be sufficiently pleaded in cases where defendants fraudulently carried out a common business or money-making goal. *See, e.g., Odom*, 486 F.3d at 552 (enterprise element met where two corporate defendants had common purpose of maximizing enrollment revenue via a fraudulent cross-marketing scheme); *Roman v.*

*Chase*, 2010 U.S. Dist. LEXIS 147809, at *9 (D. Nev. Dec. 21, 2010) (finding RICO enterprise met where defendants had "a common purpose of engaging in a course of conduct" to enter into business with the plaintiff based on fraudulent misrepresentations). Here, the Families have alleged D.R. Horton and DHIM share a common purpose to increase their profits by closing as many home sales as quickly as possible at the highest possible price, by misrepresenting the true monthly cost of the homes to homebuyers. FAC ¶ 289. These allegations meet the standard in *Odom*. *Cf. Escue v. United Wholesale Mortg., LLC*, 2025 U.S. Dist. LEXIS 193344, at *43 (E.D. Mich. Sep. 30, 2025) (in mortgage fraud case, finding alleged goal to "sell as many mortgages as possible and thereby maximize the revenue and profitability of the enterprise's members" to satisfy common purpose).

Nevertheless, Defendants say a common purpose is not met, by claiming that "overlap in personnel and organizational structure" is necessary to show common purpose. Mot. at 16. But Defendants' lone case, *U.S. v. Feldman*, 853 F.2d 648 (9th Cir. 1988), is outdated; the Ninth Circuit has since clarified that "an associated-in-fact enterprise under RICO does not require any particular ascertainable or organizational structure, separate or otherwise." *Odom*, 486 F.3d at 551. And *Feldman* does not hold that an overlap in personnel and structure are necessary components. The case concerned seven corporations, each of whom were alleged to have submitted fraudulent insurance claims, and the court found noteworthy that they were all run by at least one of the two individuals also named as defendants. *Id.* at 658. In other words, the overlap in personnel transformed what would have been seven discrete acts of fraud by seven distinct corporations into a common and ongoing operation. Here, both Defendants participated in, and were necessary actors in, each of the Families' closing of their home sales and mortgages.

Next, Defendants argue that their routine business transactions are not a common purpose, ignoring that the Plaintiffs allege the transactions were not routine but fraudulent. In support, Defendants cite two unpublished cases, involving actors with common goals of acting in the regular course of business. Mot. at 16-17 (citing *Stitt v. Citibank, N.A.*, 748 F. App'x 99, 101 (9th Cir. 2018) and *Loomer v. Zuckerberg*, No. 23-3158, 2025 U.S. App. LEXIS 7096, at *4 (9th Cir. Mar. 27, 2025)). But here, the FAC alleges a fraudulent scheme wherein Defendants shared a common purpose of using fraudulent means to close as many homes as quickly as possible at higher prices

than they knew the Families could afford on their monthly budgets. FAC ¶ 289. These plausible allegations include DR Horton training its sales representatives to focus prospective homebuyers on the Target Monthly Payment; DR Horton promising that its lending partner, DHIM, could deliver a monthly mortgage payment that fit within their budget, and DHIM structuring the mortgage loan that deceptively appeared to align with the homebuyers' budgets. And Defendants did this while knowing (1) DHIM would be suppressing property taxes in its estimates; (2) as a matter of consumer behavior, their advertising tactics would prime consumers to disregard any hidden disclosures about the true cost of the home; and (3) by providing artificially low monthly payment estimates, Defendants could capture more of the prospective Homebuyer's budgeted monthly payment in the form of principal, and by extension, charge a higher amount for the home than the homebuyer would otherwise pay. *Id.* ¶¶ 1, 41, 57–58, 60, 62.

**2.      The Families have plausibly alleged DR Horton and DHIM are separate entities distinct from the enterprise.**

A plaintiff must prove the existence of two separate entities: (1) a "person" and (2) an "enterprise" that is not simply the same "person" referred to by a different name. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Thus, individual members of an associated-in-fact enterprise must be "separate and distinct" from each other and from the enterprise itself. *Living Designs*, 431 F.3d at 361–62 (noting there was "no question" that a defendant and its hired law firm were both distinct entities). If the enterprise only depends on the involvement of one participant, it is not "separable from" that participant. *Id.* at 362 (finding enterprise distinct from members because law firms subject to regulatory and ethics rules were not at DuPont's "beck and call"). This requirement is a low bar. *See King*, 533 U.S. at 163.

Defendants claim "distinctness" is not met here, resting on the flawed belief that Plaintiffs' theory turns only on DHIM's fraudulently prepared Closing Disclosures, and not on the broader scheme. Contrary to their argument, Plaintiffs do not seek to hold DR Horton responsible solely because it is DHIM's parent corporation, but for its distinct and essential role in the enterprise.

Here, distinctness exists because neither Defendant would be able to independently deceive homebuyers into believing the monthly mortgage payment on the home would be lower than it

really was, allowing them to sell the homes and mortgages at higher price. Each Defendant is formally and separately incorporated, with "different rights and responsibilities," *King*, 533 U.S. at 163,[4] and each is bound by and must follow its own distinct regulatory and legal obligations, licensing requirements and insurance considerations. *Cf. Living Designs*, 431 F.3d at 362; *see also* FAC ¶ 286. DR Horton cannot originate mortgage loans; DHIM cannot sell homes.

### 3. The Families have plausibly alleged DHIM and DR Horton participated in and controlled the enterprise's affairs.

Overstating the legal standard, Defendants contend that Plaintiffs have not alleged that each Defendant directed the enterprise's affairs. Mot. at 18. The leading case, *Reves v. Ernst & Young*, 507 U.S. 170 (1993), holds that "primary responsibility" is not required, rather one must allege that a defendant played "*some* part in directing the enterprise's affairs." *Id.* at 179. Here, Paragraphs 292 and 293 of the FAC summarizes in detail how DR Horton and DHIM, respectively, played some part in directing the enterprise's affairs.[5] These allegations satisfy *Reves.*

Defendants argue that the allegations show each Defendant was engaged in their own affairs, rather than the affairs of the enterprise. Mot. at 18. But *Reves* does not hold that where a company pursues its own personal profit-seeking motives, it cannot also be pursuing the enterprise's affairs. Rather, the pursuit of personal affairs need only overlap in some way with those of the enterprise. *Reves*, 507 U.S. at 185 (". . .not ***just*** their own *affairs*") (emphasis in bold supplied). *See also Ogdon v. Grand Canyon Univ. Inc.,* 2024 U.S. Dist. LEXIS 57494, at *6 (D. Ariz. Mar. 29, 2024) (rejecting identical argument, stating that "the fact that conduct may be consistent with each participant's own interests does not necessarily mean that the conduct cannot also plausibly reflect the affairs of an enterprise") (internal quotations omitted). And here, both Defendants' profit seeking motives were furthered by their participation the enterprise, which allowed them to increase profits through fraud.

---

[4] Defendants also maintain that the FAC treats the two entities as a single actor, but the FAC details extensively what each Defendant is alleged to have done. *See* FAC ¶¶ 292-93; *see* Section III.A.4.

[5] And these paragraphs are in addition to the myriad specific allegations pleaded throughout and discussed in more detail in Section III.A.4,

Defendants mischaracterize the allegations as mere "garden-variety-marketing arrangement," Mot. at 18, ignoring that the Families allege their arrangement with one another was how they executed their fraud. Instead, Defendants cite *In re WellPoint, Inc.*, 865 F. Supp. 2d 1002 (C.D. Cal. 2011), where in light of the defendant's limited role managing and submitting information in its database, the court found the allegation that it was "involved in decision making" to be conclusory and implausible. *Id.* at 1034. By contrast, here, the coordinated effects to center the homebuyer's monthly budget, *e.g.,* FAC ¶¶ 46-63, and the active participation required of both a home seller and a mortgage lender in the closing process, *id*. ¶¶ 65-85 make it implausible that either Defendant was not involved in decision making. Indeed, as Defendants' case caveats, helping another improve profits is not suspicious "[a]bsent any concrete factual allegations suggesting … [a] … shared a common purpose … to improve those profits *by fraud.*" *Cisneros v. Petland, Inc.,* 972 F.3d 1204, 1213 (11th Cir. 2020) (emphasis added). [6]

### 4.    The Families' wire fraud allegations satisfy Rule 9(b).

Defendants challenge the Families' RICO allegations under Rule 9(b) on three grounds. First, they argue that the FAC pleads only "conclusory allegations of fraud." Mot. at 7. Second, they argue that the allegations against DR Horton are general rather than particularized and conflate DR Horton and DHIM's actions. *Id.* at 7-9. Third, Defendants argue that the allegations against DHIM fail to identify a specific false statement or provide the factual specificity required for facially legitimate transactions. *Id.* at 9. Each challenge fails.

Rule 9(b) requires a party to plead with particularity "the who, what, when, where, and how" of the alleged fraud. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). A complaint satisfies Rule 9(b) provided it is "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge." *Id.*

---

[6] In Defendants' other cited cases, the illegal acts appeared to have been performed by actors acting independently, and there were no allegations of coordination. *See Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854-55 (7th Cir. 2013); *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004). As discussed in the preceding sections, coordination here was essential and adequately alleged.

Predicate acts of racketeering activity include wire and mail fraud, 18 U.S.C. § 1961(1)(B), and those acts, as well as any false representations, should be averred with particularity. *See Odom*, 486 F.3d at 553–54 (9th Cir. 2007); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). In multi-defendant fraud cases however, "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant." *Swartz*, 476 F.3d at 764 (emphasis in the original). Rather, a plaintiff need only identify the role of each defendant in the alleged scheme. *Id.* And the wires themselves need not contain misrepresentations on which any particular plaintiff relied, nor directed to or from a plaintiff; they need only have been used in furtherance of the scheme's common purpose. *See U.S. v. Jinian*, 725 F.3d 954, 962-63 (9th Cir. 2013) (routine interbank wire transmissions clearing unauthorized checks furthered scheme because scheme depended on checks clearing and transactions helped conceal unauthorized payments); *Bridge*, 553 U.S. at 647-50 (mailings to property owners furthered alleged scheme to obtain tax liens, even though plaintiffs neither received nor relied on misrepresentations). Finally, a plaintiff does not have to allege that each defendant committed specific acts of mail or wire fraud. *See, e.g., Fondren v. Schmidt*, 626 F. Supp. 892, 898 (D. Nev. 1986).

As to all claims sounding in fraud against DR Horton, the Families have alleged the details of fraudulent statements made by DR Horton agents in person. The Families allege the "who" (i.e., each named DR Horton loan agents: Skougard FAC ¶ 101; Hinds ¶ 127; Robinson ¶ 155; Santorii-Whitney ¶ 183; Steffner ¶ 218; Radtke ¶ 241); and "what" (each loan agent made promises about how the home would fit into the Families' monthly budget: Skougard ¶ 103; Hinds ¶ 129; Robinson ¶ 157; Santorii-Whitney ¶ 185; Steffner ¶ 219; Radtke ¶¶ 241, 244). The Families also allege the "when" (i.e., the dates of the sales process: Skougard ¶¶ 101, 104; Hinds ¶¶ 126–30; Robinson ¶¶ 155–58; Santorii-Whitney ¶¶ 183–87; Steffner ¶¶ 216–19; Radtke ¶¶ 241–45) and "where" (made in person at DR Horton's offices and properties: Skougard ¶ 101; Hinds ¶ 129; Robinson ¶ 155; Santorii-Whitney ¶ 185; Steffner ¶ 219; Radtke ¶ 241). Finally, the Families state the "how" it was fraudulent (i.e., DR Horton knowingly misrepresented the true monthly payment to make it appear more affordable and fall within the Families' budgets).

Nevertheless, Defendants maintain that fraud is not pleaded with the requisite specificity. **With respect to the "who,"** Defendants wrongly assert that the Families have failed to engage in any differentiation between the Defendants. *See* Mot. at 8–9. But Plaintiffs detail both many acts of fraud generally (including those in the previous paragraph) and wire fraud specifically by identifying the specific Defendant involved. And the Families separately allege conduct and misrepresentations for each Defendant; for DR Horton, building and pricing the homes, FAC ¶¶ 55–56, marketing the homes, *id.* ¶¶ 46–53, training sales agents, *id.* ¶¶ 52–53, soliciting each buyer's target monthly payment and assuring them that the payment would meet their budget, *id.* ¶¶ 54, 129, 185, 241, and coordinating with DHIM on the monthly payment estimates, *id.* ¶¶ 36–40, 62; and for DHIM, reassuring the homebuyer that the payment would meet their budget, *id.* ¶¶ 110, 132, 165, structuring the loan, *id.* ¶¶ 36–40, 56, 90–97, and completing the disclosures around the suppressed figures, *id.* ¶¶ 74–79, 113, 140, 169, 200, 227, 251. *See* FAC ¶¶ 292 (DR Horton), 293 (DHIM). The FAC leaves no doubt as to which Defendant did what.[7]

In contrast, in the paragraphs Defendants identify, the collective term "Defendants" is used because each Defendant is alleged to have engaged in the conduct described. *See* Mot. at 7-8 (identifying FAC ¶¶ 46-50, 53, 57, 61, 110). This RICO case has a narrow focus: two affiliated entities, DR Horton, the homebuilder and its preferred lender DHIM, jointly operated a single scheme to induce homebuyers into home-sale and financing transactions by misrepresenting the monthly payment through a property-tax figure they knew to be suppressed. The narrow scope here means allegations that both Defendants jointly engaged in devising the scheme is not implausible, confusing, or improper. When read in conjunction with the other paragraphs identifying specific acts each performed, each Defendant can understand what is alleged against it.

**With respect to the how,** Defendants claim the FAC does not allege the 'specific content' of any representation. Mot. at 8. Not so. The FAC pleads the specific content of what each Plaintiff

---

[7] To the extent any given example of fraud is missing a specific detail, in RICO cases, a plaintiff need only "identify the role of each defendant in the alleged fraudulent scheme." *See Moore v. Kayport Package Express*, 885 F.2d 531, 540 (9th Cir. 1989). The FAC goes beyond *Moore's* relaxed requirements, detailing, in lettered subparts, the specific acts and steps in furtherance of the scheme attributable to each Defendant. *See* FAC ¶¶ 292 (DR Horton), 293 (DHIM).

was told, along with the material facts Defendants concealed to obscure the true cost of the loan. The Skougard Family's allegations are illustrative:

- DR Horton's sales agent, Mr. Chong, "advised that this was the home that would be within the Skougard Family budget," ie., "$2,100/month or less," FAC ¶ 103;

- When the Skougard Family questioned a loan document reflecting a payment higher than their target, Mr. Chong (with DHIM's employee Mr. Cooper copied on the same email) "assured the Skougard Family that they had run the numbers again and that the monthly payment met their Target Monthly Payment" on July 12, 2023, using the Suppressed Estimate to do so, *id.* ¶110;

- The Closing Disclosure represented that the "Estimated Total Monthly Payment" would be $2,076.24, using the Suppressed Estimate. *Id.* ¶ 113;

- At no point, did any DR Horton representative disclose that the Skougard Family would owe substantial additional property taxes beyond those escrowed, or that their payment would be more than $500 higher than the stated "Estimated Total Monthly Payment," *id.* ¶ 115; and

- Defendants reached the represented payment only by using a suppressed property-tax figure of $1,219.08 per year, despite knowing the true amount, *id.* ¶¶ 111,120–21.

From these allegations, Defendants have everything they need to respond. *Cf. Kearns,* 567 F.3d at 1124. *See also Odom*, 486 F.3d at 553–55.

As to DHIM, Defendants do not argue that the allegations concerning its transmission of the fraudulent closing statements do not satisfy *Kearns*.[8] They instead argue that actual closing statements do not violate applicable law and thus the transmission of them was not fraudulent. But this is both irrelevant and inaccurate. *See* Sec. III.A.6. And the FAC need only identify each Defendant's role, not allege wire fraud acts against every Defendant. Nevertheless, the Families more than meet the standard. *See, e.g.,, id.* ¶¶ 105, 116, 132, 160, 189, 217, 242, 296-300.

Finally, the FAC describes in detail the other acts experienced by the Families: the in-person sales pitches and budget assurances by DR Horton's agents, and the financing assurances by DHIM's loan officers built on the suppressed figure, demonstrating each Defendant's participation in the scheme. *See id.* ¶¶ 44-53, 99-264, 292(b)-(d), 293.

---

[8] Nor could they as each is alleged with detail. *See, e.g.*, FAC ¶¶ 81, 113, 140, 169, 200, 227, 251.

### 5.    The Families' fraud allegations rest on affirmative misrepresentations, not a breach of a duty.

To argue that no acts of wire fraud are alleged, Defendants overstate a Ninth Circuit case, which states that wire fraud "can be premised on either a nondisclosure or an affirmative misrepresentation." *See Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015). As the Supreme Court in *Bridge* and the Ninth Circuit recognize other ways to plead wire fraud,[9] this Court should read *Eller* as supplying examples of wire fraud, not a finite list. Indeed, *Bridge* is still good law. *See, e.g., Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 653 (9th Cir. 2019) (applying *Bridge* in a mail and wire fraud case); *Waldrup v. Countrywide Fin. Corp.,* 2018 U.S. Dist. LEXIS 23060, at *33-38 (C.D. Cal. Feb. 6, 2018) (collecting RICO cases employing *Bridge* in variety of ways).

Nevertheless, the Families' theory of fraud generally is based on affirmative misrepresentations, including half-truths,[10] as they repeatedly allege that Defendants made affirmative oral and written misrepresentations to the Families. *See, e.g,* FAC ¶¶ 36-40, 62, 74-76, 98, 294-301. And as discussed in Section III.A.4–5, some of these representations, such as those in the closing statements, were made over the wires; others are oral misrepresentations that evidence the fraudulent scheme. For example, Defendants primarily solicited first-time homebuyers. FAC ¶¶ 28, 35, 44. They asked each Family how much they could afford as a monthly payment. *Id.* ¶¶ 54. They then affirmatively represented, orally and in writing, that the home and loan would meet that target. *See, e.g., id.* ¶¶ 103, 129, 132, 137, 157, 162, 166, 185, 189, 195, 219, 241-42 (oral assurances to each Family); *Id.* ¶¶ 74, 113, 140, 169, 200, 227, 251 (written assurances to each Family). Defendants gave each Family final Closing Disclosures claiming to be a "statement of final loan terms" that included an "Estimated Total Monthly Payment" that Defendants knew was false. *See, e.g., id.* ¶ 113. They knew their representations were false, because they had themselves

---

[9] The Supreme Court in *Bridge* made clear that a RICO scheme predicated on mail fraud does not require reliance on a fraudulent statement sent through the mail. *See* 553 U.S. at 644-45 (notices sent to property owners in accordance with Illinois law constituted mail fraud where in furtherance of an auction scheme).  The Court construes "identical language in the wire and mail fraud statutes *in pari materia.*" *Kousisis v. U.S.*, 605 U.S. 114, 121 (2025) (internal quotations omitted).

[10] Half-truths are affirmative misrepresentations that are partly true but misleading because of a failure to provide qualifying information. *U.S. v. Jesenik,* 152 F.4th 924, 938-39 (9th Cir. 2025).

generated the true estimate and deliberately used the suppressed figure instead. FAC ¶¶ 36-37, 39, 62, 75-5; *see also id.* ¶¶ 110, 138, 167, 196, 223, 248 (true estimate prepared); *id.* ¶¶ 120, 148, 177, 208, 234, 260 (suppressed figures used). These allegations are more than enough to show a RICO scheme build on affirmative misrepresentations.[11]

Defendants disregard those allegations and controlling law, contending that they are shielded from RICO on a different premise: their extrinsic documents, namely the Loan Estimates, Closing Disclosures, and multiple other pre-closing documents disclosed estimated property taxes and were completed in accordance with TILA and RESPA. Mot. at 10–13, 15. As discussed in Section III.A, the Court cannot consider these extrinsic documents, but even if it could, Defendants do not comply with these laws, *see* Sec. III.A.6, nor does any purported compliance shield them from liability under RICO. Rather than relying on violations of statutory schemes, as Defendants would have it, the Families' RICO claims rest on Defendants' affirmative scheme to defraud, invoking those federal statutes only to establish the standard of care and industry practice against which Defendants' conduct is measured, FAC ¶¶ 90, 93–95, and as predicates for the separate state law counts, *id.* ¶¶ 312, 326–33, 359–368.[12]

**6.    The Families plausibly allege Defendants' non-compliance with TILA and RESPA.**

Defendants argue as an affirmative defense to the RICO claim that they complied with TILA and RESPA. The Court should disregard this argument as it turns on documents not incorporated into the FAC and, separately, because the claims do not hinge on violations of these statutes. Nonetheless, the extrinsic documents show Defendants violated those laws.

---

[11] While Defendants suggest an affirmative misrepresentation claim requires some breach of an independent duty, the law does not go so far. *See U.S. v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (where a scheme to defraud is based on "affirmative, material misrepresentation," a plaintiff need not also prove that defendants' conduct violated a specific statute or regulation). And *Eller* is in accord. There, the plaintiff alleged no affirmative misrepresentation, so the court required an independent disclosure duty as the hook for fraud. 778 F.3d at 1092.

[12] The FAC does separately allege that Defendants failed to disclose material facts, e.g., FAC ¶¶ 111, 142–43, 171–172, 202-203, 229, 253, but it does not rest the wire fraud predicate on those nondisclosures standing alone. These omissions are evidence of a fraudulent scheme and are tethered to Defendants' affirmative statements and half-truths. *See Jesenik*, 152 F.4th at 940.

By way of background, before disclosures can be prepared, RESPA requires mortgage lenders like DHIM to first create the escrow account, including determining the amounts that will be needed to cover applicable property taxes in the forthcoming year, pursuant to 12 C.F.R. § 1024.17 ("Escrow Set-Up Regulation"). Where the forthcoming year's property taxes are not "known," sub-section 1024.17(c)(7) generally permits a lender to use the prior year's property tax assessment. Here, Defendants used the prior's year's assessment, before the home was constructed (the unimproved land), rather than the estimate of the forthcoming year's assessment (the improved land). The FAC alleges Defendants did this to make the monthly payments look as though the cost of the home would fit in homebuyers' budgets; Defendants claim they are not liable because they complied with the Escrow Set-Up Regulation. Mot. at 10.

Defendants are wrong because the amount of property taxes on the improved property was "known" to them. Not only is this alleged in the FAC at ¶¶ 37-39, 62, 75–78, 89, 95, 146, 175, 206, but Defendants admit it in their motion.[13] Mot. at 10-11 (noting that DHIM "include[ed] the estimated improved property tax amounts . . . ."; noting that they disclose "that only 'SOME'" of the total estimated property taxes are included in the estimated escrow amount used for the monthly payment calculation"); *see also id.* at 3. Because Defendants knew the full amount of the coming year's taxes, they were legally required to include that full amount in the payment. They did not.

What's more is that the Escrow Set-up Regulation requires DHIM to set up new homebuyers' escrow accounts using an estimate of the *full* amount that will need to be paid out of the account over the course of the following year, *based on the best available information*. 12 C.F.R. § 1024.17(c)(7) (the lender "*shall* estimate the amount of the escrow items *to be* disbursed"; if the lender "knows the charge for an escrow item in the next computation year, the [lender] *shall* use that amount in estimating disbursement amounts" (emphasis added)); *see also* 12 U.S.C. § 2609(c)(1)(A). Defendants *did* estimate the amount of escrow to be disbursed based on the developed land, but they still used a much smaller figure to set up the escrow accounts.

[13] While the documents attached to Defendants' motion should be disregarded for the purposes of this motion, they make clear that Defendants were fully capable of calculating a mortgage payment using the true estimated taxes, as required by RESPA.

In addition, Defendants violated separate disclosure regulations under RESPA and TILA. These regulations require disclosures to reflect the accurate monthly payment, created through a proper escrow set-up under the Escrow Set-Up Regulation. *See* 12 C.F.R. § 1026.38(l)(7)(i)(A)(5) (violating RESPA/TILA disclosure regulations); *see also* Official Interpretation of 38(c)(1). Because DHIM did not follow the Escrow Set-Up Regulation, its disclosures were also inaccurate, violating the RESPA/TILA disclosure regulations.

While Defendants assert that DHIM *did* correctly disclose the *full* amount of the improved land taxes on page four of the closing disclosure and elsewhere, *see* Mot. at 9-10, 10-11, Defendants only did so because they knew the regulatory scheme required them to disclose such "known" amounts.[14] Nor does this "disclosure" cure the deception. The FAC alleges why this "disclosure" was misleading and not done by other lenders in the industry. FAC ¶¶ 77-70.

Moreover, DHIM was required to disclose estimated property taxes based on "taxable assessed value of the real property . . . securing the transaction after consummation, *including the value of any improvements on the property* or to be constructed on the property, *if known . . . .*" 12 C.F.R. § 1026.37(c)(5) (emphasis added); 15 U.S.C. § 1638(b)(4)(B) (same).[15] If the full, higher property taxes were "known" for the purposes of the disclosure that DHIM claims it made, they were also "known" for the purposes of setting up the escrow account, such that these amounts were required to be included in the escrow account at set-up, and included in the monthly payment in

---

[14] Lenders are *not* permitted to only escrow a portion of a whole number tax obligation, as the escrow *set up* provisions make clear, 12 C.F.R. § 1024.17. And while the *disclosure* regulation allows lenders to use the designation "some," this is limited to circumstances that do not exist here. Namely, this designation is used when there are multiple types of taxes consolidated on the line for taxes and the lender only escrows for one such amount (for instance, the lender escrows county taxes but not city taxes, and both are consolidated on the line for taxes, so the lender discloses that only "some" of the items included in "taxes" are included in the escrow account). *See* Official Interpretation of Paragraph 37(c)(4)(iv). It does *not* allow only a portion of a reasonably known whole number obligation to be paid out of escrow. *See* 80 FR 8767, 8777 (Feb. 19, 2015) ("If the amount disclosed pursuant to § 1026.37(c)(4)(ii) requires the creditor to disclose a description of *more than one amount* and only *some of those amounts* will be paid by the creditor using escrow account funds, the creditor may indicate that only some of those amounts will be paid using escrow account funds, such as by using the word 'some.'" (emphasis added)); *see also* 81 FR 54318 (Aug. 15, 2016) (extending this to taxes, with the same reasoning).

[15] Defendants' argument that they were not *required* to develop new estimates of possible tax increases when the amount is unknown is beside the point, because the amount clearly was in fact known to Defendants.

each disclosure.[16] Of course, at this stage, whether DHIM knew or did not know the improved land tax amount—such that it could have properly included the amount in the escrow account—is an issue of fact. Because the Families plausibly pleaded that DHIM did know this amount, a motion to dismiss cannot be granted on this ground.

Despite their admissions, the allegations in the FAC, and the straightforward language of the statutes and regulations, all of which were updated in response to the national foreclosure crisis in 2008, Defendants point to a nearly 30-year old rulemaking that addressed the wholly different concern of servicers abusively requiring borrowers to deposit excessive amounts into escrow accounts. Mot. at 12-13; 63 Fed. Reg. 3214, 3215 (Jan. 21, 1998). That proposed rulemaking considered whether to allow servicers to require escrow payments for amounts that might be assessed *after* the first year of payments, and decided not to do so. *Id.* at 3215 & n.6. But here, Defendants estimated that the increased tax amount would become due *in the first year*. Even in 1998, RESPA required the first year's payments to be used in the escrow account set up. And, as of 2010, TILA was amended to require that that estimated property taxes must "*include[e] the value of any improvements on the property* or to be constructed on the property, if known." 12 C.F.R. § 1026.37(c)(5); 15 U.S.C. § 1638.[17]

### 7. The Families plausibly allege Defendants' non-compliance with FHA loan regulations.

Again relying on extrinsic documents, Defendants claim they complied with regulations governing loans guaranteed by the Federal Housing Administration ("FHA"). Again, they do not.

---

[16]Similarly, RESPA and TILA require the lender to act in "good faith" and "exercise due diligence," using "the best information reasonably available" when completing disclosures. 12 C.F.R. § 1026.17(c)(2)(i), Official Interpretation of Paragraph 17(c)(2)(i)-1. *See also, e.g.*, 12 C.F.R. § 1026.19(e)(3)(ii) & Official Interpretation to same. These same requirements to use accurate information clearly also apply to RESPA's escrow set-up provisions, 12 C.F.R. § 1024.17.

[17] Defendants citation to an unpublished Georgia decision is likewise inapposite. There, the court explained that it was permissible under RESPA for a "mortgage loan servicer to base the borrower's estimated monthly escrow payment on the property taxes for the preceding year *where taxes for the upcoming year were unknown*." *Clarke v. Fid. Bank*, 2015 U.S. Dist. LEXIS 184104, at *9 (N.D. Ga. June 4, 2015) (emphasis added) (upholding negligence claim). But here, the taxes were known.

Loans guaranteed by the FHA require an escrow account be established for, among other things, "the estimated amount of *all* taxes." 24 C.F.R. § 203.23 (emphasis added). For the purposes of calculating the total mortgage payment on new construction, "property tax estimates *must* be based on the land *and improvements*." FHA Single Family Housing Policy Handbook 4000.1 at 362 (emphasis added). And lenders are required to "collect a monthly amount from the Borrower that will enable it to pay all escrow obligations." *Id.* at 375. Thus, even if Defendants were otherwise permitted to escrow only "some" of the property taxes that they estimated for the coming year (which they are not), for the Skougard, Santorii-Whitney, and Steffner Families, who have FHA loans, Defendants were required to set up the escrow account to cover *all* of the property taxes.

### 8.    Even assuming federal law compliance, regulatory compliance is not a defense to a scheme to defraud.

The fraudulent nature of a scheme is measured by a non-technical standard. *See U.S. v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980). A defendant who tells the truth in a narrow, technical sense can still execute a scheme that, taken as a whole, is fraudulently misleading. *See id.* at 1171 (fraudulent character must consider whether conduct reflects "moral uprightness, of fundamental honesty, fair play and right dealing"); *In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006) (in fraud case, refusing to reverse denial of summary judgment notwithstanding disclosures where "[t]he whole scheme was built on inducing borrowers to sign documents without really understanding the terms"); *Ketayi*, 516 F. Supp. 3d at 1123–24 (in RICO case, finding plaintiffs' receipt of disclosures irrelevant). And regulatory compliance does not provide a safe harbor. *See, e.g., Carey v. J.A.K's Puppies, Inc.*, 763 F. Supp.3d 952, 983–84 (C.D. Cal. 2025) (rejecting defendants' argument that compliance with state law negates fraud allegations). Here, Defendants knew what homebuyers' total monthly payments would be, but instead assured them through written and oral representations that it would be much lower to induce them into the home purchase. *See, e.g.*, FAC ¶¶ 62, 72, 74. Whether or not the suppressed figure technically satisfied federal disclosure requirements does not negate that the Families adequately alleged that Defendants knowingly mislead the homebuyers, which is sufficient to survive a motion to dismiss.

**B.     The Families plausibly allege violations of NDTPA.**

The NDTPA is "a remedial statutory scheme" entitled to "liberal construction to accomplish its beneficial intent." *Poole v. Nev. Auto Dealership Invs. LLC*, 449 P.3d 479, 485 (Nev. App. 2019) (citation omitted). Where an NDTPA claim turns on a "false representation," "[t]he suppression or omission of a material fact is 'equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist.'" *Taddeo v. Taddeo*, 2011 U.S. Dist. LEXIS 103649, at *20 n.3 (D. Nev. Sept. 13, 2011) (quoting *Nelson v. Heer*, 163 P.3d 420, 426 (2007)). Because the Families plausibly alleged each of their independent violations of NDTPA, detailing all elements of these claims, FAC ¶¶ 36-39, 306–16, the motion should be denied.

**1.     The Families plausibly allege violations of NDTPA §§ 598.0915(5), (13) and 598.0917.**

Sections 598.0915(5),[18] (13), and 598.0917 of NDTPA prohibit deceptive trade practices in the sale of "goods" and "services." The Nevada Supreme Court has (in a case against these same Defendants) held that the NDTPA regulates the sale and financing of real property. *See Betsinger v. D.R. Horton, Inc.*, 232 P.3d 433, 436 n.4 (2010) (rejecting an argument that the NDTPA does not reach the sale and subsequent financing of real property).[19]

Despite this binding authority, Defendants cite several federal cases suggesting that "the NDTPA does not apply to mortgage financing." Mot. at 19–20. However, "[i]n a diversity case, the published decisions of the Nevada Supreme Court bind federal courts as to the substance of Nevada law." *U.S. Bank, N.A., v. White Horse Estates Homeowners Ass'n.*, 987 F.3d 858, 863 (9th Cir. 2021). Moreover, the case Defendants cite gives no reason to disregard *Betsinger*; it does not engage in any meaningful analysis, nor does it (or the district court opinion it affirms) mention *Betsinger*.

---

[18] The Families' FAC contained a typographical error incorrectly listing § 598.0915(6) as part of Count II. The intended reference to the NDTPA is § 598.0915(5).

[19] "[M]atters contained within the body of an opinion are equal in significance to the material found within a footnote." *L.V. Transit Sys., Inc. v. L.V. Strip Trolley*, 780 P.2d 1145, 1146 n.2 (1989). The holding is not dicta, since it was necessary to the court's decision. *Cf. Argentena Consol. Min. Co. v. Jolley Urga Wirth Woodbury & Standish*, 125 Nev. 527, 536, 216 P.3d 779, 785 (2009).

*See Dowers v. Nationstar Mortg. LLC*, 852 F.3d 964, 972 (9th Cir. 2017); *Dowers v. Nationstar Mortg. LLC*, 2014 U.S. Dist. LEXIS 179025 (D. Nev. Dec. 31, 2014). Thus, *Betsinger* controls.

### 2. The Families plausibly allege violations of §§ 598.0915(15), 598.0923(1)(e), and 598.0923(1)(c).

Defendants' "goods" and "services" argument does not apply to the remainder of the Families' NDTPA claims, which do not use this language.

Section 598.0915(15) is violated when a person "[k]nowingly make[s] . . . [a] false representation in a transaction." Nev. Rev. Stat. § 598.0915(15). "Knowingly" asks only whether "the defendant is aware that the facts exist that constitute the act or omission," not whether the defendant "intend[ed] to deceive the victim." *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct.*, 514 P.3d 425, 431 (2022) (internal quotations omitted). Here, Defendants knew the true monthly cost of the homes they sold and financed and suppressed it, presenting homebuyers with a lower price within their budget. *See, e.g.*, FAC ¶¶ 36, 103, 110, 113, 129, 132, 137.[20] The FAC also alleges that the cost of the mortgage payment was material. *See, e.g., id.* ¶¶ 31, 35, 309, 313. The claim under § 598.0915(15) should move forward.

Section 598.023(1)(e) prohibits an individual from using "an unconscionable practice in a transaction," defined as a practice that either "[t]akes advantage of the lack of knowledge, ability, experience or capacity of the consumer to a grossly unfair degree" *or* "[r]esults in a gross disparity between the value received and the consideration paid, in a transaction involving transfer of consideration." §§ 598.0923(1)(e); (2)(1–2). The Families have plausibly alleged unconscionable practices under either definition—namely, Defendants are large national companies with superior knowledge taking advantage of first-time homebuyers, *e.g.*, FAC ¶¶ 1, 23, 24, 28, 35, 44 ("Defendants lean on Homebuyers' inexperience in purchasing homes"), 45–48–85, 311. Or, Defendants provided Homebuyers homes that were overpriced, due to Defendants' conduct, *e.g.*, *id.* ¶¶ 89, 289, 292, 315 ("inflated price"). In response, Defendants summarily assert that it is "not

---

[20] Contrary to Defendants' argument, the disclosures were inaccurate and misleading. *See* Sec. III.A.7; III.C; FAC ¶ 309.

'grossly unfair' for a mortgage lender . . . to estimate and accurately disclose property taxes based on the then-current property value . . . ." Mot. at 21. But this is not the scheme the Families allege. Instead, the Families allege that Defendants used their superior knowledge and experience to present the Families with an a falsely suppressed monthly mortgage payment, causing them to pay more for their homes than they otherwise would. The Families thus state this claim.

Last, Defendants argue that the Families failed to allege violations of federal law, such that their claim under § 598.0923(1)(c) should be dismissed. However, as the Families have pleaded, *see* FAC ¶¶ 90–95, 312(d), Sec. III.A.6–7, Defendants have violated federal law, and under the NDTPA, "the violation of a federal regulation amounts to an actionable deceptive trade practice under the DTPA." *MST Mgt., LLC v. Chi. Doughnut Fran. Co., LLC*, 584 F. Supp. 3d 923, 934 n.59 (D. Nev. 2022). The Families thus state a claim under § 598.0923(1)(c) as well.

**C.    The Families plausibly allege violations of the FDUTPA.**

The FDUTPA proscribes any unfair or deceptive acts or practices committed in the conduct of any trade or commerce. *See* Fla. Stat. § 501.204(1). The Florida Families allege that Defendants violated FDUTPA in three distinct ways, each of which, standing alone, is a violation of FDUTPA: (i) Defendants engaged in deceptive acts or practices; (ii) Defendants engaged in unfair acts or practices, committed an unfair, immoral, and unethical practice that is substantially injurious to consumers; and (iii) Defendants engaged in per se violations of rules (FHA, RESPA, and TILA) intended to protect consumers. FAC ¶¶ 317–350.

As to deception, Defendants argue that they provided accurate disclosures. Mot. at 22. But the Florida Families alleged that Defendants used misleading disclosures to obscure the full cost of the homes. FAC ¶ 342. As to unfairness, Defendants claim their practices complied with applicable law and, citing to extrinsic documents that cannot be considered here, *see* Sec. III., they provided extra, supplemental disclosures that were not required by law. Mot. at 22. But for the reasons raised in Section III.A.8, those extra disclosures, even if given weight, do not matter in light of the other allegations, which the Court must accept as true on this motion.

Finally, Defendants' arguments that they did not violate TILA, RESPA, or FHA regulations, and thus did not commit a per se violation of FDUTPA, fail as described above. *See* FAC ¶¶ 90–95, 328–33; *see also* Sec. III.A.6–7.

**D.     The Families plausibly allege negligence under Nevada and Florida law.**

Defendants do not dispute that DR Horton owes a duty of care to homebuyers or that it acted negligently toward the Families. Rather, they argue only that DHIM was not negligent because, they claim, DHIM does not owe a duty of care to homebuyers. Mot. at 23–24. But Florida and Nevada law recognize that a lender like DHIM may owe a duty to a borrower in certain circumstances beyond an ordinary mortgage transaction. *See First Nat. Bank & Tr. Co. v. Pack*, 789 So. 2d 411, 415–16 (Fla. 4th DCA 2001) (close relationship between lender and homebuilder gave homebuyer sense of trust and confidence in lender, which created fiduciary duty from lender to homebuyer); *Mackintosh v. Cal. Fed. Sav. & Loan Ass'n*, 935 P.2d 1154, 1160 (1997) (bank had duty to disclose known defects with house when bank was seller and financier); *see also Cap. Bank v. MVB, Inc.*, 644 So. 2d 515, 520 (Fla. 3d DCA 1994) (lender owed duty to borrower where lender provided extra services and exercised extensive control over transaction, and received greater economic benefit than from typical transaction).[21] The Nevada Supreme Court specifically found that a duty to disclose was created when there was a "special relationship" between the buyer and the seller/lender, where (a) the conditions of the relationship would cause a reasonable person to place special confidence in the seller/lender, and (b) a reasonable lender would know about this confidence. *Mackintosh*, 113 Nev. at 1160.

Here, DR Horton owns DHIM, FAC ¶ 24, and a substantial majority of business involves both entities. *Id*. ¶ 29 (noting in 2024, DHIM provided mortgage loans for 78% of the 89,690 homes closed by DR Horton and nearly all of DHIM's business involves originating loans for DR Horton). Given this close relationship, a reasonable person would place special confidence in DR Horton

---

[21] Defendants argue negligence should be pled under Rule 9(b) because "they effectively operate as negligent misrepresentation claims . . ." Mot. at 22. But the Families have alleged the elements of negligence (i.e., a duty, breach, causation, and damages) and not the elements of negligent misrepresentation. *Cf. Howard v. Murray*, 184 So. 3d 1155, 1167 n. 23 (Fla. 1st DCA 2015) (listing unique elements of negligent misrepresentation claims).

and DHIM when they worked together on home sales and financing, and a reasonable seller or lender would have known about this special trust.

### E.    The Families plausibly allege negligence per se under Nevada law.

Finally, Defendants assert that violation of "an administrative regulation" does not support negligence per se. Mot. at 23. But the Nevada Supreme Court has imposed no such limitation. *Vega v. E. Courtyard Assocs.*, 24 P.3d 219, 221 (2001) (negligence per se claim can rely on "statute, administrative regulation or local ordinance"). Moreover, the Families allege that Defendants violated federal statutes, including RESPA and TILA, and their implementing regulations. *See* Sec. III.A.6; FAC ¶¶ 312(e), 328, 359. Because each of these statutes was enacted specifically for the purpose of protecting consumers like the Families, this claim can proceed.

## IV.  CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss in full. Alternatively, leave to amend should be given.

Dated: June 12, 2026                                 Respectfully Submitted,

                                                    */s/ Kristen G. Simplicio*
                                                    **LEGAL AID CENTER OF SOUTHERN NEVADA**
                                                    Elizabeth Mikesell, Esq. (NV Bar No. 8034)
                                                    *EMikesell@lacsn.org*
                                                    Peter Aldous, Esq. (NV Bar No. 11346)
                                                    *paldous@lacsn.org*
                                                    725 E. Charleston Blvd.
                                                    Las Vegas, NV 89104
                                                    Tel.: (702) 386-1533

                                                    **VARNELL AND WARWICK PA**
                                                    Jeffrey L. Newsome II (*pro hac vice*)
                                                    *jnewsome@vandlwlaw.com*
                                                    Janet R. Varnell (*pro hac vice*)
                                                    *jvarnell@vandlwlaw.com*
                                                    Brian Warwick (*pro hac vice*)
                                                    *bwarwick@vandwlaw.com*
                                                    400 N. Ashley Drive, Suite 1900
                                                    Tampa, FL 33602
                                                    Tel.: 352-753-8600
                                                    Fax: 352-504-3301

                                                    **NATIONAL CONSUMER LAW CENTER**
                                                    Jennifer Spieler Wagner (*pro hac vice*)
                                                    *jwagner@nclc.org*
                                                    Shennan Kavanagh (*pro hac vice*)

*skavanagh@nclc.org*
7 Winthrop Square, 4th Floor
Boston, MA 02110
Tel.: 617-542-8010

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (*pro hac vice*)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Tel.: (202) 998-2299
Fax: (213) 788-4070

**CLARKSON LAW FIRM, P.C.**
Roke Iko (*pro hac vice*)
*riko@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel.: (213) 788-4050

**CLARKSON LAW FIRM, P.C.**
Molly L. Zhu (*pro hac vice*)
*mzhu@clarksonlawfirm.com*
260 Madison Ave., 8th Floor
New York, NY 10016
Tel.: (213) 788-4050

*Attorneys for Plaintiffs and the Putative Class*