Mitchel H. Kider
*pro hac vice*
Timothy P. Ofak
*pro hac vice*
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc. and DHI Mortgage Company, Ltd.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

KIM ROBINSON, BRADLEY SKOUGARD, DESIREE SKOUGARD, TAMMY SANTORII, ARTHUR WHITNEY, MICHELLE HINDS, BRADLEY HINDS, RUSTY STEFFNER, AMIE STEFFNER, and GAGE RADTKE, on behalf of themselves, and on behalf of all others similarly situated,

        Plaintiffs,

   vs.

D.R. HORTON, INC. and DHI MORTGAGE COMPANY, LTD.,

        Defendants.

Case No: 2:25-cv-02394-RFB-NJK

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**(ORAL ARGUMENT REQUESTED)**

Plaintiffs' Opposition fails to support their claims that Defendants formed a RICO enterprise to defraud homebuyers.  It does not distinguish the alleged enterprise engaging in fraud from Defendants' ordinary, lawful affiliate business relationship and it alleges fraud based only on vague assurances regarding homebuyers' budgets that are not pleaded with particularity.  And as a threshold matter, Plaintiffs cannot retreat from the documents attached to Defendants' Motion to Dismiss because the FAC depends on them and Plaintiffs do not challenge their authenticity.

Based on Plaintiffs' Opposition, their entire FAC rests on a small series of interactions in which D.R. Horton sales representatives and DHIM loan officers allegedly made vague assurances that Plaintiffs' monthly payments would fit within their budgets.  These allegations are insufficient to constitute a RICO enterprise because they: (1) do not establish that Defendants associated for the common purpose of defrauding homebuyers distinct from their pre-existing ordinary business relationship; (2) improperly infer that Defendants formed an ongoing organization that functioned as a common unit (the alleged enterprise) based only on a handful of alleged interactions in which line-level employees made vague assurances about monthly payments fitting within budgets (the alleged pattern of racketeering activity); and (3) do not plead particular details describing how each Defendant directed the enterprise's affairs as opposed to directing its own affairs.

Likewise, these vague assurances regarding monthly payments, which Plaintiffs assert without context or details, are insufficient to plead wire fraud with particularity.  And the FAC does not adequately allege any other affirmative material misrepresentation.  In fact, the FAC admits that Defendants furnished several disclosures providing the monthly payment and property tax estimates that were allegedly concealed.

Finally, Plaintiffs' state law claims and alleged violations of TILA, RESPA, and FHA requirements fail as a matter of law because they overread the governing case law and regulations and offer only conclusory allegations in support thereof.  For the reasons stated herein, as well as those found in Defendants' Motion to Dismiss, Plaintiffs' FAC should be dismissed in its entirety.

**A.  <u>The Court Should Consider the Documents Attached to the Motion to Dismiss</u>**

Plaintiffs refer to Defendant's Motion as a "bait-and-switch," Opp. at 1, yet ignore that the FAC removed from the original Complaint references to documents that are fatal to their claims

1

and that they now hope the Court will ignore.  The Court should consider the documents attached to Defendants' Motion because they were referenced in the original Complaint and Plaintiffs cannot simply remove these references from the FAC once they realize that the documents undercut their claims.  Mot. at 5-6.  Courts do not countenance "strategic omission of pertinent facts that may undermine [a plaintiff's] claims" by filing an amended complaint that omits the fatal facts previously pleaded.  *Shellenberger v. AIG WarrantyGuard, Inc.*, No. 24-657, 2024 U.S. Dist. LEXIS 163759, at *32 (W.D. Wash. Sep. 11, 2024).  Plaintiffs do not respond to this argument, and therefore, they have conceded it.  *Lundstrom v. Young*, 857 F. App'x 952, 955 (9th Cir. 2021).

Plaintiffs' claim that "Defendants do not identify any paragraphs in the FAC that incorporate" the attached documents or "explain how Plaintiffs' claims ... depends on them," Opp. at 4, is demonstrably false.  Defendants cited numerous references to these loan documents in the FAC.  Mot. at 5.  A document may also be incorporated by reference when "the plaintiff's claim depends on the contents of a document ... even though the plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Further, Plaintiffs' assertion that the documents cannot be considered because they "merely create[] a defense to the well-pleaded allegations," Opp. at 4, misstates the documents' purpose.  The attached documents emphasize that the claims were never well pleaded to begin with because they show that Plaintiffs received the supposedly concealed future monthly payment estimates and future property tax estimates in multiple legally required disclosures as well as in additional voluntary disclosures.  The FAC describes Plaintiffs' mortgage loan origination processes from start to finish, and Plaintiffs' Opposition reiterates that an allegedly fraudulent transaction must be evaluated "as a whole."  Opp. at 5, 19.  The attached documents simply allow the Court to consider the transaction "as a whole."  *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("[T]o prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based, a court may consider a writing referenced in a complaint but not explicitly incorporated therein."  (Citation modified).).

Finally, although Plaintiffs observe that documents may be incorporated by reference only "if authenticity is not disputed," Opp. at 4-5, they do not actually dispute the attached documents'

authenticity.  Instead, Plaintiffs contend that "Defendants supply no authenticating evidence that the electronic signatures on the extrinsic documents were signed by each Plaintiff on the dates therein" and that Plaintiffs may have received other unspecified documents.  *Id.*

This elusive non-denial of the attached documents' authenticity is insufficient to prevent the Court from considering them.  *See Al-Bustani v. Alger*, No. 22-5238, 2023 U.S. Dist. LEXIS 19611, at *9-10 (W.D. Wash. Feb. 6, 2023) (rejecting challenge to attached document's authenticity on basis that document may have been "incomplete and lack[ed] assurances that [it was] a complete, accurate, unedited record" because the challenge was "conclusory and generalized" and did "not identify specific facts in support").  No legal requirement exists that a party *affirmatively authenticate* documents to be incorporated by reference.  *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (Court "may assume that ... contents [of document to be incorporated by reference] are true for purposes of a motion to dismiss under Rule 12(b)(6).").

**B.  Plaintiffs' Conclusory Allegations Fail to Plead a RICO Enterprise**

Plaintiffs' focus on RICO's broad scope, Opp. at 5-6, deflects from the reality that RICO claims "are notoriously difficult to plead plausibly and ... are rarely successfully pleaded."  *Harvey v. Maxwell & Morgan P.C.*, No. 24-276, 2024 U.S. Dist. LEXIS 159478, at *14 (D. Ariz. Sep. 5, 2024) (alteration in original) (quotations omitted).  Additionally, Rule 9(b)'s heightened pleading standard must be strictly enforced in RICO cases because treble damages might be awarded and the defendant might be stigmatized.  *See Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1988) (On a motion for default judgment, the court must scrutinize a RICO claim given the potential penalties and stigma.).

*1.  Plaintiffs Fail to Plead a Common Purpose*

Plaintiffs' allegations of the alleged RICO enterprise's common purpose reduce to a conclusory statement that D.R. Horton and DHIM sought to increase home sales and mortgage originations through fraud.  Opp. at 16.  "Courts routinely reject attempts to characterize routine commercial relationships as RICO enterprises."  *Fraser v. Team Health Holdings, Inc.*, No. 20-4600, 2022 U.S. Dist. LEXIS 60544, at *27 (N.D. Cal. Mar. 31, 2022).  When "the individual constituents of an asserted enterprise are alleged only to have conducted the 'regular' business[]

of the corporate entity or business in their own interests, those allegations are insufficient to support a RICO enterprise." *In re Juul Labs, Inc.*, 497 F. Supp. 3d 552, 599 (N.D. Cal. 2020).

Accordingly, the addition of a conclusory statement that employees are making fraudulent misrepresentations to consumers does not transform a legally deficient allegation of ordinary business conduct into a plausible allegation of a fraudulent common purpose. For example, the plaintiffs in *Fraser* "describe[d] the role and business interactions among the entities and assert[ed] that each role was done to further the fraudulent scheme." 2022 U.S. Dist. LEXIS 60544, at *30. The court concluded that these "allegations [did] not establish how these relationships go beyond routine commercial dealings to show a common purpose to commit fraud." *Id.* So, too, the FAC's allegations of each Defendant's role in the enterprise, ¶¶ 292-93, simply describe the steps that any homebuilder and mortgage lender would take in a home sale financed using a mortgage loan.

Plaintiffs contend that their allegations resemble those the Ninth Circuit held to be sufficient in *Odom v. Microsoft Corporation*, 486 F.3d 541 (9th Cir. 2007). However, the allegations of a fraudulent common purpose in *Odom* were described in significantly greater detail than the FAC's conclusory allegations of routine business activity. The plaintiffs in *Odom* pleaded a detailed scheme in which Best Buy sold certain "trial" compact discs with Microsoft software and secretly transmitted to Microsoft the customer's data (including debit or credit card information) when the store clerk scanned the compact disc at checkout. *Id.* at 543. Without the customer's knowledge or permission, Microsoft would sign the customer up for its internet service and bill the customer's debit or credit card. *Id.* In exchange, Microsoft invested $200 million in Best Buy. *Id.*

The Ninth Circuit held that the plaintiffs had adequately alleged "a common purpose of increasing the number of people using Microsoft's Internet service." *Id.* at 552. Unlike here, Best Buy's actions to surreptitiously increase the number of Microsoft subscriptions were not routine operations. Likewise, Microsoft's significant investment in Best Buy was not a routine operational expense. "Whereas the plaintiffs in *Odom* set forth allegations of a quid pro quo to establish the requisite common purpose," the FAC includes "no such allegations here." *In re Jamster Mktg. Litig.*, No. 1751, 2009 U.S. Dist. LEXIS 43592, at *18 (S.D. Cal. May 22, 2009). Absent any alleged common purpose to defraud homebuyers, D.R. Horton would still sell homes and DHIM

would still originate mortgages as part of their pre-existing affiliated business relationship.  *See* FAC ¶¶ 25-30, 44-56, 64-85.

In response, Plaintiffs contend that their case is different from other RICO cases "involving actors with common goals of acting in the regular course of business" because the FAC alleges that the transactions here "were not routine but fraudulent."  Opp. at 7.  Yet the complaints in the cases that Plaintiffs try to distinguish made the same conclusory allegations of fraud.  *See, e.g.*, *Stitt v. Citibank, N.A.*, No. 12-3892, 2015 U.S. Dist. LEXIS 1120, at *13 (N.D. Cal. Jan. 6, 2015) (Allegations that defendants "formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses" were conclusory.).  Thus, the FAC "lacks factual allegations that show that the ... enterprise members *associated together ... for* that alleged common purpose," as opposed to their pre-existing affiliate relationship.  *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1089 (N.D. Cal. 2013).

2. *Plaintiffs Conflate a RICO Enterprise with a Pattern of Racketeering Activity*

Plaintiffs improperly infer that Defendants formed an ongoing organization functioning as a common unit (the alleged enterprise) based only on a handful of alleged interactions with line-level employees (the alleged pattern of racketeering activity).  But "the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other."  *Boyle v. U.S.*, 556 U.S. 938, 947 (2009) (quotations omitted).  Although Plaintiffs describe their alleged individual interactions with D.R. Horton sales representatives and DHIM loan officers, these interactions represent only "isolated incidents" that do not evidence the existence of an ongoing organization functioning as a common unit.  *See Marshall v. Goguen*, 604 F. Supp. 3d 980, 1013 (D. Mont. 2022).  Plaintiffs' contrary assertion that *U.S. v. Feldman*, 853 F.2d 648 (9th Cir. 1988), is outdated is incorrect.  *Feldman* did not explicitly hold that a particular structure is necessary; rather, it held only that the defendant's businesses were sufficiently "interconnected as to constitute a single business operated under various names to suit [his] purposes."  *Id.* at 658.  An enterprise need not have any particular "ascertainable structure," *Odom*, 486 F.3d at 551, but it must maintain some structural elements (beyond an affiliate relationship) to operate as an ongoing organization functioning as a common unit.

5

   3.   *Plaintiffs Do Not Plead How Each Defendant Directed the Enterprise's Affairs*

Plaintiffs' contention that both Defendants must have been involved in the enterprise's decision making because they "coordinated" their activities,[1] Opp. at 10, is a non-sequitur.  RICO enterprises require "that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Participation requires that each member of the enterprise "have some part in directing [the enterprise's] affairs." *Id.* at 179.  Defendants' employees' interactions pursuant to their pre-existing business relationship are not the same as direction of the affairs of a distinct enterprise. *See Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2020) (determining that performance of services pursuant to pre-existing contractual relationship did not constitute direction of RICO enterprise).  Interaction between a homebuilder and a mortgage lender does not inherently imply that either entity is directing the other, let alone directing a distinct enterprise. *See Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (Although Defendant was involved in part of the alleged enterprise, her conduct did not include giving or taking direction.).

## C.  **Plaintiffs Fail to Allege Wire Fraud or Other Fraudulent Conduct**

Plaintiffs' Opposition expressly disclaims reliance on wire fraud RICO predicate acts premised on omission or breach of a disclosure duty.  Opp. at 14-15.  To the contrary, the Opposition states that the alleged wire fraud is premised solely on affirmative misrepresentations.  Opp. at 14-15.

   1.   *Defendants' Compliance with TILA/RESPA Highlights Plaintiffs' Inability to Plead Fraud*

Defendants' compliance with TILA, RESPA, and their implementing regulations is not merely an "affirmative defense" to fraud as Plaintiffs suggest.  Opp. at 15.  Rather, Plaintiffs cannot plead any misrepresentation because they received complete information regarding their estimated monthly payments and property taxes in the legally required disclosures.

Plaintiffs try to further distance themselves from TILA and RESPA by contending that their wire fraud claims do not turn on whether Defendants complied with these statutes and their

---

[1] Plaintiffs contend that *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020), and *Ogdon v. Grand Canyon Univ. Inc.*, No. 22-477, 2024 U.S. Dist. LEXIS 57494, at *5-6 (D. Ariz. Mar. 29, 2024), support this claim, but these cases addressed whether plaintiffs had pleaded a common purpose, so they are not relevant to whether each member directed the enterprise's affairs.

implementing regulations. Opp. at 15. This statement is surprising because their proposed class definition turns on whether a borrower's "final Closing Disclosure sets forth an Estimated Total Monthly Payment that includes only a portion of the total anticipated property taxes" without reference to affirmative material representations by Defendants' employees. FAC ¶ 265. When the information in the CDs presented estimated monthly payment and property tax information in the manner provided for by law, this would put an end to their putative class action.

2. *Statements Based on RESPA-Compliant Escrow Calculations Were Not Fraudulent*

Plaintiffs conflate an "estimate" with information that is "known" to contend that DHIM *knew* unassessed future property tax amounts because it could *estimate* these amounts. Opp. at 16. Under TILA regulations, a lender must calculate and disclose on the CD estimated escrow and property tax amounts according to RESPA regulations, 12 C.F.R. § 1024.17. Plaintiffs' Opposition quotes language from these regulations out of context to support their incorrect interpretation. Opp. at 16-17. Examining the full text of these regulations provides critical context:

> To conduct an escrow account analysis, the servicer shall estimate the amount of escrow account items to be disbursed. If the servicer knows the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts. If the charge is unknown to the servicer, the servicer may base the estimate on the preceding year's charge, or the preceding year's charge as modified by an amount not exceeding the most recent year's change in the national Consumer Price Index for all urban consumers (CPI, all items). In cases of unassessed new construction, the servicer may base an estimate on the assessment of comparable residential property in the market area.

12 C.F.R. § 1024.17(c)(7). The RESPA regulations refer in some places to information that is an "estimate" and in others to information that is "known." It is a basic principle of statutory and regulatory interpretation that the use of different words in the same statute demonstrates an intent for those words to convey different meanings. *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). A lender can "estimate" the property taxes that might be due in the future based on the improved property value. But making such an estimate is not the same as "knowing" the actual amount of property taxes due after the local taxing authority reassesses the property's value.

Plaintiffs admit that the actual property tax values in effect at the time DHIM performed its escrow calculations were based on the unimproved property values. Opp. at 16. And they do not

7

claim that the local taxing authorities had already assessed Plaintiffs' property tax rates based on the improved property values but that such rates had not yet become effective. Because the future improved property tax amounts did not exist yet, DHIM could not have known such amounts.

Contrary to Plaintiffs' contention, the RESPA regulations do not allow a lender to use its best estimate of future property taxes if that amount is not yet known. Instead, the lender is to base the amount of property taxes on the prior year's charge, as DHIM did. Because the CD regulations incorporate RESPA's calculation methodology, the escrow calculation listed on the CD must reflect the prior year's property taxes. RESPA prohibits collection of escrow amounts exceeding the amounts calculated using this methodology; DHIM was not free to substitute a higher amount.

Plaintiffs acknowledge that DHIM provided them with estimates of potentially higher future property taxes on another page of the CD but contend that "Defendants only did so because they knew the regulatory scheme required them to disclose" such estimates. Opp. at 17. Plaintiffs' suggestion that providing required disclosures—including the future property tax estimates that Plaintiffs complain were concealed—is somehow injurious emphasizes their position's flaws.

In a final attempt to evade RESPA, Plaintiffs point to FHA regulations providing that lenders should amortize a borrower's projected monthly payment to include "*all* taxes." Opp. at 18-19 (quoting 24 C.F.R. § 203.23). But this provision does not provide any additional detail as to how a lender should calculate "all taxes." Instead, the FHA regulations expressly direct that a lender "shall use the procedures set forth in" the RESPA regulation quoted above. 24 C.F.R. § 203.550(a). Plaintiffs do not reconcile their position with this explicit directive. Nor do they explain why an ambiguous reference to "all taxes" in a provision regarding payment amortization should override the regulation's express directive to use the calculations in the RESPA regulations.

3.   *Plaintiffs Cannot Predicate Fraud on Alleged Vague Assurances*

Plaintiffs now contend that their wire fraud claims are predicated solely on affirmative misrepresentations in the form of vague assurances regarding their budgets made by D.R. Horton sales representatives and DHIM loan officers. Plaintiffs maintain that D.R. Horton sales representatives with whom they interacted offered general assurances that their "home[s] would fit into [their] monthly budget[s]" or that their "monthly payment[s]" would "fall within [their]

8

budgets." Opp. at 11. Likewise, they maintain that DHIM loan officers "reassure[d] homebuyers that the monthly payment[s would] fit in their budget[s]." Opp. at 2. Plaintiffs contend that these alleged assurances constitute fraudulent misrepresentations because their monthly payments later increased after their property taxes were reassessed, even though their monthly payments were initially in the amounts expected. These alleged assurances, however, lack the specificity and context necessary to constitute affirmative misrepresentations. A generalized assurance is not a specific, measurable representation that a plaintiff can demonstrate to be false. *See Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 234 (N.D. Cal. 2019) (To serve as a predicate for fraud, a representation "must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." (Quotations omitted).).

Plaintiffs do not claim that they understood these assurances to be representations that their monthly payments would never exceed the amounts for which they budgeted. *See United Food & Com. Workers Cent. Pa. v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (dismissing RICO claims when "complaint did not identify statements or representations ... that were literally false or misleading at the time they were made"). Indeed, Plaintiffs have acknowledged that they understood that their property taxes and monthly payment amounts "'can increase' over time" and that there would be "longer-term increases" in these amounts. Compl. ¶ 63, Dkt. 1.[2] Thus, Plaintiffs cannot predicate their fraud claims on vague assurances, particularly when they acknowledge receiving disclosures with the very information that they claim was concealed.

**D. Plaintiffs Fail to Plead Nevada and Florida State Law Claims[3]**

*1. Plaintiffs Overread* Betsinger *to Assert That Its Holding Applies to Mortgage Loans*

Plaintiffs' NDTPA claims under sections 598.0915(6), (13) and 598.0917 fail because these sections apply only to "goods" or "services" and a mortgage loan is neither a "good" nor "service." Here, all the alleged misrepresentations relate to Plaintiffs' mortgage loans. Plaintiffs respond by erroneously asserting that the Nevada Supreme Court held in *Betsinger* that these NDTPA sections

---

[2] As with the documents that the original Complaint referenced, the Court can consider this statement by Plaintiffs, which the FAC likewise excluded.

[3] Because Plaintiffs represented that they will voluntarily dismiss their unjust enrichment claims and Florida negligence per se claims, Opp. at 4 n.1, Defendants do not address these claims further.

9

"regulate[] the sale and financing of real property." Opp. at 20 (citing *Betsinger v. D.R. Horton, Inc.*, 232 P.3d 433, 436 n.4 (Nev. 2010)). But *Betsinger* held only that the NDTPA sections referring to "goods" or "services" apply to "the deceptive sale of real property." 232 P.3d 433, 436 n.4. *Betsinger* did not address whether these NDTPA sections apply to the **financing** of real property (including mortgage loans). *See id.* The Ninth Circuit later confirmed in *Dowers v. Nationstar Mortgage, LLC* that "the Supreme Court of Nevada ha[d] not settled" whether these NDTPA sections apply to the financing of real property. 852 F.3d 964, 972 (9th Cir. 2017).

The Ninth Circuit's *Eerie* analysis concluded "that the Supreme Court of Nevada would hold that real estate loans **do not** fall within the [N]DTPA." *Id.* (emphasis added). Consistent with this holding, a subsequent Nevada Supreme Court opinion explicitly rejected the argument that sections 598.092(5)(c) and 598.0923(2) applied to a mortgage loan transaction, because the transaction did not involve the "sale or lease of goods or services." *Noonan v. Bayview Loan Servicing, LLC*, 438 P.3d 335 (Table) (Nev. Apr. 8, 2019).

2. *Plaintiffs Fail to Plead NDTPA and FDUTPA Deception Claims*

Plaintiffs fail to plead NDTPA and FDUTPA deception claims with particularity because, as explained earlier, Defendants provided Plaintiffs with information about monthly payments over the lives of their loans by disclosing both current taxes and estimates of future taxes. In response, Plaintiffs contend that Defendants violated the NDTPA because they "knew the true monthly cost ... and suppressed it." Opp. at 21. And Plaintiffs contend that Defendants violated FDUTPA because they "used misleading disclosures to obscure the full cost of the homes." Opp. at 22.

Plaintiffs' own allegations bely their claims that Defendants "suppressed" or "obscure[d]," Opp. at 22, monthly payment estimates based on improved property values. *See, e.g.*, FAC ¶ 110 (Skougard Plaintiffs viewed a document disclosing higher future monthly payment estimates.). The FAC also does not allege that either Defendant represented that Plaintiffs' monthly payments would remain the same throughout the lives of their loans. And generalized allegations that certain employees of Defendants assured Plaintiffs regarding their budgets are legally insufficient to plead deception with particularity as required by Rule 9(b). *See Horner v. Mortg. Elec. Registr. Sys., Inc.*, No. 12-269, 2012 U.S. Dist. LEXIS 77584, at *6-7 (D. Nev. June 5, 2012), *aff'd*, 711 F.

App'x 817, 818 (9th Cir. 2017) (NDTPA claim based on "preparing and executing the false and impossible assignment" failed to plead deception with particularity.); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1289-90, 93 (11th Cir. 2025) (affirming dismissal of FDUTPA claim for failure to identify with particularity allegedly deceptive advertisements posted by defendant).

Courts have rejected similar claims. For example, the court in *Hale v. Burkhardt* affirmed dismissal of the plaintiff's claim that the defendant tried "to obtain [his] services by means of some unspecified fraud or 'false pretense.'" 764 P.2d 866, 870 (Nev. 1988). As the court explained, "vague and conclusory" allegations that the defendant "used 'false or fraudulent pretenses [sic], representations or promises, and ... knowingly and willfully [used] untrue statements of material facts' to induce [the plaintiff] to perform services in the amount of $182,250.00" were not legally actionable "*specific false representations*." *Id.* (some alterations in original).

3. *Plaintiffs Fail to Plead NDTPA Unconscionability and FDUTPA Unfairness Claims*

Plaintiffs fail to plead with particularity NTDPA unconscionability and FDUTPA unfairness claims. Plaintiffs assert that the FAC plausibly alleges NDTPA unconscionability claims based on allegations that "Defendants are large national companies with superior knowledge taking advantage of first-time homebuyers." Opp. at 21. But the supporting allegations that they cite are conclusory. *See* FAC ¶¶ 35, 44. For example, the FAC alleges that "Defendants lean on Homebuyers' inexperience in purchasing homes by designing a one-stop shopping process that funnels Homebuyers through to closing." *Id.* ¶ 44. This allegation does not describe with particularity how Defendants took advantage of Plaintiffs purported lack of knowledge "to a grossly unfair degree," Nev. Rev. Stat. § 598.0923(2)(b)(1). Affiliated companies with significant knowledge and experience in their respective industries do not inherently take advantage of a consumer when they jointly market and sell their products or services to that consumer.

Plaintiffs' assertion that "Defendants provided Homebuyers homes that were overpriced," Opp. at 21, is also incorrect. The FAC does not allege that there was a "gross disparity," Nev. Rev. Stat. § 598.0923(2)(b)(2), between any of the purchase prices of Plaintiffs' homes and the homes' fair market values. Likewise, the FAC does not allege that Plaintiffs' loan interest rates

grossly exceeded fair market rates or that their property taxes grossly exceeded the rates paid by other area residents or entitled them to grossly inferior services than other area residents received.

Finally, Plaintiffs' assertion that "regulatory compliance is not a defense to a scheme to defraud," Opp. at 19, confuses unfairness with deception. An unfair act or practice under FDUTPA is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious." *Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. Dist. Ct. App. 2001) (quotations omitted). DHIM's compliance with federal mortgage laws shows that it did not offend public policy or otherwise act immorally, unethically, or oppressively.

### 4. *Plaintiffs Fail to Plead Negligence Under Nevada Law and Florida Law*

The FAC does not identify the source of the purported duty of care that Defendants allegedly breached. In their opposition, Plaintiffs now try to claim that, because of Defendants' "close relationship, a reasonable person would place special confidence in DR Horton and DHIM when they worked together on home sales and financing." Opp. at 23-24. Yet the FAC includes no allegation of Plaintiffs' "special confidence" in Defendants. Plaintiffs' theory also amounts to a blanket rule that a lender regularly providing services in connection with an affiliated company *always* owes a duty of care to the borrower. Nowhere does the case law in either state suggest such a broad rule. Regardless, this argument would apply only to DHIM, as a lender. The cases that Plaintiffs cite do not address the duties of a homebuilder.

Finally, Plaintiffs erroneously cite *Vega v. East Courtyard Associates*, 24 P.3d 219, 221 (Nev. 2001), for the proposition that a negligence per se claim can be based on an administrative regulation (such as the TILA and RESPA regulations). Opp. at 24. *Vega* held only that "violation of a building code provision may serve as the basis for an action brought under a negligence per se theory." 24 P.3d at 222. In so holding, the court explained that a building code "is not administrative in nature"—that is, not akin to an administrative regulation. *Id.* at 221. The Nevada Court of Appeals—relying on prior Nevada Supreme Court precedent—subsequently reaffirmed that breach of an administrative regulation cannot constitute negligence per se. *See Wiltse v. LoanCare, LLC*, No. 88420, 2025 Nev. App. Unpub. LEXIS 579, at *8 (Nev. App. Oct 27, 2025).

For these reasons and the reasons stated in the Motion, the FAC should be dismissed in full.

12

Dated: June 26, 2026

*/s/ Timothy P. Ofak*
Mitchel H. Kider
*pro hac vice*
Timothy P. Ofak
*pro hac vice*
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036-1609
Tel: (202) 628-2000
kider@thewbkfirm.com
ofak@thewbkfirm.com

Sharon A. Bauman
NV Bar No. 8274
PLANTE HUGUENIN LEBOVIC KAHN LLP
8345 West Sunset Road, Suite 160
Las Vegas, NV 89113
Tel: (702) 470-0220
sbauman@phlklaw.com

*Attorneys for Defendants D.R. Horton, Inc. and DHI Mortgage Company, Ltd.*

13

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 26, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Timothy P. Ofak*

Timothy P. Ofak